1
2
3
4
5
6
7
8
9

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| CHRISTOPHER BROWN, SCOTT GRAEBER, LAURA LOES, LETICIA SHAW, and DAVID ATWOOD, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AMAZON.COM, INC., a Delaware corporation,<br><br>Defendant. | No.<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

CLASS ACTION COMPLAINT

HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................1

II.   JURISDICTION ...............................................................................10

III.  VENUE ............................................................................................11

IV.   PARTIES .........................................................................................11

    A.    Plaintiffs .................................................................................11

    B.    Defendant Amazon .................................................................13

V.    STATEMENT OF FACTS ...............................................................13

    A.    MMAs reduce online retail competition and raise consumer prices.....................13

    B.    Amazon's MMAs reduce competition on Amazon Marketplace. ........................16

    C.    The two-sided Online Retail Marketplace Market is the relevant market to assess the anticompetitive impact of Amazon's MMAs.....................25

        1.    The Online Retail Marketplace Market does not include brick-and-mortar retailers. ...........................................28

        2.    The Online Retail Marketplace Market does not include single-merchant e-commerce sites. ..............................31

        3.    Social media, comparison shopping sites, and promotional sites are not interchangeable with online retail marketplaces. ...............................................33

        4.    Online marketplaces with limited categories of goods are not reasonably interchangeable with broad-based online marketplaces. ...........................................34

    D.    Amazon's MMAs harm both sides of the Online Retail Marketplace Market and create barriers to competition from other online retail marketplaces. ...........................35

    E.    Amazon dominates the Online Retail Marketplace Market.....................37

        1.    Online retail marketplaces, like Amazon Marketplace, have powerful network effects. ...........................................38

        2.    Amazon does not face any serious competitive threat to its dominance in the Online Retail Marketplace Market. ...............................41

    F.    Amazon alternatively dominates the Online Retail Market or submarkets for specific product categories sold online. .........................43

HAGENS BERMAN

VI.     INTERSTATE TRADE AND COMMERCE ....................................................44

VII.    CLASS ACTION ALLEGATIONS ...............................................................44

VIII.   ANTITRUST INJURY AND STANDING .....................................................46

IX.     CAUSES OF ACTION ...................................................................................47

FIRST CAUSE OF ACTION VIOLATION OF 15 U.S.C. § 1 ...................................47

SECOND CAUSE OF ACTION VIOLATION OF 15 U.S.C. § 2 ..............................48

THIRD CAUSE OF ACTION VIOLATION OF CALIFORNIA'S
        CARTWRIGHT ACT, CAL. BUS. & PROF. CODE § 16700, ET SEQ.
        (*PER SE* VIOLATION ON BEHALF OF THE CALIFORNIA CLASS) ......................49

FOURTH CAUSE OF ACTION VIOLATION OF MD. CODE ANN., COM.
        LAW § 11-201, *ET SEQ*. (*PER SE* VIOLATION ON BEHALF OF THE
        MARYLAND CLASS)....................................................................................50

JURY TRIAL DEMANDED ....................................................................................52

PRAYER FOR RELIEF ...........................................................................................52


HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon the investigation made by and through their attorneys:

## I.   INTRODUCTION

1.      In *Leegin Creative Leather Products v. PSKS, Inc.*, the Supreme Court warned that that "the potential anticompetitive consequences of vertical price restraints must not be ignored or underestimated."[1] The Court emphasized that there is a significant "likelihood that the restraint facilitates" anticompetitive purposes when a dominant retailer is "the impetus for a vertical price restraint[.]" In particular, the Court warned that a dominant retailer could pressure a manufacturer into adopting minimum retail prices and "if the manufacturer believes it needs access to the retailer's distribution network," it "might consider it has little choice but to accommodate the retailer's demands for vertical price restraints."[23] In that situation, "the manufacturer does not establish the practice to stimulate services or to promote its brand"—procompetitive purposes— but rather to give an "inefficient retailer[] higher profits," while "[r]etailers with better distribution systems and lower cost structures would be prevented from charging lower prices."[4]

2.      These concerns are precisely encapsulated by Amazon's anticompetitive minimum margin agreements (MMAs) with its suppliers, which Amazon uses to prevent other online retailers from offering the same product Amazon sells at a lower price. They violate Section 1 of the Sherman Act's prohibition against price-fixing by setting a *de facto* minimum retail price for the products under agreement. By restraining competition from Amazon's online retail rivals, these agreements injure consumers by artificially raising online retail prices for thousands of retail

---

[1] 551 U.S. 877, 893 (2007).

[2] *Id.* at 893-94.

[3] *Id.* at 897-98.

[4] *Id.* at 893.



brands that Amazon sells. This conduct is a naked restraint under the Sherman Act and a *per se* violation of the Cartwright Act (California) and the Maryland Antitrust Act.[5]

3.     Under the MMAs, Amazon suppliers guarantee both that Amazon will be able to price the supplier's product competitively against other online competition at least 95% of the time *and* that Amazon will receive a minimum margin on each sale regardless of the actual price that Amazon sells the product at retail.[6] Amazon enforces this agreement by requiring its suppliers to compensate it monthly for any lost margins necessitated by lowering its retail price to match a competitor.[7]

4.     To illustrate how the MMAs work, a supplier may agree, for example, to sell its product at a wholesale price of $5 per unit and that it will compensate Amazon if it receives less than $4 over its marginal cost. If Amazon sells at least 95% of the supplier's product for $9 or more, the supplier owes Amazon no money. But if, in this example, Amazon lowers its price to $8 to match a competitor's price that month, then the supplier will owe Amazon $1 for every product sold at $8 beyond the 5% threshold.

5.     So instead of Amazon risking its own profit margins to compete with its retail rivals on price, Amazon contractually shifts that risk to its suppliers. This shift ensures that Amazon's suppliers adopt a *de facto* minimum retail price (or floor price) for their products market-wide. That floor price is the combined sum of the supplier's wholesale price and its minimum margin guarantee, in the previous example $9 ($5+$4). By requiring suppliers to compensate Amazon whenever their products sell below the agreed floor price, the MMA agreements fix prices by penalizing suppliers unless they suppress competitive pricing from Amazon's rivals.

6.     MMAs add to the suppliers' cost of doing business and are implemented to accommodate Amazon, not as a means of promoting the suppliers' products or fostering price

---

[5] *Frame-Wilson v. Amazon.com, Inc.*, 2022 U.S. Dist. LEXIS 44109, at *35-36 (W.D. Wash. Mar. 11, 2022) (holding that price-fixing under California and Maryland's antitrust statutes is a per se violation whether the scheme is horizontal (between competitors) or vertical (between entities at different levels of the distribution chain)).

[6] Boyd Evert, *The squeeze continues for retail suppliers*, https://talkbusiness.net/2017/10/the-squeeze-continues-for-retail-suppliers/; Lesley Hensell, Amazon Sellers Are Losing Control of Pricing Due to "Standards for Brands, Webretailer, Nov 08, 2021, https://www.webretailer.com/b/amazon-standards-for-brands/.

[7] *Id.*

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

competition in the marketplace. In a competitive market, suppliers would benefit by rotating price promotions with different retailers to ensure a broad range of distribution options.[8] In his chart, reprinted below, Martin Heubel, former senior Amazon category manager, illustrates how providing margin support to Amazon is ineffective for suppliers and causes higher consumer prices:[9]

**Amazon Vendor Price Cycle**

- Price promotion by retailers
- Amazon **matches price**
- Amazon demands **margin support** to keep listing
- Funding reduces vendor **profit**
- Higher **consumer prices**
- Vendor raises **cost prices** for all retailers
- Loss of market share
- Vendor reinvests profits to regain market share

7.      Heubel explains that even if a supplier is profitable at the account level, Amazon will still hold that supplier to task if any individual product is unprofitable; "the result is invariably Amazon asking them to renegotiate costs and provide margin support, and if a supplier refuses it almost always takes punitive action."[10] A supplier that refuses Amazon's demand for "back-

---

[8] Martin Heubel, *How to Design a Profitable Amazon Vendor Portfolio Strategy* (May 20, 2022), https://consulterce.com/amazon-portfolio-strategy/.

[9] Ian Quinn, *Will GSCOP stop the CRAP Amazon suppliers face?,* the Grocer (Feb. 19, 2022), https://www.thegrocer.co.uk/online/will-gscop-stop-the-crap-amazon-suppliers-face/664641.article.

[10] Martin Heubel, *What is Amazon CRaP? Definition, Causes and Solutions for Brands,* (Jan. 1, 2022), https://consulterce.com/amazon-crap/.



margin funding," will find its product delisted, no longer on order, or suppressed from most consumer searches.[11]

8.    Former Amazon senior executive, Andrea Leigh,confirms that Amazon threatens to terminate the relationship with its suppliers if it does not receive its margin guarantee:

> Amazon reports vendor profitability numbers back to vendors, requesting to be compensated when their item-level profits aren't hitting targets. They receive this funding in the form of margin guarantees and other subsidies. If Amazon can't get subsidies for these products, . . . Amazon may stop ordering.[12]

9.    Gordon Christiansen, digital marketing consultant, conludes: "Through these policies Amazon is making it clear that *they hold suppliers responsible for managing pricing across the internet*."[13] Christiansen explains that "Amazon has done a great job convincing consumers that they are the cheapest," when, "in reality Amazon is a price follower rather than a price leader."[14] So "Amazon is constantly monitoring their own site, across all their platforms, and scraping the entire web to find competitive pricing and . . . when a 'rogue' trader offers highly discounted pricing on a product," Amazon follows the price cut and then "asks the supplier of that product to pay Amazon for lost margin or they suppress the item meaning it won't turn up most searches."[15] By forcing its suppliers to pay for its lost margins, Amazon's MMAs ensure that its suppliers put an end to "rogue" discounting.[16]

10.    Another marketing consultant echoes that thought:

> They [Amazon employees] literally spider the web and other major retailers to ensure they are basically the lowest. [If you, the brand, d]on't like the price they are selling at? Tough luck says Amazon. Amazon will then direct you to other sites like Target and Walmart and tell you to tell them to raise their price before they raise Amazon

---

[11] Quinn; *see also What is Amazon CRaP? Definition, Causes and Solutions for Brands*; Gordon Christiansen, *Is Amazon A Price Leader?*, https://thinkhighlands.com/ecommerce/is-amazon-a-price-leader/.

[12] Andrea K. Leigh, *"Free Shipping" Online: The Truth About Who Pays It*, February 18, 2020, https://andreakleighconsulting.com/free-shipping-online-the-truth-about-who-pays-it/. *See also* https://andreakleighconsulting.com/about/.(stating that Ms. Leigh launched Amazon's CRaP program, which is one means Amazon uses to impose MMAs).

[13] *Is Amazon A Price Leader* (emphasis added).

[14] *Id.*

[15] *Id.*

[16] *Id.*



back up. This is one of the bigger pain points with brands as it
disrupts their retailer relationships.[17]

11.    In a competitive market, online retailers would compete for consumer loyalty by offering the best price. But Amazon's MMAs restrain that head-to-head competition. Because Amazon can match its retail rivals' prices without risking its own loss of revenue, it reduces "[r]etailers' incentives to undercut Amazon's prices at the retail level in order to improve their market position."[18] When Amazon's stacked the deck, discounting is futile.

12.    Equally, in a competitive market, suppliers would choose retailers that provide the best and most efficient means of marketing their goods. MMAs are anticompetitive because they disrupt suppliers' relationships with other retailers and force suppliers to incur unnecessary costs that they would otherwise avoid by distributing through more efficient retailers. Leigh reports that by shifting "the burden of price matching" to its suppliers, Amazon has transformed itself from manufacturers' "least expensive channel to their most expensive – by a long shot."[19] Suppliers already shoulder virtually all costs and risks associated with Amazon's distribution of their products. They pay Amazon for shipping and handling of their products and absorb any losses associated with the loss or damage to their products.[20] What is more, the "payment terms" Amazon has with its suppliers "extend beyond the amount of time necessary to collect proceeds from [its] consumer customers."[21] It is not uncommon for suppliers to wait 90 days to be paid, although 60 days is the most common term.[22] So, while big box retailers, like Walmart, Target, and Costco are

---

[17] Danny DeMichele, *Selling to Amazon or selling through Amazon? Vendor And Seller Central*, https://dannydemichele.com/selling-amazon-selling-amazon-vendor-seller-central/.

[18] European Commission, Directorate General for Competition, Case AT.40153 *EBook MFNs and related matters (Amazon)*, https://ec.europa.eu/competition/antitrust/cases/dec_docs/40153/40153_4392_3.pdf ("*EBook MFNs and related matters (Amazon)*"), ¶ 148.

[19] *Supra "Free Shipping" Online: The Truth About Who Pays It*.

[20] *Amazon sellers: first-party relationship versus third-party relationship* (Dec. 3, 2019), https://www.gs1uk.org/insights/news/amazon-sellers-first-party-relationship-versus-third-party-relationship.

[21] *Suppliers Are Funding Amazon's Future*, Marketplace Pulse (Oct. 30, 2020), https://w.marketplacepulse.com/articles/suppliers-are-funding-amazons-future.

[22] *Amazon sellers: first-party relationship versus third-party relationship* (Dec. 3, 2019), https://www.gs1uk.org/insights/news/amazon-sellers-first-party-relationship-versus-third-party-relationship; Carina McLeod, *Amazon Vendor Contract Negotiations: What You Need to Know*, https://www.ecomengine.com/blog/vendor-contract-negotiations.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

lucky if they can sell products to their customers within a couple weeks after paying their suppliers, Amazon pays its suppliers months *after* it sold their products, which "allows Amazon to borrow from its suppliers to finance its operations, interest-free."[23] It costs suppliers less to distribute the bulk of their products through other retailers, but the MMAs penalize suppliers who do so. Just as the Supreme Court had forewarned, Amazon's MMAs give an inefficient, dominant retailer higher profits, while preventing other online retailers with lower cost distribution systems to charge lower prices.

13.     Amazon's enforcement of MMAs also constitutes an abuse of monopoly power under the Sherman Act, Section 2. Monopoly power is the power to control prices or exclude competition.[24] Through anticompetitive MMAs implemented since at least October 2017, Amazon has acquired or maintained the power to control online prices for the millions of products it resells online.[25] This lock on online retail prices not only harms competition from other online retailers, but it also harms competition from other online retail marketplaces, like eBay, for whom—much like the retailers—discounting of goods sold on its platform is a largely futile act because any price eBay offers, Amazon will be able to match or undercut—without losing any revenue. For the same reason, MMAs deter potential new online retail marketplace competitors from entering the market because they likewise cannot rely on price competition to gain a foothold in the market.[26] This loss of competition ultimately harms consumers, who pay uncompetitive prices.

14.     Amazon's MMAs have also reduced competition among online marketplaces. Whereas eBay was once the largest online retail marketplace, MMAs are likely a substantial factor contributing to eBay's market share losses over the last several years. Sales on Amazon's online

---

[23] *Supra Suppliers Are Funding Amazon's Future.*

[24] *United States v. E. I. Du Pont de Nemours & Co.*, 351 U.S. 377, 378 (1956).

[25] *Supra The squeeze continues for retail supplier*s.

[26] See *Amazon Removes Price Parity Obligation for Retailers on Its Marketplace Platform*, BUNDESKARTELLAMT (Federal Cartel Office of Germany), at 2 (Dec. 9, 2013) ("BKartA Decision") at 3, http://www.bundeskartellamt.de/SharedDocs/Entscheidung/EN/Fallberichte/Kartellverbot/2013/B6-46-12.pdf%3F__blob%3DpublicationFile%26v%3D2 (discussed below) (German competition authorities found that Amazon's analogous provision prohibiting third-party sellers from selling at lower prices on competing marketplaces was a price-fixing violation and created unfair barriers to competing online marketplace operators).



retail marketplace ("Amazon Marketplace") now make up as much as 90% of all online marketplace sales in the United States and account for over 50% of all online retail sales revenue in the United States.[27] By comparison, Amazon's two closest competitors in online marketplaces, Walmart and eBay, are only peripheral players in the Online Retail Marketplace Market and account for only 7.1% and 4.3%, respectively, of online retail sales revenue.[28]

15.     Amazon operates Amazon Marketplace as a two-sided platform, where it is also the largest retailer. Beginning in 1999, Amazon opened its online retail platform to other businesses ("third-party sellers"), where they can register and list their goods for sale. Amazon Marketplace presents itself "as a single integrated platform that makes no" significant "distinction between Amazon's own retail business and the Marketplace business."[29] The "products offered by third-party sellers are presented on the same pages as those sold by Amazon itself, in competition with each other."[30]

16.     Amazon's third-party sellers vastly expand the product offering on its marketplace by adding around 340 million products to Amazon's own considerable catalogue of retail goods.[31] No other retailer or retail marketplace can match Amazon Marketplace's ability to provide products for virtually every imaginable search.[32] In Amazon's own words, "allowing third parties to offer products side-by-side" with Amazon's own catalog of about 12 million products, makes Amazon "more attractive to customers," which draws "even more sellers" to Amazon Marketplace and adds to Amazon's "economies of scale[.]"[33]

---

[27] BKartA Decision at 255; *Amazon Marketplace is 25% of US E-commerce*, Marketplace Pulse (Feb. 1, 2022), https://www.marketplacepulse.com/articles/amazon-marketplace-is-25-of-us-e-commerce (observing that third-party sellers on Amazon Marketplace alone account for 25% of ecommerce).

[28] Blake Droesch, *Amazon dominates US ecommerce, though its market share varies by category*, eMarketer (Apr. 27, 2021), https://www.emarketer.com/content/amazon-dominates-us-ecommerce-though-its-market-share-varies-by-category.

[29] BKartA Decision at 2.

[30] Autorità Garante Della Concorrenza e del Mercato, Dec. 9, 2021 Final report ("AGCM Report"), ¶ 133.

[31] *15 Amazon Statistics You Need to Know in 2022*, https://www.repricerexpress.com/amazon-statistics/.

[32] *Minimum Viable Amazon*, Marketplace Pulse (Jan 21, 2021), https://www.marketplacepulse.com/articles/minimum-viable-amazon.

[33] Amazon 2014 Annual Report, EX-99.1 (sec.gov), https://www.sec.gov/Archives/edgar/data/1018724/000119312515144741/d895323dex991.htm.



17.     As recognized by the House subcommittee on antitrust, Amazon has evolved, through its marketplace business, into the unofficial "gatekeeper for ecommerce" in the United States.[34] Amazon also has more than 2.4 million active third-party sellers which is about *24 times* the 100,000 third-party sellers that Walmart hosts and *8,000 times* the 300 third-party sellers on Target's marketplace.[35] Amazon Marketplace grants third-party sellers access to Amazon's Prime members who are 96% more likely to buy goods from Amazon Marketplace[36] and spend on average $1,968 per year on Amazon Marketplace.[37]

18.     Manufacturers and suppliers of consumer goods can no longer afford to ignore Amazon Marketplace, and it is not uncommon for a brand manufacturer to sell more than half of its products through Amazon.[38] James Thomson, Ph.D., a partner at Amazon management and consulting firm BuyBox Experts explains: "When it comes to Amazon, you're dealing with a large, open marketplace and a massive customer audience. Having a presence there not only means you're better able to manage an important piece of a smart omni-channel sales strategy, but also that you can have more control over how your brand is represented there ... because if you don't list your products on Amazon, someone else probably will."[39]

---

[34] SUBCOMMITTEE ON ANTITRUST, COMMERCIAL, AND ADMINISTRATIVE LAW OF THE COMMITTEE ON THE JUDICIARY, 116th CONG., INVESTIGATION OF COMPETITION IN DIGITAL MARKETS, MAJORITY STAFF REPORT AND RECOMMENDATIONS ("House Report") 256 (2020), https://www.competitionpolicyinternational.com/wp-content/uploads/2020/10/investigation_of_competition_in_digital_markets_majority_staff_report_and_recommendations.pdf.

[35] Walmart Surpasses 100,000 Marketplace Sellers, Marketplace Pulse (Jul. 13, 2021), https://www.marketplacepulse.com/articles/walmart-surpasses-100000-marketplace-sellers; *Target's Marketplace Still Tiny Two Years Later, Marketplace Pulse* (Feb. 23, 2021), https://www.marketplacepulse.com/articles/targets-marketplace-still-tiny-two-years-later.

[36] Kiri Masters, *What's Driving Amazon's $10 Billion Advertising Business*, Forbes (July 26, 2019), https://www.forbes.com/sites/kirimasters/2019/03/20/study-89-of-consumers-are-more-likely-to-buy-products-from-amazon-than-other-e-commerce-sites/?sh=2dd0b61a4af1 (last visited Feb. 23, 2022).

[37] Marc Bain, *Prime has never been more important to Amazon*, Quartz (May 3, 2021), https://qz.com/2004369/the-pandemic-made-prime-even-more-valuable-to-amazon/ (last visited Feb. 23, 2022).

[38] *Supra The Truth About Who Pays for "Free Shipping" Online*; *see also* As Amazon's dominance grows, suppliers are forced to play by its rules, cnbc.com (Dec. 21, 2017) ("At least 21 public companies have disclosed they are generating 10 percent or more of their revenue through Amazon."), https://www.cnbc.com/2017/12/21/as-amazons-dominance-grows-suppliers-are-forced-to-play-by-its-rules.html.

[39] ModernRetail, The Retailer's Guide to Amazon (2019), pdf, https://www.modernretail.co/wp-content/uploads/2019/07/modernretail_report_2019_updated-1.pdf.



19.     The House subcommittee on antitrust found that Amazon "uses its dominant position in e-commerce as leverage" to impose anticompetitive agreements "to ensure that none of its suppliers or third-party sellers can collaborate with an existing or potential competitor to make lower-priced or innovative product offerings available to consumers."[40]

20.     Amazon's MMA is one example of the types of anticompetitive agreements that Amazon uses to prevent other online retailers from offering the same product Amazon sells at a lower price. David Barnett, Founder and CEO of Amazon supplier PopSockets, testified before the House subcommittee that Amazon imposed minimum margin guarantees on his company's products, and that in his experience Amazon suppliers generally concede to its practice of "demanding funding whenever [Amazon] elects to lower prices to the consumer."[41] This is consistent with an industry report on October 1, 2017, stating: "Amazon.com asks suppliers to sign a 'Guaranteed Minimum Margin Agreement.' The agreement requires a monthly true-up between actual margin and what was guaranteed, so long as it is in Amazon's favor."[42]

21.     Courts and regulators have found that similar contractual provisions that raise consumer prices by immunizing the retailer from competition from other retailers are anticompetitive. In *United States v. Apple*, the court found that a series of contracts between a retailer and its suppliers "destroyed" competition because it "removed the ability of retailers to set the prices of their e-books and compete with each other on price, relieved Apple of the need to compete on price," and increased consumer prices.[43] The European Commission investigated Amazon in 2015-2017 and found that Amazon replicated the same anticompetitive agreements used in the *Apple* conspiracy and that such action constituted an abuse of its monopoly power.[44]

---

[40] House Report at 295.

[41] Questions for the Record from the Honorable David N. Cicilline, Chairman, Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary, Questions for David Barnett, Founder and CEO, PopSockets, https://docs.house.gov/meetings/JU/JU05/20200117/110386/HHRG-116-JU05-20200117-QFR007.pdf.

[42] Boyd Evert, *The squeeze continues for retail suppliers*, TB&P (Oct. 1, 2017), https://talkbusiness.net/2017/10/the-squeeze-continues-for-retail-suppliers/.

[43] *United States v. Apple Inc.*, 952 F. Supp. 2d 638, 694. (S.D.N.Y. 2013), *affirmed* 791 F.3d 290 (2d Cir. 2015).

[44] *E-book MFNs and related matters (Amazon)*.

HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

The German competition agency, Bundeskartellamt ("BKartA"), found that Amazon harmed competition in the online retail marketplaces market when it sought to enforce similar provisions that penalized Amazon's third-party sellers who sold their goods on another online platform at a price lower than on Amazon Marketplace.[45]

22.     The loss of competition in the Online Retail Marketplace Market represents higher prices and the loss of quality and innovation that a competitive market fosters. Existing marketplaces cannot expand by competing on price and new marketplaces cannot enter the market to compete on price.

23.     Plaintiffs assert price-fixing and monopolizing claims against Amazon on behalf of themselves and other consumers who bought goods from Amazon that are subject to Amazon's MMAs. See below Sec. VII (defining classes).

## II.     JURISDICTION

24.     This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. §§ 15(a) and 26 because this Action arises under federal antitrust laws, including 15 U.S.C. §§ 1 and 2, as invoked herein.

25.     Additionally, this Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) because at least one Class member is of diverse citizenship from Amazon, there are more than 100 Class members nationwide, and the aggregated amount in controversy exceeds $5,000,000, exclusive of interest and costs.

26.     Plaintiffs are residents of California and Maryland who purchased goods from Amazon. Amazon's conduct as discussed further herein harmed and injured Plaintiffs financially.

27.     This Court has personal jurisdiction over Amazon because Amazon is headquartered in Washington State and has registered with the Washington Secretary of State.

---

[45] BKartA Decision.



### III.   VENUE

28.     Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because Amazon's principal place of business is in this judicial district, and a substantial part of the events giving rise to the claims occurred in this judicial district.

### IV.   PARTIES

**A.   Plaintiffs**

29.     Plaintiff Christopher Brown is a resident of California. He has been a Prime Member for more than ten years and regularly shops from Amazon and other sellers in the relevant markets (as defined below, Secs. C-E) that are controlled by Amazon and restrained by its anticompetitive conduct. In the last several years, Plaintiff Brown has spent, on average, $26,000.00 annually on Amazon Marketplace, including on goods that Amazon sells as a first-party seller. Since 2018, Plaintiff Brown has purchased hundreds of goods directly from Amazon as a first-party seller on Amazon Marketplace, including Adidas, Bosch, Carhartt, and Hanes products. Many of these goods he purchased at supracompetitive prices directly caused by Amazon's price fixing agreement with its suppliers and its monopolizing conduct. Plaintiff Brown has been injured and will continue to be injured by paying more for online retail goods than he would have paid or would pay in the future in the absence of Defendant's unlawful acts, as alleged in this Complaint.

30.     Plaintiff Scott Graeber is a resident of California. He has been a Prime Member since February 17, 2014, and regularly shops from Amazon and other sellers in the relevant markets that are controlled by Amazon and restrained by its anticompetitive conduct. In the last several years, Plaintiff Graeber has spent, on average, approximately $11,000.00 annually on Amazon Marketplace, including on goods that Amazon sells as a first-party seller. Since 2018, Plaintiff Graeber has purchased hundreds of goods directly from Amazonas a first-party seller on Amazon Marketplace, including Bosch products. Many of these goods he purchased at supracompetitive prices directly caused by Amazon's price fixing agreement with its suppliers and its monopolizing conduct. Plaintiff Graeber has been injured and will continue to be injured by

HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

paying more for online retail goods than he would have paid or would pay in the future in the absence of Defendant's unlawful acts, as alleged in this Complaint.

31.     Plaintiff Laura Loes is a resident of California. Through an account she shares with her husband, Plaintiff Loes has been Prime Member since December 30, 2015. Ms. Loes regularly shops from Amazon and other sellers in the relevant markets that are controlled by Amazon and restrained by its anticompetitive conduct. In the last several years, Plaintiff Loes, together with her husband, has spent on average about $7,000.00 annually on Amazon Marketplace, where they purchased hundreds of goods directly from Amazon as a first-party seller. Many of these goods they purchased at supracompetitive prices directly caused by Amazon's price fixing agreement with its suppliers and its monopolizing conduct. Plaintiff Loes has been injured and will continue to be injured by paying more for online retail goods than she would have paid or would pay in the future in the absence of Defendant's unlawful acts, as alleged in this Complaint.

32.     Plaintiff Leticia Shaw is a resident of California. Through an account she shared with her husband, Plaintiff Shaw has been a Prime Member Since 2018. She regularly shops from Amazon and other sellers in the relevant markets that are controlled by Amazon and restrained by its anticompetitive conduct. In the last several years, Plaintiff Shaw, together with her husband, has spent on average about $2,000.00 annually on Amazon Marketplace, where they purchased hundreds of goods directly from Amazonas a first-party seller, including Adidas and D'Addario products. Many of these goods she purchased at supracompetitive prices directly caused by Amazon's price fixing agreement with its suppliers and its monopolizing conduct. Plaintiff Shaw has been injured and will continue to be injured by paying more for online retail goods than she would have paid or would pay in the future in the absence of Defendant's unlawful acts, as alleged in this Complaint.

33.     Plaintiff David Atwood is a resident of Maryland. He has been a Prime Member since 2017, and regularly shops from Amazon and other sellers in the relevant markets that are controlled by Amazon and restrained by its anticompetitive conduct. In the last several years, Plaintiff Atwood has spent, on average, approximately $4,500.00 annually on Amazon

HB HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

Marketplace including on goods that Amazon sells as a first-party seller. Since 2018, Plaintiff Atwood has purchased hundreds of goods directly from Amazon as a first-party seller on Amazon Marketplace including Hanes, Oral-B, and Tide products. Many of these goods he purchased at supracompetitive prices directly caused by Amazon's price fixing agreement with its suppliers and its monopolizing conduct. Plaintiff Atwood has been injured and will continue to be injured by paying more for online retail goods than he would have paid or would pay in the future in the absence of Defendant's unlawful acts, as alleged in this Complaint.

**B.    Defendant Amazon**

34.    Amazon is the largest retailer in the United States and operates Amazon Marketplace, the largest electronic commerce ("e-commerce") marketplace in the world.

## V.    STATEMENT OF FACTS

**A.    MMAs reduce online retail competition and raise consumer prices.**

35.    Former Amazon employees and other industry participants confirm that Amazon requires suppliers to compensate Amazon whenever it lowers its retail price to match the price of a competitor, so that suppliers are compelled to implement vertical price restraints. *See supra*, Sec. I.

36.    Because of Amazon's dominance as an online retail platform, suppliers have little choice but to accommodate Amazon's demands for vertical price restraints.

37.    If suppliers want to exclude their products from MMAs, they could potentially sell them exclusively with Amazon. The catch? While most retailers would "love product exclusives" because they "offer a differentiation point for stores and can draw shoppers loyal to a particular brand or type of product,"[46] Amazon *charges extra* if its supplier offers an exclusive distribution on Amazon.[47] Amazon requires payment of a 5% flat fee calculated on the net receipts of the

---

[46] Jeff Wells, What makes a product right for a retail exclusive? | Grocery Dive (Apr. 17, 2017), https://www.grocerydive.com/news/grocery--what-makes-a-product-right-for-a-retail-exclusive/535215/.

[47] Martin Heubel, *Exclusive Products on Amazon: The Complete Guide for Vendors*, (Jun. 7, 2022), https://consulterce.com/amazon-exclusives/.



1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

supplier—and not just for the supplier's exclusive product but across all its product sales to Amazon, including any non-exclusive items.[48]

38.     In theory, a manufacturer also could avoid the MMA by selling to Amazon's customer base as a third-party seller, but Amazon refuses to give this option to major national brands that distribute their products through other major retailers.[49] In 2016, Sebastian Gunningham, then senior vice president of Amazon Marketplace, explained that "there are x,000 suppliers around the world that do not get this choice . . . . I am talking about the apple, nikes and p&g, etc . . . . We don't want to open that door, [the] relationship has to be reseller."[50] Amazon's Standards for Brands Selling in the Amazon Store formally adopted this policy by proclaiming that Amazon "may choose to source products from some Brands for sale by Amazon only."[51] A former Amazon employee confirmed to the House Committee on antitrust "that it was not uncommon for Amazon to use its brand standards policy to shut down a brand's third-party seller account and force brands into an exclusive wholesaler relationship."[52]

39.     Although ostensibly geared to lower retail prices, Amazon's MMAs achieve the opposite by eradicating online competition. MMA penalties coerce Amazon's suppliers to raise wholesale prices to Amazon's retail competitors or otherwise restrict them from offering lower retail prices than Amazon. This harms retail competition and hurts Plaintiffs and other consumers who purchase online at uncompetitive prices.

40.     The European Commission previously found that similar provisions employed by Amazon in its contracts with eBooks suppliers violated competition laws. In 2017, the European Commission found that Amazon abused its dominance in the market for German and English-language eBooks by requiring Amazon suppliers to guarantee that no other retailer would sell their

---

[48] *Id.*

[49] *Big National Brands As Amazon Sellers*, (Feb. 10, 2020), https://www.leanedgemarketing.com/blog/big-brands-that-are-amazon-sellers.

[50] House Report at 259 (alliteration in the original) (quoting AMAZON-HJC-00190108 (June 6, 2016), available https://judiciary.house.gov/uploadedfiles/00190108.pdf).

[51] Garrett Bluhm, *SFBSitAS Policy Reveals Amazon's Vendor Singularity Program, Pattern*, May 29, 2019, https://pattern.com/blog/sfbsitas-policy-reveals-amazons-vendor-singularity-program/.

[52] House Report at 259.

HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

eBooks at a lower price than on Amazon Marketplace and to compensate Amazon by providing the same or better terms as any of its competitors.[53]

41.     The Commission found that employing these contractual provisions was an abuse of Amazon's dominance in that market. It found that the "Retail Price Parity Provisions," which guaranteed that no eBook would be sold at a lower price than on Amazon Marketplace, were "capable of deterring, or likely to deter, the expansion or entry of competing E-book Retailers, thereby strengthening Amazon's dominant position" in the eBooks market and were "capable of allowing, or are likely to allow, Amazon to reduce competition between E-book Retailers," which "could ultimately lead to higher e-book retail prices."[54] The Commission found that retailers had little incentive to lower their prices to consumers because suppliers were required to offer Amazon the same terms to match those prices or promotions.[55] In response to the Commissions' findings, Amazon agreed not to enforce these price parity clauses in the European markets for five years.[56]

42.     Critically, the Commission's opinion did not rest solely on explicit parity provisions. It found, for example, that Amazon's contracts with the five largest e-book publishers required them to notify Amazon if other retailers sold their e-books at a lower price than Amazon.[57] The Commission also found that Amazon threatened punitive measures, if these publishers did not agree to discount their price to Amazon to allow it to match the competitor's price.[58] The Commission found that the requirement of notifying Amazon if these publishers offered better terms to other retailers combined with the credible threat of punishment by Amazon if the publisher did not offer Amazon the same terms, had the same anticompetitive function and effect as express price parity provisions found in Amazon's agreements with the smaller publishers.[59] Likewise, under the MMAs, suppliers face significant financial penalties and potential disruption in the

---

[53] *EBook MFNs and related matters (Amazon).*

[54] *Id.* ¶¶ 116-17.

[55] *Id.* ¶¶ 127-29, 147-48.

[56] *Id.* ¶ 159.

[57] *Id.* ¶¶ 33, 137

[58] *Id.* ¶¶ 138-42.

[59] *Id.* ¶¶ 139-44.

distribution of their products unless they enforce vertical price restraints with other retailers. Amazon's demands for margin guarantees can therefore be understood as an implicit demand for vertical price restraints, or as one commentator aptly put it: "Through these policies Amazon is making it clear that they hold suppliers responsible for managing pricing *across the internet*."[60]

43.     Previously, in 2013, the German competition authority, das Bundeskartellamt ("BKartA"), investigated price parity clauses on Amazon Marketplace, which analogous to Amazon's MMAs with its suppliers, penalized Amazon's third-party sellers it they sold their goods on another online platform at a price lower than on Amazon Marketplace.[61] A "poll of 2,500 online retailers" conducted by BKartA found that Amazon's price parity clause "resulted in significant price increases in e-commerce."[62] BKartA also found that by preventing competition between online marketplaces generated by "more favourable prices for final customers," Amazon's price parity clauses served "as barriers to market entry" for new "internet marketplace operators" and hindered "the expansion of existing competitors[.]"[63] In response to these findings, Amazon voluntarily "abandoned its price parity clauses" with its third-party sellers "on an EU-wide basis."[64]

**B.    Amazon's MMAs reduce competition on Amazon Marketplace.**

44.     Amazon's dominance not only increases online prices, it also reduces consumer choices and prevents more innovative online shopping marketplaces from competing in the United States. "The concept of shopping Amazon built - a search bar with infinite selection - doesn't have the excitement and inspiration of some of the more modern e-commerce models, especially those in China."[65] For instance, both Amazon and Alibaba use machine learning to recognize patterns in shopping behavior, but whereas Amazon generally limits its suggestions to items similar to the

---

[60] *Supra Is Amazon A Price Leader?* (emphasis added).

[61] BKartA decision.

[62] *Id.*

[63] *Id.* at 3.

[64] *Id.* at 3.

[65] *Minimum Viable Amazon*, Marketplace Pulse (Jan. 21, 2021), https://www.marketplacepulse.com/articles/minimum-viable-amazon.



ones the customer previously bought or things that other customers, searching for the same item, also bought, Alibaba provides a much more extensive and innovative list of suggestions.[66]

45.     But Amazon Marketplace does not need to be innovative or a price leader to attract customers. By manipulating online prices through MMAs, Amazon and its suppliers create barriers to competition with other existing or potential online marketplace operators that cannot rely on price competition to gain a share of the Online Retail Marketplace Market. Because Amazon is the seller of record for about 12 million products, systemic use of its MMAs would have a massive impact on online retail prices across every category of good.

46.     In a competitive market, free of margin guarantees, we would expect far more competition and lower prices in the Online Retail Marketplace. Indeed, Amazon Marketplace itself would look very different. Suppliers would sell their products to Amazon and its third-party sellers at comparable rates, leaving them free to compete on price. And Amazon's chances of winning the Buy Box for those products would directly correlate with having the lowest price for them on Amazon Marketplace.

47.     An analysis of sales data on Amazon Marketplace during the class period of 2,000 top-selling products—a small but illustrative set of products—is indicative of significant and wide-spread effects. This analysis considers the historical prices for sales by Amazon, historical prices of third-party sellers, and the historical percentage of days that Amazon won the Buy Box each month for the period of September 2017 through December 2020. The Buy Box, pictured below,[67] is the white box on the right-hand side of the Amazon product detail page used for customers to purchase items in their cart; it accounts for over 83% of all sales on Amazon Marketplace.[68]

---

[66] Dashveenjit Kaur, Techwire Asia (Jan. 28, 2021), *China vs. US e-commerce – How they're very different*, https://techwireasia.com/2021/01/china-vs-us-e-commerce-how-theyre-very-different/.

[67] Image reproduced from https://www.thesellingguys.com/how-to-win-the-amazon-buy-box-ultimate-guide/.

[68] Feeadvisor, *What Is the Amazon Buy Box and How to Win the Buy Box in 2022?*, https://feedvisor.com/university/amazon-buy-box/.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX



48.     The Buy-Box winner for any given product may vary from day to day and represents, at the time of the consumer's search, Amazon's estimation of the most competitive price offered by a high-performance seller with available stock.[69]

49.     Contrary to these expectations, distinct patterns emerge across multiple product categories with a persistency that is unlikely to occur without brand price manipulation, such as through Amazon's MMAs:

    a.    Amazon increased its chances of winning the Buy Box despite increasing its own prices for the brand's products, and in those instances where third-party sellers' prices increased, they increased faster than Amazon's price (criteria 1 and 2, illustrated below);

    b.    Amazon maintained its chances of winning the Buy Box, despite increasing its price for the brand's products (criterion 3, illustrated below);

    c.    Amazon increased its chances of winning the Buy Box, despite holding its price steady for the brand's products (criterion 4, illustrated below); and

---

[69] *Id.*



d.      Amazon maintained its chances of winning the Buy Box, while holding its price steady for the brand's products, and despite increases in third-party sellers' prices for the same products (criterion 5, illustrated below).

The following charts illustrate these effects on 2,000 best-selling products.

HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

50.     <u>Criterion 1: Amazon wins the Buy Box with greater frequency even as its price increases, and third-party sellers' prices increase faster.</u> The analysis of major-selling brands from September 2017 through December 2020, shows for example, that despite increasing its prices, Amazon's chances of winning the Buy Box increased for about 7% of roughly 250 Bosch Automotive products sold on Amazon Marketplace, for about 16% of roughly 115 Hanes products sold on Amazon Marketplace, and about 5% of the roughly 65 Croc products sold on Amazon Marketplace. For each of the products included in this chart, third-party sellers' prices increased faster than Amazon's, suggesting that the MMAs had the likely anticompetitive effect of protecting Amazon from competition from its third-party sellers:



HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

51.   <u>Criterion 2: Amazon wins the Buy Box with greater frequency even as its price</u>
<u>increases along with the prices of its third-party sellers.</u> The analysis shows that in the same 39-
month period, even when third-party sellers prices did not increase more quickly than Amazon,
Amazon's percentage of Buy-Box wins increased despite its price increase for almost 35% of the
roughly 115 Hanes products, over 15% of the roughly 250 Bosch Automotive products, and nearly
20% of roughly 130 Gildan apparel products. This ability to marginalize third-party sellers despite
increasing prices is a likely anticompetitive effect of Amazon's MMAs:



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

52.   <u>Criterion 3: Despite Amazon's prices increasing over time, Amazon maintains the</u> <u>same frequency of winning the Buy Box.</u> The analysis of the same 39-month period shows, for example, that Amazon maintained its share of Buy-Box wins for about 55% of the roughly 65 Croc products despite increasing its prices. This is also the case for about 10% of: roughly 75 Carhartt products, roughly 115 Hanes products, roughly 130 Gildan products, roughly 170 Oral-B products and roughly 250 Bosch Automotive products. This ability to marginalize third-party sellers despite increasing prices is a likely anticompetitive effect of Amazon's MMAs:





53.   <u>Criterion 4: Amazon's prices remain steady, yet Amazon wins the Buy Box with greater frequency.</u> The analysis shows over the same 39-month period, for example, that Amazon was able to increase the frequency of its Buy-Box wins without reducing its prices for about 10% of roughly 75 Carhartt products and roughly 115 Hanes products. This ability to marginalize third-party sellers without lowering its own prices is a likely anticompetitive effect of Amazon's MMAs:





54.   Criterion 5: While third-party prices increase over time, Amazon wins the Buy Box with the same frequency while maintaining the same price. The analysis over the same 39-month period shows, for example, that Amazon can maintain its price and percentage of Buy-Box wins, while third-party sellers are forced to increase their prices for a small percentage of the roughly 75 Carhartt products, the roughly 115 Hanes products, and the roughly 175 Oral-B products. This ability to sell at the same prices, while other sellers were forced to raise their prices, is a likely anticompetitive effect of Amazon's MMAs:





HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

55. <u>All Criteria.</u> Collectively, all five criteria over the same 39-month period show likely anticompetitive impacts on between 65% and 30% of all Crocs, Dickies, D'Addario, Hanes, Rain-X, Gildan, and Bosch Automotive products sold on Amazon Marketplace:



**C. The two-sided Online Retail Marketplace Market is the relevant market to assess the anticompetitive impact of Amazon's MMAs.**

56. Amazon owes its dominance as an online retailer, including the economic power it holds over its suppliers, to the dominance of its online retail marketplace, where the vast majority of U.S. online consumers shop. *See infra*, Sec. E. According to the House subcommittee on antitrust, Amazon Marketplace's "market power is at its height in its dealings" with many of its suppliers.[70] Documents reviewed by the Subcommittee "make clear that Amazon has monopoly power" over "many of its suppliers."[71] David Barnett, CEO of Amazon supplier, PopSockets, testified that "most brands cannot afford to leave Amazon" and "have no choice but to endure

---

[70] House Report at 255.

[71] *Id.* at 257.



tactics that would be rejected out of hand in any ordinary relationship whereby the two parties enter into the relationship by preference rather than necessity."[72] According to a 2017 survey conducted by Luzern eCommerce solutions, roughly half of respondents worldwide stock their entire product range on Amazon.[73] Over 40% of respondents in the U.S. and Canada count on Amazon for at least 21% of their online revenue.[74] The majority of U.S. and Canadian companies (61%) directly supply Amazon, while the remaining 39% sell through a third-party seller on Amazon Marketplace.[75] No respondents declined to sell on Amazon Marketplace.[76]

57.     The Online Retail Marketplaces Market, comprised of online platforms that allow consumers to purchase retail products listed by multiple independent sellers without having to leave the platform,[77] is therefore the relevant market by which to assess the competitive harm caused by Amazon's MMAs.

58.     The Italian competition authority, Autorità Garante della Concorrenza e del Mercato ("AGCM") recently fined Amazon $1.3 billion for its use of a biased algorithm that suppressed offers from disfavored third-party sellers that chose not to enroll in Amazon's logistics service, Fulfilled by Amazon.[78] For purposes of its enforcement action, the AGCM defined the relevant market as the market for intermediation services on online marketplaces.[79]

59.     This market has the same features as Plaintiffs' Online Retail Marketplace Market. An online "marketplace," as distinguished from a retailer's proprietary website, "allows consumers to access the offer of goods of one or more product categories by a plurality of sellers and the latter to offer their products online to an often very large audience of consumers."[80] An intermediation

---

[72] *Id.*

[73] *Are Brands Too Dependent On Amazon For Their eCommerce Strategy?* (wbresearch.com), https://b2bonlineeu.wbresearch.com/blog/are-brands-too-dependent-on-amazon-for-their-ecommerce-strategy.

[74] *Id.*

[75] *Id.*

[76] *Id.*

[77] AGCM Report ¶¶ 38-46.

[78] *Id.* ¶ 883.

[79] *Id.* ¶¶ 508-21.

[80] *Id.* ¶ 38.



service, as used by the AGCM and alleged here by Plaintiffs, refers to the business of a two-sided platform that brings together consumers and merchants and can resolve transactions without redirecting them elsewhere.[81] In economic theory, a two-sided platform is characterized by the presence of network effects: its usefulness for one set of users (in this case, consumers) increases as the number of complementary users (third-party sellers) increases.[82] Suppliers benefit by distributing on this marketplace because of the unrivaled size of its customer base and their willingness to buy goods there. As described below (Sec. E.1), online retail marketplaces are characterized by their network effects.

60.     The Online Retail Marketplace Market necessarily excludes the following retail sales:

a.      Offline sales because "the physical channel for the sale of products to end consumers is not considered replaceable with online sales" or "intermediation services offered by marketplaces" in "e-commerce";[83]

b.      Sales on proprietary online sites managed directly by retailers because of the "significant differences" from "the perspective of the retailer" between "the exercise of the online sales activity through a platform and the construction and management of a website owned with ecommerce functionality";[84]

c.      Sales on social media or a price comparison service because the sales transactions are not realized on the original platform, but rather require the consumer to be redirected "to sellers' websites or to marketplaces";[85] and

d.      Sales on specialized marketplace platforms that offer a selection of products in a limited category because they only serve "the needs of consumers looking for a

---

[81] *Id.* ¶¶ 38-46.

[82] *Id.* ¶ 41.

[83] *Id.* ¶ 522

[84] *Id.* ¶ 532

[85] *Id.* ¶ 565

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

specific product and a targeted purchase" and attract only a small fraction of the third-party sellers that sell on broader "horizontal markets," like Amazon's.[86]

### 1.  The Online Retail Marketplace Market does not include brick-and-mortar retailers.

61.  The AGCM's distinction, which Plaintiffs also assert, between online retail marketplaces and physical retail stores is consistent with multiple U.S. authorities that recognize the Online Retail Sales Market as separate and distinct from the physical, brick-and-mortar retail sales market. The FTC has concluded that "a relevant market may be divided by channel of sale resulting in separate markets for brick-and-mortar sales and online sales."[87] The House Report found, based on extensive industry interviews and economic analysis, that the Online Retail Sales Market was a distinct market and that Amazon controlled over 50% of it.[88] And the U.S. Department of Commerce has acknowledged—again, based on industry research—the distinction between online retail sales and physical retail sales, tracking online retail sales as a separate category.[89]

62.  The fact that many prominent retailers routinely offer different prices in their physical locations from those offered online supports the conclusion that online sales represent a distinct market. According to the FTC/DOJ horizontal merger guidelines, differential pricing is a good indicator of the existence of a price-discrimination market. A price-discrimination market, in turn, is a relevant marker of market boundaries; it represents the market in which a hypothetical monopolist would have the ability and incentive to apply a SSNIP to the good because it knows that only an insignificant number of customers will switch to another seller. Because retailers typically price goods sold in-store at a higher price than online, the market already demonstrates

---

[86] *Id.* ¶¶ 81, 84.

[87] House Report at 255 (quoting Complaint at 4, *In the Matter of Edgewell Personal Care Co. & Harry's Inc.*, No. 9390 (FTC Feb. 2, 2020)).

[88] *Id.*

[89] *See, e.g.*, U.S. DEP'T OF COM., ECON. & STAT. ADMIN., NEW INSIGHTS ON RETAIL E-COMMERCE (2017), https://www.commerce.gov/sites/default/files/migrated/reports/new-insights-retail-e-commerce.pdf (collecting data on ecommerce sales since 1998).

HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

that in-store retail prices are not constrained by online retail prices, and this indicates online retail prices are also not constrained by in-store retail prices.

63.     Economists agree that the "[i]nternet represents a fundamentally different environment for retailing from traditional retailing."[90] An online channel has distinct characteristics from a physical channel.[91] Yale economist Fiona Scott Morton notes that "[d]igital platforms combine economies of scale, low marginal costs, economies of scope through data and an installed base of users, network effects, multi-sidedness, and sometimes a global reach."[92] The combination of these attributes "tend to generate concentrated markets, or market structures containing few firms," and, "with the addition of inertial (or 'sticky') consumers these markets feature high entry barriers which make it difficult for new firms to enter the market to create competition."[93]

64.     Physical retail sales are *not* suitable alternatives in this market because sales on the Online Retail Marketplace Market, or online generally, have distinctive characteristics: they are not limited by geography, time of day, or day of week; they offer exponentially larger volumes and diversity of inventory compared to physical stores; and they offer consumers additional services not offered in physical stores, such as saving consumers' payment history and past purchases or using data to individualize product offerings.

65.     Online retail sites allow consumers to use internet-enabled devices to shop for a wide range of goods without limitations based on geographic markets, the time of day, or the day of the week. Consumers also benefit from using online retail platforms because online shopping reduces the risk that a product will be out of stock as online retailers often store a larger and more diverse volume of goods than brick-and-mortar stores. Additionally, once consumers create an account with an online retail platform, the platform provides the consumer with the benefit of

---

[90] Forsythe, S.M., & Shi, B., *Consumer Patronage and Risk Perceptions in Internet Shopping*, 56 J. BUS. RSCH. 867, 874 (2003).

[91] Katawetawaraks, C. & Wang, C. H., *Online Shopper Behavior: Influences of Online Shopping Decision*, 1 ASIAN J. BUS. RSCH. 66 (2011).

[92] *Supra* Morton.

[93] *Id.*



storing consumer information including, for example, payment methods and delivery addresses. Online retail platforms also store a consumer's payment history, allowing a consumer to re-order past items instantly and with little transaction costs.

66.     And from the retailer's perspective, compared to the physical channel, online marketplaces allow the seller to: (i) reach a wider audience, serve a greater number of geographic markets (at least within national borders) without time limitations (24/7); (ii) generally, to reduce transaction costs, those of market intelligence, for the collection of information on consumers, on new trends and new opportunities, as well as the costs of research and negotiation; (iii) shorten the supply chain, reducing, for example, the degree of outsourcing of the product distribution activity; and (iv) provide the consumer with a broader and more user-friendly set of information than is possible in a physical store, including the opinions of other consumers and, in some cases, expert reviews.[94]

67.     Online retail sites acquire a multitude of consumer data as a result of the repeated engagement of their consumers and use this data to ensure that consumers receive individualized product listing aimed at displaying the most relevant products to the particular consumer. Online retail platforms' ability to acquire a multitude of consumer data differentiates online retail platforms from brick-and-mortar stores. As FTC Chair Lina Khan explained:

> [T]he types of consumer behavior that internet firms can access—how long you hover your mouse on a particular item, how many days an item sits in your (electronic) shopping basket before you purchase it, or the fashion blogs you visit before looking for those same items through a search engine—is unchartered ground. The degree to which a firm can tailor and personalize an online shopping experience is different in kind from the methods available to a brick-and-mortar store—precisely because the type of behavior that online firms can track is far more detailed and nuanced. And unlike brick-and-mortar stores—where everyone at least *sees* a common price (even if they go on to receive discounts)—internet retail enables firms to entirely personalize consumer experiences, which eliminates any collective baseline from which to gauge price increase or decreases.[95]

---

[94] AGCM Report ¶ 523.

[95] Lina M. Khan, *Amazon's Antitrust Paradox*, 126 Yale L.J. 710, 764 (2017), https://www.yalelawjournal.org/pdf/e.710.Khan.805_zuvfyyeh.pdf (last visited Feb. 23, 2022).



68.     These reasons lead to a simple conclusion: There is little cross-elasticity of demand between the use of online retail sites and the use of brick-and-mortar stores.

### 2.     The Online Retail Marketplace Market does not include single-merchant e-commerce sites.

69.     Unlike single-merchant stores, online retail marketplaces are two-sided platforms that connect consumers to third-party sellers and through them offer a broader variety of goods than single-merchant stores can. Because "[o]nly other two-sided platforms can compete with a two-sided platform for transactions," Plaintiffs properly exclude single-merchant stores from this market.[96]

70.     Single-merchant online stores are not reasonably interchangeable with online marketplaces because the intermediation services provided by an online platform permit a retailer to immediately reach a large number of consumers, quickly and with extremely limited set-up costs, making the marketplace an immediately usable solution for accessing e-commerce.[97] An online marketplace allows a merchant to take advantage of a much wider audience of consumers than the merchant could otherwise reach individually through its own website.[98] The visibility the merchant obtains through an online marketplace platform is far superior to what the individual retailer could obtain on its individual website because marketplaces have the ability to: (a) invest significant resources in advertising and promotional campaigns; (b) carry out the "profiling" of consumers and create targeted advertising thanks to the availability of an enormous amount of data; and (c) develop a prominent presence on search engines.[99] These possibilities are completely closed not only to small sellers but to most established brands.[100]

71.     A retailer survey conducted by Raymond James Research found that 62% of respondents believe that participation in an online retail marketplace increases the retailer's

---

[96] *Ohio v. Am. Express*, 138 S. Ct. 2274, 2287 (2018).

[97] AGCM Report ¶ 533.

[98] *Id*. ¶ 534

[99] *Id*. ¶ 536.

[100] *Id*.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

1    visibility in comparison to its own website, and 44% of respondents see marketplaces as the

2    "starting point" for consumers to search for a product.[101]

3    72.    From the merchant's perspective, single-merchant online stores are not

4    interchangeable with online marketplaces both because they are not open to multiple sellers and

5    because the merchants that operate single-merchant online stores typically continue to use online

6    retail marketplaces to reach their customers.[102] A hypothetical monopolist issuing a SSNIP also

7    would not cause third-party sellers to resort to single-merchant online stores. In fact, testimony of

8    third-party sellers and their representatives confirm that a monopolist charging a SSNIP increase

9    would not cause third-party sellers to leave Amazon Marketplace. As Stacy Mitchell, the Co-

10   Director of the Institute for Local Self-Reliance explained to the House subcommittee on antitrust,

11   "[a]s [one independent retailer] moved online, so too did the company" but after sales began to

12   decline because consumers "were no longer starting their online shopping on a search engine" but

13   were "going straight to Amazon" the retailer decided to join Amazon after concluding that "[i]f

14   the customer is on Amazon, as a small business you have to say, '***That is where I have to go. . .***

15   ***.Otherwise, we are going to close our doors.***"[103] The House subcommittee also found that

16   numerous third-party sellers reached the conclusion that "they cannot turn to alternative

17   marketplaces, ***regardless of how much Amazon may increase their costs of doing business*** or

18   how badly they are treated."[104]

19   73.    Consumers likewise benefit more from marketplaces than single-merchant sites

20   because the marketplace serves as a place of aggregation of various offers belonging to different

21   product categories. The variety of choice and the pervasiveness of the offers attract a very high

22   number of consumers.[105] Consumers who opt not to use online marketplaces in favor of single-

23   merchant online stores face a lack of variety of merchandise and dramatically higher transaction

24

25   [101] *Id.* ¶ 541.

     [102] *Id.* ¶ 544.

26   [103] House Report at 256–57 (emphasis added).

     [104] House Report at 257 (emphasis added).

27   [105] *Id.* ¶ 534.

28


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

costs as a result of having to identify, search product lists, and manage accounts and transactions at countless online stores.

74.    Consumers also derive confidence from the level of security recognized in the online marketplace in comparison to the variable experiences with single-merchant sites. Their confidence depends on factors like the reliability of payment services, the security of delivery times, prompt and efficient customer care in handling complaints and returns, etc. The investments required for the development of these services are extremely significant and accessible only to large operators.[106] For all these reasons, single-merchant online stores are not reasonable substitutes for online marketplaces, and a hypothetical monopolist issuing a SSNIP also would not cause a significant number of consumers to resort to single-merchant online stores.

### 3.    Social media, comparison shopping sites, and promotional sites are not interchangeable with online retail marketplaces.

75.    The European Commission, in its investigation of Google Search (Shopping), found that price comparator sites and search engines (such as Google Shopping) belong to a relevant market distinct from that of e-platforms (such as Amazon and eBay).[107]

76.    In its 2013 report and investigation of Amazon Marketplace, the German antitrust authority, BKartA, considered the impact of Amazon's pricing policies in the "national market for B2C online platform services for the sale of a general product range which does not include auction platforms, price comparison engines or online advertising."[108]

77.    Although like marketplaces, comparison sites allow consumers to compare the online offers of the same good from multiple sellers, these sites do not allow sales transactions on the platform and, consequently, they do not offer any of the additional services that complement the marketplace offerings to consumers and sellers.[109] They also serve a different commercial function for the online merchant. Comparator sites charges the merchant each time a user arrives

---

[106] *Id.* ¶ 538.

[107] European Competition Commission, Case AT.39740 *Google Search* (*Shopping*), §216, https://ec.europa.eu/competition/antitrust/cases/dec_docs/39740/39740_14996_3.pdf.

[108] BKartA Decision at 3.

[109] AGCM Report ¶¶ 566-67.



at the e-commerce site through the comparator, whether the contact translates into a purchase or not. On the other hand, the marketplaces provide for commissions to be paid by the sellers calculated as a percentage of the value of the transactions carried out on the platform.[110]

78.     Like price comparators, offers from online sellers available through social media also lack the online retail marketplace's ability to conduct the sales transaction directly on the platform.[111] And sites that principally offer promotions, like Groupon, do not offer a viable alternative to the marketplace for third-party sellers because they only offer space for promotional sales for a short and defined period of time and because merchants selling unfamiliar brands typically do not benefit from such promotions.[112]

79.     In consideration of the extremely different business models social media, price comparators, and promotional sites rely on as opposed to the online marketplace model, it would require substantial investments and changes to their respective business organizations before they could extend the same benefits to third party sellers or consumers as online marketplaces currently offer.[113]

### 4.     Online marketplaces with limited categories of goods are not reasonably interchangeable with broad-based online marketplaces.

80.     Specialized online marketplaces, *e.g.*, clothing or electronics, provide reasonable substitutes at most for a subset of online merchants that market goods falling within the specialized marketplaces' product categories.[114]

81.     From the consumers' perspective, the large number of product categories on broad-based marketplaces make them attractive for multiple and diversified purchases, even on the same purchase occasion. On the other hand, specialized marketplaces only satisfy the needs of the consumer who is looking for a specific product within the category covered.[115] It follows that

---

[110] *Id.*

[111] *Id.* ¶ 569.

[112] *Id.* ¶ 570.

[113] *Id.* ¶ 571.

[114] *Id.* ¶ 575.

[115] *Id.* ¶ 576.

HAGENS BERMAN

specialized marketplaces serve a different purpose, making them complementary and not alternative to an online retail marketplace from the consumer's perspective.[116] The same is true for third-party sellers, only a small percentage of whom sell on specialized marketplaces.[117]

**D.    Amazon's MMAs harm both sides of the Online Retail Marketplace Market and create barriers to competition from other online retail marketplaces.**

82.    Amazon harms both third-party sellers and consumers alike through its MMAs. MMAs harm third-party sellers because they cannot compete on price with Amazon and lose sales opportunities that would otherwise be available to them in a competitive market. MMAs harm consumers because they overpay for products inflated by Amazon's MMAs.

83.    In theory, Amazon's third-party sellers should provide significant competition to Amazon's own retail sales. From 1999 to the present, third-party sellers' sales have grown from 3% to 56% of the sales on Amazon Marketplace:[118]



84.    But Amazon's first-party retail sales remain its largest source of revenue[119]:

---

[116] *Id.*

[117] *Id.* ¶ 579.

[118] Chart reprinted from: *Amazon GMV in 2019*, Marketplace Pulse (Feb. 4, 2019), https://www.marketplacepulse.com/articles/amazon-gmv-in-2019; Amazon Percent of Units by Marketplace Sellers 2004-2021, Marketplace Pulse, https://www.marketplacepulse.com/stats/amazon/amazon-percent-of-units-by-marketplace-sellers-1.

[119] Chart reprinted from: *Minimum Viable Amazon*, Marketplace Pulse (Jan 21, 2021), https://www.marketplacepulse.com/articles/minimum-viable-amazon.





85.     Despite the growth of the third-party sellers' sales on Amazon Marketplace, they have not significantly threatened Amazon's own retail business. Many third-party sellers gain traction on Amazon, not by selling the same established brands that Amazon sells, but by finding a unique source, establishing exclusive rights to sell on Amazon, or selling goods other sellers cannot source.[120] Amazon does not face price competition from its third-party sellers in the sale of its suppliers' goods because its MMAs allow Amazon to match any price without losing any revenue. The effect of MMAs is clear: Amazon's first-party net sales have enjoyed a steady growth since the advent of Amazon Marketplace, including an average 20% increase each year since 2014[121]:

---

[120] *The Disappearing Amazon Resellers*, Marketplace Pulse (Jan. 26, 2021), https://www.marketplacepulse.com/articles/the-disappearing-amazon-resellers.

[121] Lukas Peters, amazon.com: E-Commerce net sales from 2014 to 2022, Statista (Sep 24, 2021), https://www.statista.com/forecasts/1218313/amazon-revenue-development-ecommercedb.





86.    And by cutting out price competition from other online retailers and online retail marketplaces by the same device, Amazon's MMAs also deter new internet marketplace operators from entering the market and existing competitors from expanding their share.[122] In a competitive market, these competitors could reduce prices on the platform to attract more consumers and third-party sellers, but Amazon's MMAs defeats these efforts.

**E.    Amazon dominates the Online Retail Marketplace Market.**

87.    Amazon's anticompetitive conduct has allowed it to maintain or increase its market share of the Online Retail Marketplace Market, which is estimated to be as high as 90% of all U.S. online marketplace sales.[123]

88.    For many U.S. consumers online shopping is virtually synonymous with Amazon. Before making a purchase, 82% of consumers check prices from Amazon, 79% check Amazon's

---

[122] *See* BKartA Decision at 3.

[123] *Supra Amazon Marketplace is 25% of US E-commerce.*



reviews, and 74% of US consumers go directly to Amazon when they are ready to purchase a specific product.[124]

### 1. Online retail marketplaces, like Amazon Marketplace, have powerful network effects.

89.     Online retail marketplaces like Amazon Marketplace benefit from powerful network effects. "Network effect" refers to any situation in which the value of a product, service, or platform depends on the number of buyers, sellers, or users who use that product, service, or platform.[125] Indirect network effects occur when the benefit of the platform increases for one user group (e.g., third-party sellers) when more people join from the other group of users (e.g., consumers).

90.     Amazon Marketplace is the prototypical example of indirect network effects. Amazon' consumer base of hundreds of millions of customers makes it indispensable to third-party sellers, and its 2.4 million active third-party sellers help to secure its customers' loyalty, who cannot find the breadth of products that Amazon's marketplace offers anywhere else.

91.     As a first-party retailer, Amazon sells 12 million products on its marketplace—not including books, media, wine, and services.[126] Amazon Marketplace, inclusive of third-party sellers' product offerings, expands to about 350 million products.[127]

92.     Amazon relies primarily on its logistics service (FBA) to bind third-party sellers to Amazon Marketplace and Prime membership to bind consumers.[128] Currently, over 90% of Amazon sellers use FBA; most use it exclusively.[129] Using FBA makes it more expensive for third-

---

[124] The 2019 Amazon Consumer Behavior Report, https://fv.feedvisor.com/rs/656-BMZ-780/images/Feedvisor-Consumer-Survey-2019.pdf at 14-15.

[125] Tim Stobierski, *What are network effects?*, Harvard Business School Online (Nov. 12, 2020), https://online.hbs.edu/blog/post/what-are-network-effects (last visited Feb. 23, 2022).

[126] *How many products does Amazon carry?*, Retail TouchPoints, https://www.retailtouchpoints.com/resources/how-many-products-does-amazon-carry (last visited Feb. 23, 2022).

[127] 15 Amazon Statistics You Need to Know in 2022, repricerexpress.com, https://www.repricerexpress.com/amazon-statistics/.

[128] AGCM Report ¶ 733.

[129] Dave Hamrick, Amazon FBA vs FBM: Which is Better? 2021 Comparison Guide, junglescout.com (Jan. 4, 2021), https://www.junglescout.com/blog/amazon-fba-vs-fbm/.



party sellers to expand to other marketplaces, especially since competing channels do not want their customers to receive boxes with Amazon branding.[130]

93. In a letter to shareholders, Jeff Bezos described how Amazon's FBA-Prime-Marketplace strategy works: "Every time a seller joins FBA, Prime members get more Prime eligible selection. The value of membership goes up. This is powerful for our flywheel. FBA completes the circle: Marketplace pumps energy into Prime, and Prime pumps energy into Marketplace."[131] In other words, Amazon itself extols the network effects of its unique marketplace business model: the more FBA sellers, the more Prime products, to the advantage of Prime users and, therefore, the more Prime users, the more Prime Product Purchases, to the advantage of FBA sellers, which in turn generate more FBA Sellers, etc.[132]

94. As one top seller explained: "It doesn't seem appealing to me to add an enormous burden of having another inventory somewhere other than Amazon just to be able to sell 10% more than we currently sell on Amazon."[133] Amazon's stronghold is therefore built on the army of third-party sellers with inventory stored in FBA, and what's keeping the merchants on Amazon are the hundreds of millions of customers, lured both by Amazon's infinite shelf space and the below-cost shipping available through Amazon's Prime membership.[134]

95. Amazon's strong network effects when tied with its order fulfillment services and massive data advantage only further allows Amazon to exercise its market power. As Dr. Fiona Scott Morton, a Yale economist, explained to the House subcommittee on antitrust, "[d]igital platforms combine economies of scale, low marginal costs, economies of scope through data and an installed base of users, network effects, multi-sidedness, and sometimes a global reach" and when combined these attributes "tend to generate concentrated markets, or market structures

---

[130] *Castle Amazon*, Market Pulse (Nov.14, 2018), https://www.marketplacepulse.com/articles/castle-amazon.

[131] Amazon 2014 Annual Report, EX-99.1 (sec.gov), https://www.sec.gov/Archives/edgar/data/1018724/000119312515144741/d895323dex991.htm.

[132] AGCM Report ¶ 733.

[133] *Supra Castle Amazon.*

[134] *Id.*

HB | HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

containing few firms," and, "[w]ith the addition of inertial (or 'sticky') consumers these markets feature high entry barriers which make it difficult for new firms to enter the market to create competition."[135]

96.      The House subcommittee on antitrust itself recognized that "large technology firms" like Amazon "maintain market power in part because it is not easy for users to switch away from the incumbent's technology."[136] For example, a third-party merchant cannot easily download and migrate its ratings and reviews from Amazon Marketplace and would instead have to start without ratings and reviews on a new platform.[137] The difficulty users face with switching away from Amazon's technology causes both consumers and third-party sellers to stick with Amazon even though they may prefer an Amazon rival.[138]

97.      Amazon further strengthens its market power by compiling a massive set of consumer data based on its retail customers' shopping information—including how long a consumer browses a product.[139] An Amazon former employee revealed that the internal data that the online retail giant complies is more sophisticated and unrivaled by similar data in the public domain or collected by third-party tools.[140] Amazon's extravagant data collection efforts have helped Amazon grow into an online retail juggernaut by allowing it to determine how consumers spend their money.[141]

---

[135] Testimony of Fiona M. Scott Morton, Ph.D., House Judiciary Committee (Mar. 7, 2019), https://docs. house.gov/meetings/JU/JU05/20190716/109793/HHRG-116-JU05-Wstate-ScottMortonF-20190716.pdf (last visited Feb. 23, 2022).

[136] House Report at 41.

[137] *Id.* at 42.

[138] *Id.* at 41-42.

[139] *See Amazon.com Privacy Notice*, AMAZON.COM, https://www.amazon.com/gp/help/customer/display.html? nodeId=201909010#GUID-1B2BDAD4-7ACF-4D7A-8608-CBA6EA897FD3__SECTION_87C837F9CCD84769B 4AE2BEB14AF4F01 (last visited Feb. 23, 2022).

[140] Krystal Hu, *Revealed: How Amazon Uses Third-Party Seller Data to Build a Private Label Juggernaut*, YAHOO FINANCE (Sept. 27, 2019), https://www.yahoo.com/lifestyle/amazon-uses-thirdparty-sellers-data-to-build-private-labels-145813238.html (last visited Feb. 23, 2022).

[141] Jennifer Wills, *7 Ways Amazon Uses Big Data to Stalk You* (AMZN), INVESTOPEDIA (Oct. 20, 2018), https://www.investopedia.com/articles/personal-finance/070215/how-buying-amazoncom-works.asp (last visited Feb. 23, 2022).



## 2. Amazon does not face any serious competitive threat to its dominance in the Online Retail Marketplace Market.

98.     Amazon's size alone is direct evidence of its market power. Amazon's market capitalization is currently $1.151 trillion.[142] By that measure, Amazon is the world's fifth-biggest company. Big box stores do not pose a credible threat to Amazon Marketplace. While they may have a significant number of visitors to their website, they cannot compete with the broad catalogue of goods available on online retail marketplaces or the marketplaces' ability to deliver to their customers.[143] Because "most marketplaces launched by retailers" do not invest in the infrastructure necessary to resolve those issues, they "fail to generate significant sales volume."[144] For example, Best Buy launched its marketplace in the U.S. in 2011, only to shut it down five years later because of "customer confusion over marketplace purchases."[145] Jeff Shelman, Best Buy spokesperson, explained that its customers were frustrated by Best Buy's "inability to offer in-store pickup for items offered for sale by third-party sellers" or allow its customers to return those "items to Best Buy's retail stores."[146]

99.     Other Big Tech companies have failed to challenge Amazon's dominance. After attracting fewer than 8,000 sellers even with promise of eliminating seller commissions,[147] Google exited the online marketplace market last year.[148]

100.    Nor does the specialized ecommerce platform, Shopify, pose a risk to Amazon Marketplace's dominance. As recently confirmed by CEO Tobi Lütke, Shopify has no current intention of competing with Amazon in the Online Retail Marketplaces Market.[149] Nor is there a

---

[142] https://companiesmarketcap.com/amazon/marketcap/ (last visited June. 28, 2022).

[143] *Retailers Do Not Need Marketplaces*, Marketplace Pulse (Nov. 14, 2018), https://www.marketplacepulse.com/articles/retailers-do-not-need-marketplaces.

[144] *Id.*

[145] *Id.*

[146] *Id.*

[147] *Google Shopping Is Not Attracting Sellers Despite 0% Fees*, Marketplace Pulse (Sep. 30, 2020), https://www.marketplacepulse.com/articles/google-shopping-is-not-attracting-sellers-despite-0-fees.

[148] *Google Promised a Marketplace but Then Gave Up*, Marketplace Pulse (Aug. 19, 2021), https://www.marketplacepulse.com/articles/google-promised-a-marketplace-but-then-gave-up.

[149] *Shopify Won't Build a Marketplace*, Marketplace Pulse (Apr. 6, 2021); Lucy Carney, *Shopify vs Amazon: Which Platform Should You Use?* (February 23, 2022), https://www.websitebuilderexpert.com/ecommerce-website-

realistic chance that it would do so in the near future. Shopify's business model differs significantly from Amazon. Amazon Marketplace benefits from the indirect network effects of having the largest consumer base and the largest product and seller offering. In comparison, Ben Thompson at Stratechery explains, online retailers "are Shopify's reason to exist," but they "are not a point of leverage for Shopify to build a consumer brand[.]"[150] Shopify helps retailers build their own online store, but it does not help them reach online customers, and conversely Shopify's consumer-facing app does not even allow consumers to search for products across Shopify stores.[151]

101.    Sally Hubbard, former New York Assistant Attorney General and current Director of Enforcement Strategy at the Open Markets Institute, observes, consumers "benefit from robust competition, open markets, and a de-concentrated economy," where "the best rise to the top because of merit, not because powerful gatekeepers control who gets to succeed."[152]

102.    In China, for example, where Amazon withdrew from the market because of the fierce competition it faced, consumers have many innovative options for online shopping.[153] Most Chinese sites offer next-day shipping, which Amazon Marketplace struggles to provide.[154] Payment for Chinese e-commerce is also commonly held in an escrow and then released once the delivery occurs, eliminating many disputes related to shipping.[155] Online sites in China provide shoppers extensive product suggestions based on machine learning, allow consumers to skip time-consuming credit card transactions by using mobile payment, and permit consumers to avoid the chaos of China's equivalent of Black Friday by paying a security deposit to reserve products at the

---

builders/comparisons/shopify-vs-amazon/https://www.marketplacepulse.com/articles/shopify-wont-build-a-marketplace.

[150] *Id.*

[151] *Shopify's Almost-Marketplace Called Shop*, Marketplace Pulse (Apr. 29, 2020), https://www.marketplacepulse.com/articles/shopifys-almost-marketplace-called-shop.

[152] Amazon Is a Monopoly, an Interview With Sally Hubbard - Marketplace Pulse (Aug. 6, 2019), https://www.marketplacepulse.com/articles/amazon-is-a-monopoly-an-interview-with-sally-hubbard.

[153] Arjun Kharpa, *Amazon is shutting down its China marketplace business. Here's why it has struggled*. CNBC (Apr. 19, 2019), https://www.cnbc.com/2019/04/18/amazon-china-marketplace-closing-down-heres-why.html.

[154] *The Real Difference Between China and US E-Commerce*, Enleaf, https://enleaf.com/the-real-difference-between-china-and-us-e-commerce/.

[155] *Id.*



sales price weeks before the sale occurs.[156] And built-in online chat forums allow consumers to bargain with online sellers.[157]

103.    In a competitive market, U.S. consumers would likely benefit from similar innovations. But facing no serious competition in the Online Retail Marketplace Market, Amazon does not innovate: "The feedback Amazon gathered over the years is that it doesn't need to do more than it already does," and instead it "spends most of its resource" on fortifying its monopoly power.[158] This includes Amazon's enforcement of MFNs to prevent price competition with the products it sells as part of its first-party retail sales.

**F.      Amazon alternatively dominates the Online Retail Market or submarkets for specific product categories sold online.**

104.    The House Report found that the Online Retail Sales Market is a distinct market and that Amazon dominates it. *See supra* Sec. C.1. This represents an alternative market, in the event the Online Retail Marketplaces Market is not found to be the relevant market in which to assess the impact of Amazon's MMAs.

105.    As a further alternative, Amazon has minimally obtained monopoly power in the product category submarkets with U.S. online retail markets, where its market share exceeds 50%. For example, in 2018, tracking the number of online purchases across 100 million devices from 500 different e-commerce retailers and marketplaces, market analyst, Jumpshot, found that Amazon Marketplace had a 97% share of online battery purchases, 94% share of online kitchen and dining product purchases, a 93% share of online home improvement tool purchases, a 92% share of online golf-related product purchases and a 91% share of online skin care product purchases.[159]

---

[156] *Supra* Kaur.

[157] *Supra The Real Difference Between China and US E-Commerce.*

[158] *Supra Minimum Viable Amazon.*

[159] Amy Gresenhues, *Amazon Owns More Than 90% Market Share Across 5 Different Product Categories [Report]*, Marketing Land (May 31, 2018), https://martech.org/amazon-owns-more-than-90-market-share-across-5-different-product-categories-report/.



106.    In a 2019 report, Jumpshot found that Amazon Marketplace had over 50% market share in 18 categories:[160]



## Amazon Market Share by Top-Level Category

| Category | Market Share |
|---|---|
| Musical Instruments & Karaoke | 94% |
| Automotive | 92% |
| Health | 91% |
| Sports, Fitness & Outdoors | 87% |
| Party, Arts & Crafts | 85% |
| Household Essentials | 83% |
| Office | 83% |
| Home Improvement | 82% |
| Electronics | 82% |
| Toys & Video Games | 81% |
| Personal Care | 81% |
| Beauty | 73% |
| Home | 72% |
| Appliances | 70% |
| Jewelry & Accessories | 70% |
| Pets | 68% |
| Baby | 67% |
| Furniture | 54% |

## VI.    INTERSTATE TRADE AND COMMERCE

107.    Amazon's activities as alleged in this complaint were within the flow of, and substantially affected, interstate commerce. Amazon sells goods online across, and without regard to, state lines.

## VII.    CLASS ACTION ALLEGATIONS

108.    Plaintiffs bring this action on behalf of themselves, and as a class action under the Federal Rules of Civil Procedure ("Rules"), specifically Rules 23(a)) and (b)(3), seeking damages pursuant to antitrust laws (*see infra* Causes of Action) on behalf of the members of the following Classes:

> **National Class**: All persons who, on or after July 13, 2018, purchased goods from Amazon subject to its minimum margin agreements.

---

[160] 2019 Jumpshot report, Losers Brands and Retailers Who Couldn't Make It Happen in 2018 at 21.



**State Classes**[161]: All persons who, on or after July 13, 2018, purchased in [state] goods from Amazon subject to its minimum margin agreements.

109.    Excluded from the Class are Amazon and its officers, directors, management, employees, subsidiaries, or affiliates. Also excluded from the Class are the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members, judicial officers and their personnel, and all governmental entities. Further excluded from the class are individuals who are already pursuing antitrust claims based on Amazon's SBA program on their individual behalf in arbitration before the American Arbitration Association.

110.    The identities of all Class members are readily identifiable from information and records maintained by Amazon.

111.    **Numerosity:** Members of the Class are so numerous that joinder is impracticable. Plaintiffs believe that there are more than a hundred million members of the Class, geographically dispersed throughout the United States, such that joinder of all class members is impracticable.

112.    **Typicality:** Plaintiffs' claims are typical of the claims of the other Class members. The factual and legal bases of Amazon's liability are the same and resulted in injury to Plaintiffs and all other members of the proposed Class.

113.    **Adequate representation:** Plaintiffs will represent and protect the interests of the proposed Class both fairly and adequately. They have retained counsel competent and experienced in complex class-action litigation. Plaintiffs have no interests that are antagonistic to those of the proposed Class, and their interests do not conflict with the interests of the proposed Class members they seek to represent.

114.    **Commonality:** Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members because Amazon has acted on grounds generally applicable to the Class and because Class members share a common injury. Thus, determining damages with respect to the Class as a whole is appropriate. The common applicability of the relevant facts to claims of Plaintiffs and the proposed Class are

---

[161] Plaintiffs assert State Classes on behalf of California and Maryland purchasers.



1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

inherent in Amazon's wrongful conduct because the overcharge injuries incurred by Plaintiffs and each member of the proposed Class arose from the same anticompetitive conduct alleged herein.

115.     There are common questions of law and fact specific to the Class that predominate over any questions affecting individual members, including:

      a.  Whether Amazon's MMAs with its suppliers unreasonably restrain trade in the relevant markets in violation of section 1 of the Sherman Act;

      b.  Whether Amazon unlawfully acquired or maintained its monopoly in the relevant market, including by way of the contractual terms, policies, practices, mandates, and restraints described herein;

      c.  Whether competition in the relevant market has been restrained and harmed by Amazon's monopolization of this market;

      d.  Whether Amazon's MMAs violate California and Maryland's antitrust laws;

      e.  Whether consumers and Class members have been damaged by Amazon's conduct;

      f.  The amount of any damages; and

      g.  The scope of any injunctive relief.

116.     **Predominance and superiority:** This proposed class action is appropriate for certification. Class proceedings on behalf of the Class members are superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable. Resolution of the Class members' claims through the class action device will present fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court.

## VIII.   ANTITRUST INJURY AND STANDING

117.     During the Class Period, Plaintiffs and Class members directly purchased from Amazon goods that its sells as a first-party seller. Because of Defendant's anticompetitive conduct, Plaintiffs and Class members were forced to pay more for those purchases than they would have if Amazon had not unreasonably restrained competition in the price of products subject to its MMAs with its suppliers. Defendant therefore has caused Plaintiffs and Class members to suffer overcharge damages. Plaintiffs and Class members have standing therefore as direct purchasers of goods inflated by Amazon's anticompetitive agreements. Because Defendant continues to restrain

trade and exploit its market dominance through its enforcement of anticompetitive MMAs, Plaintiffs and Class members are reasonably likely to incur future overcharges when they make additional purchases from Amazon of products subject to its MMAs. Both the actual harm and the threat of future harm are cognizable antitrust injuries directly caused by Defendant's violations of federal antitrust laws, including its anticompetitive agreement with its suppliers, and its monopolization of the relevant markets, as alleged herein.

## IX.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATION OF 15 U.S.C. § 1
### (ON BEHALF OF NATIONAL CLASS)

118.    Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

119.    Plaintiffs bring this federal law claim on their own behalf and on behalf of each member of the proposed nationwide Class described above.

120.    Amazon and its suppliers entered into MMAs, whereby the suppliers contractually guarantee that Amazon receives a minimum margin on the sale of the products they supply to Amazon for resale on Amazon Marketplace.

121.    The MMAs are unreasonable restraints on trade because they penalize the suppliers if other, more efficient retailers can sell the same products at a lower price. The purpose and effect of these agreements is to create an illegal price floor.

122.    Amazon is liable for the creation, maintenance, and enforcement of its agreements with its suppliers under a "quick look" or rule-of-reason standard.

123.    For purposes of Plaintiffs and Class members' quick-look or rule-of-reason claims, the relevant geographic market is the United States. The relevant product market is the Online Retail Marketplace Market or the alternative markets defined above. *See supra* Secs. C-F.

124.    Amazon's MMAs with its suppliers have an open and obvious adverse effect on competition in the Online Retail Marketplace Market. Amazon is the gatekeeper for ecommerce in the United States and as much as 90% of all online marketplace sales occur on Amazon Marketplace. Amazon holds at least a 50% share of the alternative product markets. Amazon's



MMAs insulate it from competition from other online retailers by ensuring that no other online retailer can sell the goods supplied to Amazon at a lower price.

125.    A straightforward application of fundamental economic principles shows that the arrangements in question would have an anticompetitive effect on customers and the relevant market.

126.    Amazon and its suppliers did not act unilaterally or independently when entering into the MMAs. The MMAs substantially, unreasonably, and unduly restrained trade in the relevant markets, and harmed Plaintiffs and the Class thereby.

127.    Amazon's MMAs have no legitimate, pro-competitive business justification or any justification that outweighs its harmful effect. Even if there were some conceivable justification, the MMAs are broader than necessary to achieve such a purpose.

128.    Plaintiffs and members of the Class were injured in their business or property by paying higher prices for purchases on Amazon Marketplace than they would have paid in the absence of Amazon's unlawful conduct. They are entitled to overcharge damages as alleged in this Complaint.

## SECOND CAUSE OF ACTION
### VIOLATION OF 15 U.S.C. § 2
### (ON BEHALF OF NATIONAL CLASS)

129.    Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

130.    Plaintiffs bring this federal law claim on their own behalf and on behalf of each member of the proposed nationwide Class described above.

131.    Defendant obtained monopoly power in the relevant markets, *see supra* Secs. C-F, as demonstrated by its power to set the price of goods sold in the relevant markets and Defendant's dominant market shares.

132.    Amazon has gained and maintains monopoly power in the applicable markets by improper and unlawful means.

133.    Defendant has willfully acquired or maintained its monopoly power in the applicable markets in part through its enforcement of its MMAs. These agreements with Amazon's



suppliers establish a price floor based on Amazon's price listings on its marketplace. By requiring its suppliers to apply a price floor on all other online retail platforms, Defendant has largely immunized its retail business from competitive pricing in the relevant markets and caused goods sold on Amazon Marketplace to be listed at supra-competitive prices.

134.    Plaintiffs and the Class members have been injured and will continue to be injured in their businesses and property by paying more for goods on Amazon Marketplace than they would have paid or would pay in the future in the absence of Defendant's unlawful acts. They are entitled to overcharge damages and an injunction that terminates the ongoing violations alleged in this Complaint.

**THIRD CAUSE OF ACTION**
**VIOLATION OF CALIFORNIA'S CARTWRIGHT ACT,**
**CAL. BUS. & PROF. CODE § 16700, ET SEQ.**
**(*PER SE* VIOLATION ON BEHALF OF THE CALIFORNIA CLASS)**

135.    California Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

136.    California Plaintiffs bring this California law claim on their own behalf and on behalf of each member of the proposed California Class described above.

137.    California Plaintiffs have standing under the Cartwright Act as direct purchasers of goods that Amazon sells to them at prices inflated by its anticompetitive MMAs.

138.    The California Business & Professions Code generally governs conduct of corporate entities. The Cartwright Act, Cal. Bus. & Prof. Code §§ 16700-16770, governs antitrust violations in California.

139.    California policy is that "vigorous representation and protection of consumer interests are essential to the fair and efficient functioning of a free enterprise market economy," including by fostering competition in the marketplace. Cal. Bus. & Prof. Code § 301.

140.    A trust in California is any combination intended for various purposes, including, but not limited to, creating or carrying out restrictions in trade or commerce, increasing the price



1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

of merchandise, or preventing competition in the market for a commodity. Cal. Bus. & Prof. Code § 16720.

141.    Through its MMAs, Defendant entered into an illegal trust with its suppliers. These agreements establish a floor price based on the sum of the supplier's wholesale price to Amazon along with the minimum margin it guarantees to Amazon with each sale. By agreeing that its suppliers will pay Amazon if Amazon's competitors price below this floor, Amazon has ensured that its suppliers will enforce a minimum resale price to prevent Amazon's competitors from offering a lower price than Amazon. This restraint of competition caused Plaintiff and class members to overpay for goods subject to MMAs.

142.    Every trust to restrain trade in California is *per se* unlawful except as provided by the Code. *Id.* at § 16726. No exceptions apply to Defendant's conduct.

143.    Although California Plaintiffs do not believe it is necessary to prove market impact, to the extent it is necessary, the relevant markets for purposes of this claim are the markets defined in this complaint, *see supra* Secs. C-F, where Amazon dominates.

144.    California Plaintiffs and Class members have been injured and will continue to be injured in their businesses and property by paying more for goods subject to Amazon's MMAs than they would have paid or would pay in the future in the absence of Defendant's unlawful acts. They are entitled to overcharge damages and an injunction that terminates the ongoing violations alleged in this Complaint.

### FOURTH CAUSE OF ACTION
### VIOLATION OF MD. CODE ANN., COM. LAW § 11-201, *ET SEQ.*
### (*PER SE* VIOLATION ON BEHALF OF THE MARYLAND CLASS)

145.    Maryland Plaintiff repeats and re-make every allegation above as if set forth herein in full.

146.    Maryland Plaintiff brings this Maryland Antitrust Act claim on his own behalf and on behalf of each member of the proposed statewide Class of Maryland direct purchasers, as described above.



1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

147. Maryland Plaintiff has standing under the Maryland Antitrust Act as a direct purchaser of the goods that Amazon sells to him at a price inflated by its anticompetitive MMAs.

148. The Maryland Antitrust Act, MD. Code Ann., Com. Law § 11-201, *et seq*., governs antitrust violations in Maryland. It prohibits, inter alia, any contract, combination, or conspiracy with one or more other persons that unreasonably restrains trade or commerce. *See* §11-204.

149. Under the Maryland Antitrust Act, a "contract, combination, or conspiracy that establishes a minimum price below which a retailer, wholesaler, or distributor may not sell a commodity" is a *per se* violation of Maryland antitrust law. § 11-204(b).

150. Although Maryland Plaintiff does not believe it is necessary to prove market impact, to the extent it is necessary, the relevant markets for purposes of this claim are the markets defined in this complaint, *see supra* Secs. C-F, where Amazon dominates.

151. Through its MMAs, Defendant entered into an illegal agreement with its suppliers to establish a floor price based on the sum of the supplier's wholesale price to Amazon along with the minimum margin it guarantees to Amazon with each sale. By agreeing that its suppliers will pay Amazon if Amazon's competitors price below this floor, Amazon has ensured that its suppliers will enforce a minimum resale price to prevent Amazon's competitors from offering a lower price than Amazon. This restraint of competition caused Plaintiff and class members to overpay for goods subject to MMAs.

152. Defendant has engaged in a contract, combination, or conspiracy with its co-conspirator suppliers that establishes a minimum price below which a retailer may not sell a commodity in violation of § 11-204(b).

153. Maryland Plaintiff and Class members have been injured and will continue to be injured in their businesses and property by paying more for goods subject to Amazon's MMAs than they would have paid or would pay in the future in the absence of Defendant's unlawful acts. They are entitled to overcharge damages and an injunction that terminates the ongoing violations alleged in this Complaint.

HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

**JURY TRIAL DEMANDED**

154.    Plaintiffs hereby demand a trial by jury of all the claims asserted in this Complaint.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Amazon as follows:

A.    The Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representative and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.    Adjudication that the acts alleged herein constitute unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. § 1;

C.    Actual damages, treble damages, and such other relief as provided by the statutes cited herein;

D.    Pre-judgment and post-judgment interest on such monetary relief;

F.    The costs of bringing this suit, including reasonable attorneys' fees; and

G.    All other relief to which Plaintiffs and members of the Class may be entitled at law or in equity.

DATED this 13th day of July, 2022

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By:    */s/ Steve W. Berman*
Steve Berman (WSB # 12536)
By:    */s/ Barbara Mahoney*
Barbara Mahoney (WSB# 31845)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone:    (206) 623-7292
Facsimile:    (206) 623-0594
Email:    steve@hbsslaw.com
barbaram@hbsslaw.com

*Counsel for Plaintiffs and the Proposed Class*



1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX