The Honorable John H. Chun

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CHRISTOPHER BROWN, SCOTT GRAEBER, LAURA LOES, LETICIA SHAW, and DAVID ATWOOD, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

AMAZON.COM, INC., a Delaware corporation,

Defendant.

No. 2:22-cv-00965-JHC

AMAZON.COM, INC.'S MOTION TO DISMISS

***NOTE ON MOTION CALENDAR:***
December 16, 2022

***Oral Argument Requested***

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................. 3

    A.    Amazon's Store and Its Dealings with Suppliers ................................. 3
    B.    Plaintiffs' Theory of Harm ................................................................... 4
    C.    The Retail Landscape ........................................................................... 5
    D.    Plaintiffs ................................................................................................. 6

LEGAL STANDARDS ....................................................................................... 6

ARGUMENT ........................................................................................................ 7

I.    PLAINTIFFS LACK ANTITRUST STANDING. ....................................... 7

    A.    The Alleged Anticompetitive Conduct Occurred in a Market Involving
        Wholesale Suppliers Selling to Retailers, and Plaintiffs Do Not Participate
        in Such a Market. ................................................................................... 7
    B.    Plaintiffs Are Not Efficient Enforcers of the Antitrust Laws. ............. 8

II.    COURTS ARE RELUCTANT TO INTERFERE WITH NEGOTIATIONS
    BETWEEN A RETAILER AND ITS SUPPLIERS. ................................... 11

    A.    Margin Protection Agreements Reflect Lawful and Procompetitive Price
        Negotiations. ........................................................................................ 11
    B.    Amazon Can Lawfully Bargain for Lower Costs Because It Is Free to
        Choose the Terms on Which It Deals with Its Suppliers. .................... 13

III.    PLAINTIFFS' SHERMAN ACT CLAIMS FAIL FOR ADDITIONAL,
    INDEPENDENT REASONS. ........................................................................ 15

    A.    Plaintiffs Fail to State a Section 1 Claim under the Quick-Look
        Framework. ........................................................................................... 15
    B.    Plaintiffs' Sections 1 and 2 Claims Fail Because the Complaint Does Not
        Plausibly Allege Anticompetitive Effects. .......................................... 17
    C.    Plaintiffs Fail to State Section 1 and 2 Claims Because They Do Not
        Allege Cognizable Relevant Markets. ................................................. 20

IV.    PLAINTIFFS' CLAIMS UNDER CALIFORNIA AND MARYLAND LAW
    FAIL FOR THE SAME REASONS PLAINTIFFS' FEDERAL CLAIMS FAIL. ........ 23

CONCLUSION .................................................................................................... 24

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*49er Chevrolet, Inc.* v. *Gen. Motors Corp.*,
803 F.2d 1463 (9th Cir. 1986) ...........................................................................14

*AAA Liquors, Inc.* v. *Joseph E. Seagram & Sons, Inc.*,
705 F.2d 1203 (10th Cir. 1982) .....................................................................12, 16

*AFMS LLC* v. *United Parcel Serv. Co.*,
105 F. Supp. 3d 1061 (C.D. Cal. 2015) ...............................................................16

*Am. Ad Mgmt, Inc.* v. *Gen. Tel. Co. of California*,
90 F.3d 1051 (9th Cir. 1999) .................................................................................8

*Am. Ad Mgmt., Inc.* v. *GTE Corp.*,
92 F.3d 781 (9th Cir. 1996) ...................................................................................7

*In re Amazon.com, Inc. eBook Antitrust Litigation*,
2022 WL 4581903 (S.D.N.Y. 2022).................................................................17, 19

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
19 F.4th 127 (2d Cir. 2021) ...............................................................................9, 10

*Ohio* v. *Am. Express*,
138 S. Ct. 2274 (2018)......................................................................................20, 23

*Analogix Semiconductor Inc.* v. *Silicon Image, Inc.*,
2008 WL 8096149 (N.D. Cal. 2008) ....................................................................20

*Andrx Pharms.* v. *Biovail Corp. Int'l*,
256 F.3d 799 (D.C. Cir. 2001) .............................................................................10

*United States* v. *Apple*,
791 F.3d 290 (2d Cir. 2015)............................................................................16, 17

*Ashcroft* v. *Iqbal*,
556 U.S. 662 (2009)...............................................................................................6

*Ass'n of Wash. Pub. Hosp. Dists.* v. *Philip Morris Inc.*,
241 F.3d 696 (9th Cir. 2001) .................................................................................8

*Associated General Contractors of California, Inc.* v. *California State Council of Carpenters*,
459 U.S. 519 (1983)...........................................................................................1, 8

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

*Atl. Richfield Co.* v. *USA Petrol. Co.*,
 495 U.S. 328 (1990) ..................................................................................11

*Austin* v. *Blue Cross & Blue Shield of Ala.*,
 903 F.2d 1385 (11th Cir. 1990) ...............................................................13

*Bell Atl. Corp.* v. *Twombly*,
 550 U.S. 544 (2007) ....................................................................................6

*Big Bear Lodging Ass'n* v. *Snow Summit, Inc.*,
 182 F.3d 1096 (9th Cir. 1999) ...................................................................21

*Blue Shield of Virginia* v. *McCready*,
 457 U.S. 465 (1982) ...................................................................................10

*Brantley* v. *NBC Universal, Inc.*,
 675 F.3d 1192 (9th Cir. 2012) ...................................................................20

*Brillhart* v. *Mut. Med. Ins., Inc.*,
 768 F.2d 196 (7th Cir. 1985) .....................................................................13

*Bubar* v. *Ampco Foods, Inc.*,
 752 F.2d 445 (9th Cir. 1985) .......................................................................7

*Butera* v. *Sun Oil Co.*,
 496 F.2d 434 (1st Cir. 1974) ......................................................................13

*Cable Line, Inc.* v. *Comcast Cable Communications of Pennsylvania, Inc.*,
 2017 WL 4685359 (M.D. Pa. 2017) ...............................................21, 22, 23

*Campfield* v. *State Farm Mut. Auto. Ins. Co.*,
 532 F.3d 1111 (10th Cir. 2008) ............................................................20, 22

*City of Oakland* v. *Oakland Raiders*,
 20 F.4th 441 (9th Cir. 2021) ..............................................................7, 8, 10

*In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig.*,
 691 F.2d 1335 (9th Cir. 1982) ...................................................................11

*Coronavirus Rep.* v. *Apple, Inc.*,
 2021 WL 5936910 (N.D. Cal. 2021) ..........................................................23

*Dickson* v. *Microsoft Corp.*,
 309 F.3d 193 (4th Cir. 2002) .....................................................................18

*In re EpiPen Direct Purchaser Litigation*,
 2022 WL 1017770 (D. Minn. 2022) ...........................................................19

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

*Feitelson* v. *Google Inc.*,
   80 F. Supp. 3d 1019 (S.D. Cal. 2015) ................................................................8, 20

*Frame-Wilson* v. *Amazon.com, Inc.*,
   2022 WL 741878 (W.D. Wash. 2022) ........................................................................17

*Golden Gate Pharm. Servs., Inc.* v. *Pfizer, Inc.*,
   433 F. App'x 598 (9th Cir. 2011) ..............................................................................22

*United States* v. *Grinnell Corp.*,
   384 U.S. 563 (1966) .....................................................................................................7

*Cal. ex rel. Harris* v. *Safeway, Inc.*,
   651 F.3d 1118 (9th Cir. 2011) ...............................................................................2, 16

*Hicks* v. *PGA Tour, Inc.*,
   897 F.3d 1109 (9th Cir. 2018) ...................................................................................20

*Illinois Brick Co.* v. *Illinois*,
   431 U.S. 720 (1977) ...................................................................................................10

*Kartell* v. *Blue Shield of Mass., Inc.*,
   749 F.2d 922 (1st Cir. 1984) ......................................................................................13

*Kloth* v. *Microsoft Corp.*,
   444 F.3d 312 (4th Cir. 2006) ......................................................................................11

*Kolling* v. *Dow Jones & Co.*,
   137 Cal. App. 3d 709 (Ct. App. 1982) .......................................................................23

*Kunert* v. *Mission Fin. Servs. Corp.*,
   110 Cal. App. 4th 242 (2003) .....................................................................................24

*Leegin Creative Leather Prods.* v. *PSKS, Inc.*,
   551 U.S. 877 (2007) ...................................................................................................14

*Lewis Service Center, Inc.* v. *Mack Truck*,
   714 F.2d 842 (8th Cir. 1983) ................................................................................11, 12

*Lifewatch Servs. Inc.* v. *Highmark Inc.*,
   902 F.3d 323 (3d Cir. 2018) .......................................................................................20

*Lorenzo* v. *Qualcomm Inc.*,
   603 F. Supp. 2d 1291 (S.D. Cal. 2009) ........................................................................8

*Lucas* v. *Bechtel Corp.*,
   800 F.2d 839 (9th Cir. 1986) ......................................................................................10

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

*Mailand* v. *Burckle*,
   20 Cal. 3d 367 (1978) ...................................................................................24

*Monahan's Marine, Inc.* v. *Bos. Whaler, Inc.*,
   866 F.2d 525 (1st Cir. 1989) .......................................................................15

*N.M. Oncology* v. *Presbyterian Healthcare Servs.*,
   418 F. Supp. 3d 826 (D.N.M. 2019) ............................................................13

*Pac. Bell Tel. Co.* v. *linkLine Commc'ns, Inc.*,
   555 U.S. 438 (2009)............................................................................2, 13, 15

*PLS.Com, LLC* v. *Nat'l Ass'n of Realtors*,
   32 F.4th 824 (9th Cir. 2022) ........................................................................18

*Pool Water Prods.* v. *Olin Corp.*,
   258 F.3d 1024 (9th Cir. 2001) .......................................................................7

*Pro Music Rights LLC* v. *Apple, Inc.*,
   2020 WL 7406062 (D. Conn. 2020) .............................................................22

*FTC* v. *Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) ............................................................. *passim*

*Randy's Ring & Pinion Serv., Inc.* v. *Eaton Corp.*,
   2009 WL 10727790 (W.D. Wash. 2009)......................................................20

*Rebel Oil Co.* v. *Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) ........................................................................18

*Schwab Short-Term Bond Mkt. Fund* v. *Lloyds Banking Grp. PLC*,
   22 F.4th 103 (2d Cir. 2021) ..........................................................................10

*Seafarers Welfare Plan* v. *Philip Morris*,
   27 F. Supp. 2d 623 (D. Md. 1998) ...............................................................23

*SmileCare Dental Grp.* v. *Delta Dental Plan of Cal., Inc.*,
   88 F.3d 780 (9th Cir. 1996) ...........................................................................6

*Song Fi Inc.* v. *Google Inc.*,
   2016 WL 1298999 (N.D. Cal. 2016) ............................................................23

*Tanaka* v. *Univ. S. Calif.*,
   252 F.3d 1059 (9th Cir. 2001) ......................................................................21

*Todd* v. *Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001)..........................................................................21

AMAZON'S MOTION TO DISMISS (2:22-cv-00965-JHC) - v

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

*Universal Grading Serv.* v. *eBay, Inc.*,
    2012 WL 70644 (N.D. Cal. 2012) ......................................................22

*US Airways*, Inc. v. *Sabre Holdings Corp.*,
    938 F.3d 43 (2d Cir. 2019)................................................................23

*Verizon Commc'ns Inc.* v. *Law Offs. of Curtis V. Trinko, LLP*,
    540 U.S. 398, 417, (2004)...................................................................9

*Walker Process Equip, Inc.* v. *Food Mach. & Chem. Corp.*,
    382 U.S. 172 (1965)..........................................................................20

*Walker* v. *USAA Inc. Co.*,
    474 F. Supp. 2d 1168 (C.D. Cal. 2007) .......................................14, 24

*William O. Gilley Enterprises, Inc.* v. *Atlantic Richfield Co.*,
    2006 WL 8437393 (S.D. Cal. 2006) ...............................................19

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

**INTRODUCTION**

In the intensely competitive retail industry, consumers compare prices across many options to find the best deal.  One of Amazon's core business objectives in serving its customers is to have a reputation for low prices, and Amazon constantly works to offer its customers low prices to maintain that reputation.  Like all retailers, Amazon negotiates with its suppliers to lower Amazon's wholesale costs so that Amazon may set competitive retail prices.  One way Amazon does this is to negotiate Margin Agreements with some of its suppliers that determine the amounts Amazon pays those suppliers when Amazon lowers its retail prices to consumers.  Plaintiffs, consumers who shop in Amazon's store, seek to turn antitrust law on its head by bringing this case to challenge the Margin Agreements.  Amazon lowering retail prices—the event that triggers the Margin Agreements—not only benefits Plaintiffs, it is an outcome that antitrust law encourages, not condemns.  Even taking the Complaint's allegations as true, there are multiple independent reasons why the Court should dismiss Plaintiffs' claims in full.

*First*, Plaintiffs lack antitrust standing because they (1) have not suffered an "antitrust injury" in the relevant market; and (2) are not "efficient enforcers" of the antitrust laws.  The Complaint challenges conduct related to Amazon's purchase of goods from suppliers on a wholesale basis for eventual sale to consumers.  That conduct occurs entirely outside any market in which Plaintiffs, as consumers, participate.  Where, as here, Plaintiffs' alleged injuries are "experienced in another market," they "do not suffer antitrust injury."  *FTC* v. *Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020).[1]  Nor are Plaintiffs efficient enforcers of the antitrust laws because their alleged injury is not proximately caused by the alleged anticompetitive conduct, as required by *Associated General Contractors of California, Inc.* v. *California State Council of Carpenters* ("*AGC*"), 459 U.S. 519, 535−36  (1983).  To the contrary, as Plaintiffs admit in their allegations, the alleged antitrust injury occurs only at the end of a multi-step causal chain

---

[1] With respect to quoted material, unless otherwise indicated, all brackets, ellipses, footnote call numbers, internal quotations, and citations have been omitted for readability.  All emphasis is added unless otherwise indicated.

AMAZON'S MOTION TO DISMISS (2:22-cv-00965-JHC) - 1

1   involving multiple intervening and independent acts by suppliers and other retailers, rather than

2   at the first step of the chain as *AGC* requires.

3       *Second*, Plaintiffs challenge conduct that cannot give rise to antitrust liability.  Plaintiffs

4   allege that the Margin Agreements are anticompetitive because Amazon and its suppliers are

5   agreeing to lower wholesale prices in response to lower consumer prices that reduce Amazon's

6   margins.  Whether accomplished by pre-established agreements or subsequent wholesale price

7   negotiations, antitrust law does not interfere with price negotiations between a supplier and

8   retailer, including to protect the retailer's margins.  Antitrust law encourages retailers like

9   Amazon to lower consumer prices by lowering its costs.  *Pac. Bell Tel. Co.* v. *linkLine*

10   *Commc'ns, Inc.*, 555 U.S. 438, 448 (2009).

11      *Third*, even assuming there is an antitrust claim which Plaintiffs have standing to bring,

12   Plaintiffs fail to state a Section 1 claim under the "quick-look" framework.  The quick-look

13   framework applies only where "an observer with even a rudimentary understanding of

14   economics" can confidently conclude that the agreements are plainly anticompetitive.  *Cal. ex*

15   *rel. Harris* v. *Safeway, Inc.*, 651 F.3d 1118, 1134 (9th Cir. 2011).  "Quick look" analysis is

16   foreclosed here because courts have declined to interfere with above-cost wholesale price

17   negotiations and have upheld as procompetitive agreements whereby wholesalers provide rebates

18   to retailers to allow for price cuts to consumers—precisely what Plaintiffs allege the Margin

19   Agreements allow Amazon to do.  Plaintiffs' sole basis for requesting "quick-look" analysis is its

20   allegation that the Margin Agreements are "vertical price fixing" agreements, but the Margin

21   Agreements are not price-fixing because, as the Complaint alleges, Amazon independently sets

22   the retail prices for the products it sells.  Compl. ¶ 35.

23      *Fourth*, the Complaint lacks plausible allegations of anticompetitive effects.  Plaintiffs'

24   theory of anticompetitive effects is that Amazon's suppliers subject to Margin Agreements have

25   the power to charge other retailers—even major ones—higher wholesale prices or the power to

26   pressure those retailers to raise retail prices to consumers, in order to avoid triggering payments

27   under the Margin Agreements.  Plaintiffs do not plausibly allege that any of Amazon's suppliers

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

has the market power to control how Amazon's retail competitors (such as Walmart or Target) price their products, or that these retail competitors would raise prices (and thereby risk losing sales to competitors) just because a supplier asks.  Nor do Plaintiffs plausibly allege how Amazon's suppliers are able to impose and maintain higher market-wide prices across all retailers.  The Complaint also does not allege that any specific product was available at a supracompetitive price in Amazon's store as a result of the Margin Agreements.

*Fifth*, Plaintiffs fail to allege a relevant antitrust market, an essential element of their claims.  Amazon enters into Margin Agreements in a market in which retailers and suppliers negotiate the price of wholesale goods.  But Plaintiffs make *no* allegations about any such market.  Instead, the Complaint focuses on the alleged effect of the Margin Agreements in an entirely different market—the purported Online Retail Marketplace market—in which consumers purchase goods from retailers.  Even *that* market is not plausibly alleged.  For antitrust purposes, a relevant product market must be defined by products that are reasonably interchangeable substitutes.  Plaintiffs' proposed market excludes identical products available in single-seller online and brick-and-mortar stores, and aggregates products of highly differentiated uses (like shoes, batteries, and motor oil) that are not reasonably interchangeable.

*Finally*, the state law antitrust claims fail for the same reasons the federal claims fail.

## BACKGROUND

### A.    Amazon's Store and Its Dealings with Suppliers

Amazon operates a retail store in which it offers millions of products directly to consumers.  Compl. ¶¶ 15, 91.  Like other retailers, Amazon purchases goods at wholesale and in turn sells those goods to consumers.  The Complaint challenges agreements that Amazon enters into with a subset of its suppliers, called minimum margin agreements ("Margin Agreements").  Margin Agreements address the amounts Amazon pays those suppliers for products that Amazon sells at retail and are triggered when Amazon "lowers its retail price to match the price of a competitor."  Compl. ¶ 35.  Amazon pays the supplier a price for goods it will sell, but some of that may be refunded by the supplier if Amazon does not earn an agreed margin for that product.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1   *Id.* ¶¶ 3-4.  The agreements are individually negotiated by Amazon and each supplier, with the

2   negotiations including the prices (i.e., costs to Amazon) and other terms of dealing between

3   Amazon and its suppliers.  *Id.* ¶¶ 3-4, 6 nn.8-9, 7 nn.10-11, 8 n.12, 12 n.22.

4   Negotiations and agreements relating to wholesale prices and margins are common

5   throughout retail.  The Complaint cites sources explaining that retailers like Walmart, CVS,

6   Sam's Club, and Walgreens use margin guarantees in their dealings with wholesalers, Compl. ¶ 3

7   n.6,[2] and that seeking such guarantees "is nothing new with large retailers," *id.* ¶ 12 n.22.[3]

8   Retailers negotiate lower wholesale prices in order to increase their margins.  *Id.* ¶ 3 n.6.[4]

9   ### B.      Plaintiffs' Theory of Harm

10  Plaintiffs attempt to thwart established antitrust law by alleging that Amazon *lowering*

11  prices for products to consumers in its store triggers a complex multi-step chain of events that

12  somehow ultimately results in "higher consumer prices."  Compl. ¶ 6.  According to the

13  Complaint, in the first step of this chain, Amazon "lowers its retail price to match the price of a

14  competitor."  *Id.* ¶ 35.  Because that "price cut" reduces Amazon's margin, *id.* ¶ 9, Amazon

15  allegedly then seeks a payment from its supplier, pursuant to a Margin Agreement, so Amazon

16  can maintain its margin.  *Id.* ¶¶ 6, 8.

17  Plaintiffs allege that suppliers who make margin payments do one of two things to

18  prevent making additional payments under the Margin Agreements:  (a) raise wholesale prices to

19  Amazon's retail competitors, or (b) "otherwise restrict" those competitors from offering lower

20  retail prices—although the Complaint does not say how.  *Id.* ¶ 39.  Through these actions,

21  suppliers allegedly "adopt a de facto minimum retail price (or floor price) for their products

22  market-wide."  *Id.* ¶¶ 5, 39, 121, 151.  Only then, according to the Complaint, do "higher

23

24  [2] Citing Boyd Evert, *The squeeze continues for retail suppliers*, Talk Business & Politics, https://talkbusiness.net/2017/10/the-squeeze-continues-for-retail-suppliers/.

25  [3] Citing Carina McLeod, *Amazon Vendor Contract Negotiations: What you need to Know*, eComEngine, https://www.ecomengine.com/blog/vendor-contract-negotiations.

26  [4] Citing Boyd Evert, *The squeeze continues for retail suppliers*, Talk Business & Politics,

27  https://talkbusiness.net/2017/10/the-squeeze-continues-for-retail-suppliers/ ("Earlier this year, select suppliers attended a meeting where Walmart reportedly conveyed an expectation of a 15% cut in their cost of goods, while maintaining margins.").

AMAZON'S MOTION TO DISMISS (2:22-cv-00965-JHC) - 4

consumer prices" result for products purchased "market-wide" and by Plaintiffs in Amazon's store. *Id.* ¶¶ 5, 6, 133. A chart in the Complaint, *id.* ¶ 6, demonstrates that the first step of the causal chain—reduced prices by other retailers—benefits Plaintiffs, and that Plaintiffs' alleged injury does not occur until the sixth step of the causal chain, involving intervening and independent pricing decisions by suppliers and retailers:



### C.   The Retail Landscape

The Complaint describes a dynamic and competitive retail landscape, within Amazon's store and across a diverse set of online and physical retailers and marketplaces. In Amazon's store alone, the Complaint describes how Amazon features only the most competitive price for a product—and how the featured offer is dynamic, changing frequently. Compl. ¶¶ 47-48.

The Complaint acknowledges that consumers have multiple options outside of Amazon's store: there are large retailers like Walmart, Target, and Costco, which offer millions of products in physical stores and online—just as Amazon does. Compl. ¶¶ 12, 14. Walmart and Target sell direct to consumers as first-party retailers and also open their online stores to third-party sellers.

AMAZON'S MOTION TO DISMISS (2:22-cv-00965-JHC) - 5

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

*Id.* ¶¶ 12, 14.  There are also other online marketplaces like eBay, where sellers offer a broadbased range of goods for sale to consumers just as they do in Amazon's store.  *Id.* ¶ 13, ¶ 16 n.31.[5]  And there are "single-merchant online stores," where retailers offer their products direct to consumers.  *Id.* ¶¶ 60(b), 69.  Consumers can also discover and purchase products through social media, price comparator websites, and search engines like Google shopping.  *Id.* ¶¶ 75-78.

### D.    Plaintiffs

Plaintiffs are five consumers from California and Maryland who shop in Amazon's store.  Compl.  ¶¶ 29-33.  Each alleges that they have purchased goods "directly from Amazon as a first-party seller."  *Id.*  They identify seven brands of such products—Adidas, Bosch, Carhartt, Hanes, D'Addario, Oral-B, and Tide—but do not identify what product was purchased, or even whether Amazon purchased each product from a supplier subject to a Margin Agreement applicable to that product.  *Id.*[6]  Plaintiffs allege they "were forced to pay more" for those products in Amazon's store than they would have if Amazon had not entered into Margin Agreements with its suppliers.  *Id.* ¶ 117.

### LEGAL STANDARDS

To survive a Rule 12(b)(6) motion, a complaint must allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 547 (2007).  Determining whether a claim is plausible is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 679 (2009).  A plaintiff cannot defeat a motion to dismiss based on a complaint's "conclusory language regarding the elimination of competition and improper purpose."  *SmileCare Dental Grp.* v. *Delta Dental Plan of Cal., Inc.*, 88 F.3d 780, 783 (9th Cir. 1996).

---

[5] According to this source, 80% of third-party sellers in Amazon's store also sell in these different marketplaces.  Recipeexpress, *15 Amazon Statistics You Need to Know*, https://www.repricerexpress.com/amazon-statistics/ (cited in Compl. ¶ 16 n.31).

[6] Plaintiff Loes does not identify the brand of any product she purchased from Amazon.  *Id.* ¶ 31.

AMAZON'S MOTION TO DISMISS (2:22-cv-00965-JHC) - 6

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

To state a Sherman Act, § 1 claim, a plaintiff must allege facts plausibly showing that (a) an agreement, conspiracy, or combination exists between two or more entities; and (b) such agreement, conspiracy, or combination imposed an unreasonable restraint of trade under a rule of reason or *per se* analysis (the latter of which is not alleged here).  *Am. Ad Mgmt., Inc.* v. *GTE Corp.*, 92 F.3d 781, 784 (9th Cir. 1996).  "To establish liability under § 2, a plaintiff must show: (a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal antitrust injury." *Qualcomm*, 969 F.3d at 990.  The mere "possession of monopoly power will not be found unlawful under § 2 unless it is accompanied by an element of anticompetitive conduct." *Id.*; *see also United States* v. *Grinnell Corp.*, 384 U.S. 563, 571 (1966) (distinguishing "willful acquisition" of monopoly power from "development as a consequence of a superior product, business acumen, or historic accident").

## ARGUMENT

### I.   Plaintiffs Lack Antitrust Standing.

To state a Sherman Act § 1 or § 2 claim, a plaintiff must have "antitrust standing." *Pool Water Prods.* v. *Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2001).  Antitrust standing is comprised of two elements:  a plaintiff must show antitrust injury and that the plaintiff is an "efficient enforcer" of the antitrust laws.  Antitrust standing is "a question of law" to be considered "at the outset." *Bubar* v. *Ampco Foods, Inc.*, 752 F.2d 445, 449 (9th Cir. 1985); *see also City of Oakland* v. *Oakland Raiders*, 20 F.4th 441, 461 (9th Cir. 2021); *Pool Water Prods.*, 258 at 1033 (affirming dismissal for lack of antitrust standing).

#### A.   The Alleged Anticompetitive Conduct Occurred in a Market Involving Wholesale Suppliers Selling to Retailers, and Plaintiffs Do Not Participate in Such a Market.

To have antitrust injury, the plaintiff must suffer an injury "that flows from that which makes defendants' acts unlawful." *City of Oakland*, 20 F.4th at 456 ("antitrust injury is mandatory").  "Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury." *Qualcomm*, 969 F.3d at 992.  Plaintiffs allege that Amazon entered into Margin Agreements governing

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1   transactions in which suppliers sell goods at wholesale to Amazon as a retailer.  Compl. ¶ 20.

2   Plaintiffs, as consumers, do not participate in any market between wholesale suppliers and

3   retailers.  Instead, Plaintiffs allege that they are injured by paying higher prices as buyers in a

4   separate market—a purported Online Retail Marketplace Market where consumers purchase

5   goods online from Amazon and third-party sellers.  *Id*. ¶¶ 56-57.

6          Where the alleged injury occurs in a separate market from the alleged anticompetitive

7   conduct, the Court cannot determine whether the alleged injury "flows from that which makes

8   [Defendant's] acts unlawful."  *Am. Ad Mgmt., Inc.* v. *Gen. Tel. Co. of California*, 190 F.3d 1051,

9   1055 (9th Cir. 1999).  Courts therefore dismiss antitrust claims for lack of antitrust standing

10  where, as here, Plaintiffs "allege that they suffered antitrust injury in the form of

11  supracompetitive pricing" in a separate market from "the market in which the alleged

12  anticompetitive conduct occurred."  *Feitelson* v. *Google Inc.*, 80 F. Supp. 3d 1019, 1027−28

13  (S.D. Cal. 2015) (dismissing claim based on contracts between Google and cell phone

14  manufacturers in the market for internet search products where plaintiffs participated in the

15  downstream retail market for cell phones); *see also Ass'n of Wash. Pub. Hosp. Dists.* v. *Philip*

16  *Morris Inc.*,  241 F.3d 696, 704−05 (9th Cir. 2001) (affirming dismissal where the "nicotine

17  delivery market" was the market where competition was allegedly restrained, and the plaintiff

18  hospitals' injuries "were not experienced in the nicotine delivery market, but rather in the health

19  care market"); *Lorenzo* v. *Qualcomm Inc.*, 603 F. Supp. 2d 1291, 1301 (S.D. Cal. 2009) (no

20  antitrust standing for cell phone purchasers who sought to challenge discriminatory licensing of

21  patents to chip manufacturers, who were at different level of the supply chain).

22         **B.    Plaintiffs Are Not Efficient Enforcers of the Antitrust Laws.**

23         Whether Plaintiffs are efficient enforcers of the antitrust laws requires courts to consider:

24  (1) the directness of the alleged injury; (2) the speculative measure of the harm; (3) the risk of

25  duplicative recovery; and (4) the complexity in apportioning damages.  *City of Oakland*, 20 F.4th

26  at 455.  The efficient-enforcer test stems from the proximate cause requirement of *Associated*

27  *General Contractors of California, Inc.* v. *California State Council of Carpenters*, 459 U.S. 519,

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

535−36 (1983).  In cases of alleged economic harm, proximate cause under federal antitrust law is defined by the "first-step" rule, which limits liability to parties injured at the first step of the causal chain of the defendants' actions.  *Id.* at 534 ("The general tendency of the law, in regard to damages at least, is not to go beyond the first step.").  Under the first-step rule, Plaintiffs are not efficient enforcers of the antitrust law and thus lack antitrust standing because they are not "injured at the first step of the causal chain of the defendants' actions."  *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 134−35, 139−40 (2d Cir. 2021); *Verizon Commc'ns Inc.* v. *Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 417, (2004) (Stevens, J. concurring) (in determining antitrust standing, "the general tendency . . . is not to go beyond the first step").

As the Complaint has defined the conduct here, no injury to Plaintiffs occurs until at least six steps into a multi-step chain of events, as Plaintiffs' own chart illustrates.  First, Amazon enters into the Margin Agreements with certain of its suppliers.  Compl. ¶ 4.  This first step does not cause any alleged injury to Plaintiffs.  Second, Amazon lowers "its retail price to match the price of a competitor."  *Id.* ¶ 35.  At this step, there is not only no antitrust injury, Plaintiffs benefit because Amazon has lowered prices for consumers.  Third, Amazon then allegedly receives payments under its Margin Agreements.  *Id.* ¶¶ 5-6.  This step also causes no injury to Plaintiffs.  Fourth, in response to the Margin Agreements being triggered, suppliers then adopt "a de facto minimum retail price (or floor price) for their products market-wide," allegedly equal to the wholesale price plus the amount of the margin guarantee.  *Id.* ¶ 5.  For there to be adoption of such a de facto minimum retail price, thousands of suppliers would have to agree to such a price for the hundreds of millions of products sold by online retailers.  Because this step affects only wholesale prices, Plaintiffs have no injury at this step.  Fifth, assuming the adoption of a minimum de facto retail price across all products sold by all suppliers, the suppliers allegedly enforce this minimum retail price by either raising "wholesale prices to Amazon's retail competitors" or "restrict[ing]" those same competitors "from offering lower retail prices than Amazon."  *Id.* ¶ 39.  This step causes no harm to Plaintiffs.  Finally, Plaintiffs allege that Amazon then matches the prevailing minimum retail price, resulting in supracompetitive prices

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

"market-wide."  *Id.* ¶¶ 5, 11-13.  Plaintiffs allegedly suffer injury only in this final step, when they supposedly pay "higher consumer prices" for products they bought from Amazon in Amazon's store—all because Amazon started by lowering a price to consumers.  *Id.* ¶¶ 6, 133. And, even accepting Plaintiffs' alleged causal chain, there are Plaintiffs who benefited from Amazon lowering prices, before there were market-wide price increases.

Because Plaintiffs' alleged injury occurs too far along the causal chain and not at its first step, the Court must dismiss this Complaint.  *In re American Express Anti-Steering Rules Antitrust Litigation* is instructive:  the plaintiffs—merchants who did not accept Amex— challenged Amex's rules prohibiting merchants from steering customers to other payment mechanisms (such as Visa or Mastercard).  19 F.4th at 140−41.  The Second Circuit affirmed the dismissal of plaintiffs' claims for lack of antitrust standing because they "did not suffer a direct injury from the alleged antitrust violation"—Amex's anti-steering rules.  *Id.*  Instead, plaintiffs' alleged injury occurred farther along the causal chain—after Mastercard and Visa raised their own merchant fees.  *Id.*  That Amex's rules allegedly enabled other card companies to raise their fees did not matter, because such allegations did "not establish the 'direct relation' between injury and antitrust violation that the first-step rule requires."  *Id.* at 141.  The result is equally true for Plaintiffs' multi-step causal chain.  *See also Lucas* v. *Bechtel Corp.*, 800 F.2d 839, 844 (9th Cir. 1986) (no antitrust standing where there were too many "vaguely defined links" between the alleged injury and the alleged agreement to fix wages at a depressed price); *City of Oakland*, 20 F.4th at 460 ("too many speculative links in the chain of causation" between alleged anticompetitive conduct and injury); *Schwab Short-Term Bond Mkt. Fund* v. *Lloyds Banking Grp. PLC*, 22 F.4th 103, 116 (2d Cir. 2021) (applying first-step rule and affirming dismissal for lack of antitrust standing); *Andrx Pharms.* v. *Biovail Corp. Int'l*, 256 F.3d 799, 817 (D.C. Cir. 2001) (same).[7]

---

[7] Plaintiffs try to avoid the first-step rule by alleging that they "directly purchase" the products at supracompetitive prices.  Compl. ¶ 117.  Whether a plaintiff is a direct purchaser under *Illinois Brick Co.* v. *Illinois*, 431 U.S. 720 (1977) is "analytically distinct" from "the conceptually more difficult question of which persons have sustained injuries too remote to give them standing to sue."  *Blue Shield of Virginia* v. *McCready*, 457 U.S. 465, 476 (1982);

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

II.  **Courts Are Reluctant to Interfere with Negotiations Between a Retailer and Its Suppliers.**

A.  **Margin Protection Agreements Reflect Lawful and Procompetitive Price Negotiations.**

As courts have held, agreements like the Margin Agreements are procompetitive and lawful because they allow retailers to respond to price competition by lowering consumer prices, while giving retailers autonomy to decide what retail prices to charge. Here, as in cases upholding similar provisions, the Margin Agreements come into play only when Amazon decides to lower the retail prices it is charging consumers—prices that Plaintiffs acknowledge Amazon independently sets. Compl. ¶ 35. The sources cited by the Complaint demonstrate that negotiations to reduce wholesale prices to preserve a retailer's margins are commonplace in retail, including when a retailer reduces consumer prices. Compl. ¶ 3 n.6.

It is well-established that negotiating for lower prices, in this case lower wholesale prices, will not be condemned under the antitrust laws. It is a fundamental premise of the antitrust laws that "[l]ow prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition." *Atl. Richfield Co.* v. *USA Petrol. Co.*, 495 U.S. 328, 338, 340 (1990). This remains true whether wholesale prices are negotiated up front or renegotiated individually or through agreements which trigger changes in payments to protect retailer margins. In *Lewis Service Center, Inc.* v. *Mack Truck*, the Eighth Circuit upheld as lawful under the rule of reason a "sales assistance" program through which a supplier, Mack Truck, agreed to reduce its contracted wholesale price to allow dealers to offer competitive retail prices while maintaining their profit margin. 714 F.2d 842, 843−44 (8th Cir. 1983). As with the Margin Agreements, the sales assistance program was triggered when Mack Truck's retailers faced competition that required them to lower their prices to remain competitive. *Id.* In response to a request from the retailer for help reducing prices, Mack Truck would lower its

---

*see also In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig.*, 691 F.2d 1335, 1340 n.6 (9th Cir. 1982) (same); *Kloth* v. *Microsoft Corp.*, 444 F.3d 312, 323 (4th Cir. 2006) ("courts sometimes blend the indirect purchaser rule of *Illinois Brick* and the requirements of § 4 standing under *Associated General Contractors*," but the Supreme Court has explained they are "analytically distinct"). Even "direct purchasers" do not have antitrust standing if they are injured only at the end of a multi-step causal chain.

AMAZON'S MOTION TO DISMISS (2:22-cv-00965-JHC) - 11

wholesale price by an amount that would allow dealers to respond to price competition (lowering prices to buyers) while maintaining a certain profit margin on the sale.  *Id.*  As with the Margin Agreements, the "sales assistance" program rebate was triggered only if the dealer did not achieve its target profit margin on the sale, *id.* at 844, but the program did not establish the ultimate price paid by the consumer.  *Id.* at 845.  Such a program, the Eighth Circuit held, did not violate the Sherman Act and could not "be characterized as anything other than procompetitive," because it allowed dealers to respond to price competition.  *Id.* at 848.

Just like the "sales assistance" program in *Lewis*, through the Margin Agreements, Amazon seeks rebates from its wholesale suppliers that enable Amazon to cut its retail prices to match lower prices from retail rivals, a procompetitive outcome the antitrust laws encourage and protect.  Plaintiffs' conclusory allegation that the Margin Agreements result in suppliers charging higher prices does not compel a different conclusion.  The plaintiff in *Lewis* similarly claimed that Mack Truck, the wholesaler, set its "standard wholesale price artificially high."  *Id.* at 844.  But that could not and did not transform the sales assistance program into an antitrust violation because, regardless of the wholesale price, "presumably [the dealer] would not be able to offer a competitive price without sales assistance."  *Id.* at 848.  Likewise, here, the Margin Agreements allow Amazon to reduce consumer prices in response to competition.  Compl. ¶ 35.

Similarly, in *AAA Liquors, Inc.* v. *Joseph E. Seagram & Sons, Inc.*, the Tenth Circuit held that a margin protection program in which the wholesaler asked the manufacturer to agree to lower prices and guarantee a 10.5% profit margin for the wholesaler was lawful and not price fixing under Section 1.  705 F.2d 1203, 1207 (10th Cir. 1982).  The court explained that "a retailer who believes its prices are not competitive must be allowed to ask the wholesaler or manufacturer to lower its prices so that the retailer can offer competitive prices."  *Id.*  Plaintiffs' Complaint presents the same theory rejected in *AAA Liquors*.  It does not matter that upstream price negotiations "have the natural effect of raising or depressing the retail price"—as long as they do not set retail prices, they "should not be deemed unlawful price fixing arrangements."  *Id*.  It has long been the law that "changes in wholesale prices, of course, inevitably affect retail

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

prices, but more than that must be shown to constitute a violation of Section 1 of the Sherman Act." *Butera* v. *Sun Oil Co.*, 496 F.2d 434, 436 (1st Cir. 1974).

Like the margin protection agreements in each of the cases discussed above, the terms of the Margin Agreements do not set the ultimate price that consumers, including Plaintiffs, pay for any product in Amazon's store. Instead, the Margin Agreements exist *because* of Amazon's willingness to unilaterally cut prices in response to competition from other retailers—conduct which the antitrust laws encourage, not condemn.

**B.    Amazon Can Lawfully Bargain for Lower Costs Because It Is Free to Choose the Terms on Which It Deals with Its Suppliers.**

Amazon's Margin Agreements are also *per se* lawful because as "a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co.* v. *linkLine Comm'cns, Inc.*, 555 U.S. 438, 448 (2009). Nothing in the antitrust laws prohibits "a buyer from bargaining for the best deal possible." *Brillhart* v. *Mut. Med. Ins., Inc.*, 768 F.2d 196, 201 (7th Cir. 1985). Nor does it matter for antitrust purposes if a retail buyer negotiates wholesale prices based on the available prices of its competitors; that is the nature of price competition. *E.g., Butera*, 496 F.2d at 438 ("A producer like Sun may legitimately tailor its wholesale price to the rise and fall of the market."); Areeda & Hovenkamp ¶ 1627b (A "manufacturer may set its wholesale price as a percentage of average industry prices" even if "such a manufacturer may hope to influence the ultimate retail price level for its product."). The antitrust laws do not interfere in such price negotiations, even where the buyer is alleged to possess market power, because "a firm that has substantial power on the buy side of the market . . . is generally free to bargain aggressively when negotiating the prices it will pay for goods and services." *N.M. Oncology* v. *Presbyterian Healthcare Servs.*, 418 F. Supp. 3d 826, 847−48 (D.N.M. 2019) (quoting *W. Penn. Allegheny Health Sys., Inc.* v. *UPMC*, 627 F. 3d 85, 103 (3d Cir. 2010)). The "choice of what to seek to buy and what to offer to pay is the buyer's." *Kartell* v. *Blue Shield of Mass., Inc*., 749 F.2d 922, 928−29 (1st Cir. 1984) (Breyer, J.); *see also Austin* v. *Blue Cross & Blue Shield of Ala.*, 903 F.2d

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1385, 1391 (11th Cir. 1990).  The antitrust laws do not interfere with the purchase price Amazon pays its wholesalers, whether established by a Margin Agreement, or by Amazon bargaining up front for lower wholesale prices from its suppliers.

Plaintiffs cannot rely on their allegation that the "purpose and effect" of Margin Agreements "is to create an illegal price floor."  Compl. ¶ 121.  The same argument could be made any time a retailer reduces payments to wholesalers.  According to Plaintiffs, suppliers avoid making margin payments to Amazon by raising wholesale prices to Amazon's retail competitors or barring those competitors from offering retail prices lower than Amazon's, ensuring "a de facto minimum retail price (or floor price) for their products market-wide."  *Id.* ¶¶ 5, 39, 121, 151.  But the Complaint does not allege that any agreement was made to fix a price to another; Plaintiffs' allegations describe an ordinary negotiation between Amazon and its suppliers over the price Amazon will pay for the goods it purchases.  *Cf. 49er Chevrolet, Inc.* v. *Gen. Motors Corp.*, 803 F.2d 1463, 1467 (9th Cir. 1986) ("Ordinary sales contracts do not unlawfully restrain trade; indeed, trade would be impossible without them"); *Walker* v. *USAA Inc. Co.*, 474 F. Supp. 2d 1168, 1175 (C.D. Cal. 2007) (this is "not price-fixing: it is just buying and selling with an agreement on transaction prices").

Citing dictum in *Leegin Creative Leather Prods.* v. *PSKS, Inc.*, 551 U.S. 877, 893 (2007), Plaintiffs allege the Margin Agreements are anticompetitive because a "dominant retailer could pressure a manufacturer into adopting minimum retail prices to give an inefficient retailer higher profits, while retailers with better distribution systems and lower cost structures would be prevented from charging lower prices."  Compl. ¶ 1.  But *Leegin* in no way permits an antitrust claim based on a retailer keeping prices low by bargaining for lower wholesale prices or entering into agreements, like Margin Agreements, which lower a retailer's costs.  *Leegin* concerned resale price maintenance—agreements between suppliers and retailers by which the supplier sets the retail price.  551 U.S. at 883.  Here, Plaintiffs do not allege that the Margin Agreements set the price at which Amazon or any other retailer sells to customers, and they explicitly allege that Amazon sets its own retail prices in response to competition.  Compl. ¶ 35.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1   Plaintiffs have filed a notice of related action, Dkt. 8, relating to a complaint filed by the

2   California Attorney General ("CAAG"), asserting state law claims based on "virtually identical"

3   allegations to Plaintiffs' allegations here concerning the Margin Agreements.  The existence of

4   the CAAG Complaint does not change the legal issues on this motion.  Plaintiffs' Complaint here

5   still rests on a claim that the antitrust laws may interfere with retailers protecting their margins

6   by negotiating for lower wholesale prices in response to their reducing consumer prices.  The

7   CAAG Complaint suggests no other possible theory.  And, even without the Margin Agreements,

8   the alleged chain of causation and result would be the same whenever Amazon or any other

9   retailer responds to competitive prices by reducing the retail prices that consumers pay, with that

10  chain consisting of:  (1) a retailer's reduced margins; (2) the retailer negotiating for lower

11  wholesale prices or stopping unprofitable wholesale purchases altogether; and (3) wholesalers

12  then, according to Plaintiffs, being incented to work to maintain higher consumer prices.

13      Plaintiffs' Complaint and the CAAG Complaint both describe conduct—retailers

14  negotiating lower wholesale prices to maintain margins in response to competition—that

15  established antitrust law protects, not condemns.  *linkLine Comm'cns, Inc.*, 555 U.S. at 448

16  (businesses are free to set prices, noting the rare exception of predatory, below-cost prices).  If

17  retailers and suppliers cannot bargain for "low, nonpredatory prices without the threat of antitrust

18  actions, they will hesitate to cut their prices" or decide "not to cut prices at all."  *Monahan's*

19  *Marine, Inc.* v. *Bos. Whaler, Inc.*, 866 F.2d 525, 527–28 (1st Cir. 1989) (Breyer, J.).  To

20  eliminate such price negotiation, which is Plaintiffs' proposed outcome, suppliers and then

21  retailers would increase prices, an outcome that it is "certainly to the detriment of the Sherman

22  Act's ultimate beneficiary, the consumer."  *Id.*

**III.   Plaintiffs' Sherman Act Claims Fail for Additional, Independent Reasons.**

23

24      **A.      Plaintiffs Fail to State a Section 1 Claim under the Quick-Look Framework.**

25      Even if the Complaint did not have all of the failings described above, Plaintiffs'

26  allegations of a Section 1 claim under the "quick-look" framework must be dismissed.  Compl.

27  ¶ 122.  Whether an agreement unreasonably restrains trade in violation of Section 1 is

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

presumptively analyzed under the "rule of reason" standard, which requires balancing the agreement's restraint on competition against any justifications or procompetitive effects of the agreement. *Am. Ad Mgmt.*, 92 F.3d at 789. The "'quick-look' analysis is the exception, rather than the rule." *Id.* It applies only where "an observer with even a rudimentary understanding of economics could" reach a "confident conclusion" that the agreements at issue "have an anticompetitive effect on customers and markets." *Cal. ex rel. Harris* v. *Safeway, Inc.*, 651 F.3d 1118, 1134 (9th Cir. 2011). "If an arrangement might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition, then a quick look form of analysis is inappropriate." *Id.* Because the courts have upheld agreements similar to the Margin Agreements, "quick look" analysis is foreclosed.

Plaintiffs' request for "quick-look" analysis rests on a conclusory allegation that Margin Agreements constitute vertical price fixing. Compl. ¶ 2. But, as Plaintiffs repeatedly concede, Amazon independently sets the retail prices that it charges consumers, Compl. ¶ 35; *see also id.* ¶ 6 (Amazon vendor price cycle: "Amazon matches prices"), so the Margin Agreements cannot be price fixing. *AAA Liquors*, 705 F.2d at 1207 (no price fixing because retailer maintained control over its prices).

In addition, the Complaint alleges procompetitive justifications for the Margin Agreements. According to Plaintiffs, the Margin Agreements are triggered only when Amazon lowers consumer prices, Compl. ¶ 35, an outcome that benefits consumers and forecloses any claim of illegality based on a "quick look." *E.g.*, *Safeway*, 651 F.3d at 1138 ("Because we cannot reach a confident conclusion that the principal tendency of the [provision] is to restrict competition, truncated review is inappropriate."); *AFMS LLC* v. *United Parcel Serv. Co.*, 105 F. Supp. 3d 1061, 1082 (C.D. Cal. 2015) ("Plaintiff has presented a plausible procompetitive justification for the TPC Policy, thus a quick look will not suffice.").

Plaintiffs' reliance (Compl. ¶ 21) on an analogy to *United States* v. *Apple*, 791 F.3d 290 (2d Cir. 2015), is inapposite because in that case horizontal competitors—publishers—conspired with one another to use terms in their distribution agreements with Apple to mutually enforce an

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

e-book price hike in order to neutralize price competition from Amazon, which offered e-books at low prices.  *Id*. at 318.  "The relevant agreement in restraint of trade" was "the price-fixing conspiracy"—i.e., to set a floor and "cap" for e-book prices—"not Apple's vertical contracts with" publishers.  *Id*. at 325.  Here, Plaintiffs allege only a series of vertical agreements between Amazon and its suppliers—they do not allege that Amazon and competing retailers use Margin Agreements as a way to enforce a horizontal agreement between retailers.  *Frame-Wilson* v. *Amazon.com, Inc.*, 2022 WL 741878, at *7 (W.D. Wash. 2022) (distinguishing *Apple* and requiring "plausible allegations of a horizontal arrangement"); *In re Amazon.com, Inc. eBook Antitrust Litig.*, 2022 WL 4581903, at *10 (S.D.N.Y. 2022) ("a hub-and-spoke theory is cognizable under Section 1 only if there are both vertical agreements between the hub and each spoke, and also a horizontal agreement among the various spokes with each other"), *adopted* 2022 WL 4586209 (S.D.N.Y 2022).

**B.      Plaintiffs' Sections 1 and 2 Claims Fail Because the Complaint Does Not Plausibly Allege Anticompetitive Effects.**

A Section 1 rule of reason claim and a Section 2 monopolization claim both require the challenged conduct to have an "anticompetitive effect—that is, [the conduct] must harm the competitive process and thereby harm consumers."  *Qualcomm*, 969 F.3d at 990−91.  Plaintiffs' allegations of anticompetitive effects fail because they do not plausibly allege that the Margin Agreements cause supracompetitive pricing or otherwise impair competition.

**1.   The Complaint Does Not Plausibly Allege Supracompetitive Prices.**

Plaintiffs do not identify any product that Amazon or another retailer sold at a supracompetitive price.  Nor do they allege any causal connection between any price and the Margin Agreements, or that they purchased a product subject to a Margin Agreement.

Plaintiffs also do not allege that suppliers subject to Margin Agreements have the market power to raise retail prices market-wide.  Plaintiffs' theory of anticompetitive harm depends on the assumption that each supplier subject to a Margin Agreement either has the market power to charge other retailers—even major ones—whatever wholesale prices they want, and that those

AMAZON'S MOTION TO DISMISS (2:22-cv-00965-JHC) - 17

retailers in turn have the market power to pass those increased wholesale costs on to customers by raising their retail prices, or compel those retailers to raise retail prices, regardless of competition.  But Plaintiffs do not plausibly allege that any of Amazon's suppliers—let alone all of them—have the market power to control how Amazon's retail competitors (such as Walmart or Target) price the products they sell to consumers, or that these retail competitors would raise prices for all products (and risk losing sales to competitors) just because a supplier asks.

"Sufficient market power" is required "in order unilaterally to raise prices above competitive levels."  *Rebel Oil Co.* v. *Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).  Absent allegations that Amazon's suppliers have such market power, the Margin Agreements could not cause the price increases Plaintiffs suggest, rendering Plaintiffs' allegations of anticompetitive effects implausible.  *E.g., PLS.Com, LLC* v. *Nat'l Ass'n of Realtors*, 32 F.4th 824, 834 (9th Cir. 2022) ("To prove a substantial anticompetitive effect indirectly, a plaintiff must show that the defendants have market power in the relevant market.").  Nor do Plaintiffs plausibly allege how suppliers are able to impose and maintain higher market-wide prices across the hundreds of millions of products sold by online retailers.  Compl. ¶ 91.

Plaintiffs' theory of market-wide anticompetitive effects rests on allegations regarding the combined effects of individual Margin Agreements; this theory fails because the Complaint does not allege an agreement or conspiracy among and between the Amazon suppliers along with Amazon.  According to Plaintiffs, it is the combined effect of each of Amazon's Margin Agreements that (eventually) leads to higher prices for the hundreds of millions of products sold by online retailers.  But where, as here, a theory of harm depends on the effect of multiple individual vertical agreements, courts must review each alleged agreement individually and "evaluate each agreement's potential for anticompetitive effects."  *Dickson* v. *Microsoft Corp.*, 309 F.3d 193, 210 (4th Cir. 2002).  If each individual agreement cannot cause the anticompetitive effects that Plaintiffs allege, here, higher prices for the hundreds of millions of products sold by online retailers, their Complaint must be dismissed.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

For example, in *William O. Gilley Enterprises, Inc.* v. *Atlantic Richfield Co.*, 2006 WL 8437393 (S.D. Cal. 2006), *aff'd* 588 F.3d 659 (9th Cir. 2009), a motion to dismiss was granted and affirmed in a case alleging anticompetitive effects from separate, individual bilateral agreements between energy companies for the sale of gasoline in California.  The court of appeals affirmed dismissal because the plaintiff failed to allege that each bilateral agreement had a "discrete effect on competition."  *Id.* at 688; *see also In re Amazon.com, Inc. eBook Antitrust Litig.*, 2022 WL 4581903 at *23–24  (dismissing antitrust claims because plaintiffs cannot rely on "the aggregate effects of the [defendants'] individual conduct" to show cognizable anticompetitive effects "where the allegations in the complaint do not support an inference of concerted action"); *In re EpiPen Direct Purchaser Litigation*, 2022 WL 1017770, at *9–10 (D. Minn. 2022) (dismissing Section 1 claim for failure to plead plausible anticompetitive effects where plaintiff relied on aggregating the alleged market share of independent vertical agreements).  Because Plaintiffs do not allege that any individual supplier subject to a Margin Agreement has or could raise prices market-wide, and because Plaintiffs do not allege any agreements between and among such suppliers, Plaintiffs have failed to allege anticompetitive effects.

### 2.   The Complaint Does Not Plausibly Allege Reduced Consumer Choices.

Plaintiffs' alternative allegation that the Margin Agreements "reduce consumer choices and prevent more innovative online shopping marketplaces from competing in the United States," Compl. ¶ 44, is insufficient for multiple reasons.  *First*, the allegation depends on Plaintiffs' implausible allegation that the Margin Agreements have a market-wide effect on consumer prices.  *Id.* ¶¶ 45-46.  *Second*, the allegation requires that a supplier have market power to cause the alleged anticompetitive effect but, as explained above, the Complaint contains no plausible allegation that any supplier has market power, much less that the tens of thousands of suppliers of all consumer products covered by the allegations have such market power.  *Third*, Plaintiffs do not identify a single product or competitor that has been excluded because of the Margin Agreements and therefore do "not sufficiently allege an injury to competition."  *Brantley*

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

v. *NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012) (affirming dismissal for failure to allege anticompetitive effects).  Plaintiffs cannot plausibly allege anticompetitive effects without foreclosure of competition in a relevant market.  *Randy's Ring & Pinion Serv., Inc.* v. *Eaton Corp.*, 2009 WL 10727790, at *5 (W.D. Wash. 2009) (dismissal where no plausible allegations of foreclosure); *Feitelson*, 80 F. Supp. 3d at 1032 (same).

      **C.**    **Plaintiffs Fail to State Section 1 and 2 Claims Because They Do Not Allege Cognizable Relevant Markets.**

"A proper definition of the relevant market is required for a successful claim under either Section 1 [rule of reason] or Section 2 of the Sherman Act."  *Analogix Semiconductor Inc.* v. *Silicon Image, Inc.*, 2008 WL 8096149, at *7 (N.D. Cal. 2008).  The relevant market is defined as the "area of effective competition" which is typically the arena in which "significant substitution in consumption or production occurs."  *Ohio* v. *American Express*, 138 S. Ct. 2274, 2285 (2018).  Without that market definition, "there is no way to measure" a defendant's "ability to lessen or destroy competition."  *Walker Process Equip, Inc.* v. *Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965).  The Court may draw upon its "judicial experience and common sense" and reject a market definition that is "not natural" or "contorted to meet" a plaintiff's "litigation needs."  *Hicks* v. *PGA Tour, Inc.*, 897 F.3d 1109, 1121 (9th Cir. 2018).

      **1.**    **Plaintiffs Fail to Allege a Market of Competing Retailers that Includes Reasonably Interchangeable Substitutes from the Perspective of Suppliers.**

The law requires analyzing the effects of the alleged anticompetitive conduct within the market in which the anticompetitive conduct is alleged to occur.  *Qualcomm*, 969 F.2d at 992.  Here, Plaintiffs challenge an alleged restraint, Margin Agreements, that are entered into as part of Amazon's negotiations over its purchase of goods at wholesale. Compl. ¶¶ 3-4.  Thus, the relevant market "is not the market of competing sellers but of competing buyers."  *Campfield* v. *State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008); *see also Lifewatch Servs. Inc.* v. *Highmark Inc.*, 902 F.3d 323, 337 (3d Cir. 2018) ("Critically, in a buyer-side conspiracy case, the seller rather than consumer or purchaser behavior is the focus.").

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

That market must be "comprised of" retailers "who are seen by" suppliers "as being reasonably good substitutes." *Todd* v. *Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001). Here, the Complaint makes no attempt to allege a market comprised of retailers and suppliers and therefore should be dismissed. *Big Bear Lodging Ass'n* v. *Snow Summit, Inc.*, 182 F.3d 1096, 1105 (9th Cir. 1999) (affirming dismissal where plaintiffs did not allege their proposed market was "the area of effective competition in which buyers of these products can find alternative sources of supply, or that there are no other goods or services that are reasonably interchangeable" with alternatives); *Tanaka* v. *Univ. S. Calif.*, 252 F.3d 1059, 1063 (9th Cir. 2001) (affirming dismissal based on "conclusory assertion" that the market was "unique and hence not interchangeable").

*Cable Line, Inc.* v. *Comcast Cable Communications of Pennsylvania, Inc.*, 2017 WL 4685359 (M.D. Pa. 2017), *aff'd* 767 Fed. App'x 347 (3d Cir. 2019), illustrates the Complaint's failure. There, Comcast operated on two different levels of the supply chain: it was both a seller of cable services to consumers and a buyer of cable installation services from providers. 2017 WL 4685359 at *8. Plaintiff cable installation companies challenged Comcast's arrangements with installation providers. *Id.* Instead of alleging a relevant market of installation services where Comcast was the purchaser, plaintiffs alleged a market of cable services in which Comcast was the seller and consumers were purchasers. *Id.* The court dismissed the complaint because plaintiffs failed to "properly allege buy-side market power." *Id.* The Court should dismiss for the same reason here: Plaintiffs only allege relevant markets unrelated to the Margin Agreements—the Online Retail Marketplaces Market and Online Retail Sales Market—where Amazon is a seller to consumers, not a buyer of goods at wholesale.

### 2. Taking Plaintiffs' Markets as Alleged, They Are Implausibly Underinclusive and Overinclusive.

**Underinclusive**: The alleged markets are underinclusive because they exclude online single-seller and brick-and-mortar retailers that purchase from the same suppliers. Plaintiffs fail to allege that, from the perspective of suppliers, sales to a single-seller online store or brick-and-mortar retailer are not reasonably interchangeable with sales to an Online Retail Marketplace retailer. Put another way, from the perspective of a supplier of toothpaste or shampoo, wholesale

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

sales to Walmart are reasonably interchangeable with sales to Walmart.com.  *See, e.g.*, *Campfield*, 532 F.3d at 1118 (where alleged buy-side market fails to include "reasonably good substitutes," no relevant market alleged); *Pro Music Rights LLC* v. *Apple, Inc.*, 2020 WL 7406062, at *10 (D. Conn. 2020) (dismissing buyer-side claim where plaintiff "does not allege any facts suggesting that these markets actually exist, nor does it address interchangeability and cross-elasticity of demand").

**Overinclusive**: At the same time, Plaintiffs' Online Retail Marketplace market is overinclusive because it is composed of products which are not reasonable substitutes for one another, but rather includes every product for sale online—including at least 350 million products available in Amazon's store.  Compl. ¶ 91.  From the perspective of both a retailer and a consumer (or anyone), dog food is not a substitute for diapers, which in turn are not substitutes for a computer, even though these products frequently are all available at one store (Walmart, Costco, for example).  Courts have rejected far narrower markets as too broad on a motion to dismiss.  *E.g.*, *PSKS, Inc.* v. *Leegin Creative Leather Prod., Inc.* 615 F.3d 412, 418 (5th Cir. 2010) ("women's accessories" was "too broad and vague a definition to constitute a market"); *Golden Gate Pharm. Servs., Inc.* v. *Pfizer, Inc.*, 433 F. App'x 598, 599 (9th Cir. 2011) (alleged "pharmaceutical industry" market failed "to allege a product market consisting of reasonably interchangeable goods"); *Universal Grading Serv.* v. *eBay, Inc.*, 2012 WL 70644, at *7 (N.D. Cal. 2012) (holding that "plaintiffs provide no authority supporting such an overbroad and amorphous market definition, which would theoretically encompass the market for every one of the millions of items sold through eBay.").

### 3.  Plaintiffs' Submarket Approach Fails.

While more narrow, Plaintiffs' "product category" submarket approach also fails. Compl. ¶¶ 105-06.  Plaintiffs rely on a chart showing Amazon's alleged market share in 18 different categories, but that share is based on Amazon's role as the seller, not as the buyer— the relevant inquiry for a buy-side market.  *Comcast*, 2017 WL 4685359, at *8 ("It does not matter how much market power Comcast has in the cable-provider industry, rather, it matters

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

how much market power Comcast has in the cable installation industry.").  And even from the perspective of the consumer, these submarkets are both overbroad and underinclusive.  For example, "household essentials" include toilet paper and toothpaste; "automotive" includes windshield wiper fluid and tires; and "baby" includes diapers and pacifiers.  But none of these products are reasonably interchangeable, and each is available through single-seller online retailers and in brick-and-mortar stores, as well as in Online Marketplaces.

### 4.  Plaintiffs' Two-Sided Transaction Market Allegations Also Fail.

Plaintiffs try to get around these insurmountable problems by alleging a two-sided transaction market.  Compl. ¶¶ 56-60.  But this effort also fails because the two-sided market on which it relies is comprised of retailers and consumers—while Plaintiffs challenge a restraint involving suppliers and retailers.  *Supra* § I.A.  Even if the transaction market for retailers and consumers were correct, Plaintiffs fail to allege reasonable interchangeability from retailers' and consumers' perspectives.  "Evaluating both sides of a two-sided transaction platform is also necessary to accurately assess competition."  *Am. Express*, 138 S. Ct. at 2287; *see also US Airways, Inc.* v. *Sabre Holdings Corp.*, 938 F.3d 43, 57 (2d Cir. 2019) ("In cases involving two-sided transaction platforms, the relevant market must, as a matter of law, include both sides of the platform."); *Coronavirus Rep.* v. *Apple, Inc.*, 2021 WL 5936910, at *12 (N.D. Cal. 2021) (dismissing where both sides of two-sided transaction platform not evaluated).

### IV.   Plaintiffs' Claims under California and Maryland Law Fail for the Same Reasons Plaintiffs' Federal Claims Fail.

Plaintiffs' *per se* price fixing claims under the California Cartwright Act and Maryland Antitrust Act (Counts 3 and 4) fail because, as explained above, *supra* § I, Plaintiffs lack antitrust standing.  *E.g.*, *Seafarers Welfare Plan* v. *Philip Morris*, 27 F. Supp. 2d 623, 634 (D. Md. 1998) (dismissing claim under Maryland Antitrust Act for lack of antitrust standing); *Song Fi Inc.* v. *Google Inc.*, 2016 WL 1298999, at *5-6 (N.D. Cal. 2016) (dismissing Cartwright Act claim because allegations "do not support that Plaintiffs' injuries were proximately caused by the alleged conspiracy"); *Kolling* v. *Dow Jones & Co.*, 137 Cal. App. 3d 709, 723 (Ct. App. 1982)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

(Cartwright Act requires plaintiff to have "standing to sue," and show that "an antitrust violation was the proximate cause of his injuries").

Plaintiffs also fail to allege any agreement to fix prices, *supra* §§ II, III.A.  Their allegation that the Margin Agreements are *per se* violations of California and Maryland law fails as a matter of law.  Under California law, resale price maintenance involves an agreement that "limits the distributor's freedom to sell the supplier's product at a price independently selected by the distributor; instead, the supplier establishes the price at which its distributors may sell the supplier's products, resulting in maintenance of the resale price at a single level." *Kunert* v. *Mission Fin. Servs. Corp.*, 110 Cal. App. 4th 242, 263 (2003); *see also Mailand* v. *Burckle*, 20 Cal. 3d 367, 378 (1978) (finding illegal resale price maintenance where a franchisor had the contractual right to set the retail price charged customers).[8]  Similarly, Maryland law prohibits conspiracies that "establish a minimum price below which a retailer, wholesaler, or distributor may not sell a commodity."  Md. Code, Comm. Law § 11-204(b).

Here, Plaintiffs do not allege that the Margin Agreements set any retail price.  Instead, the Margin Agreements relate only to the terms on which Amazon purchases goods from wholesale suppliers.  This does not violate the California or Maryland law; "it is just buying and selling with an agreement on transaction prices." *Walker* v. *USAA Casualty Ins. Co.*, 474 F. Supp. 2d 1168, 1175 (E.D. Cal. 2007).

## CONCLUSION

The Court should grant this motion and dismiss Plaintiffs' claims with prejudice.

DATED this 30th day of September, 2022.

---

[8] The Court in *Mailand* held that resale price maintenance was a *per se* Cartwright Act violation based on federal law pre-dating *Leegin*. *Mailand*, 20 Cal. 3d at 376.  The Supreme Court in *Leegin* overruled prior precedent holding that resale price maintenance was a *per se* violation.  *Leegin*, 551 U.S. at 907.

AMAZON'S MOTION TO DISMISS (2:22-cv-00965-JHC) - 24

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Davis Wright Tremaine LLP

s/ *John A. Goldmark*
Stephen M. Rummage, WSBA #11168
John A. Goldmark, WSBA #40980
MaryAnn Almeida, WSBA #49086
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
Telephone: (206) 757-8136
Fax: (206) 757-7136
E-mail: steverummage@dwt.com
E-mail: johngoldmark@dwt.com
E-mail: maryannalmeida@dwt.com

Paul, Weiss, Rifkind, Wharton & Garrison LLP

s/ *Karen L. Dunn*
Karen L. Dunn (pro hac vice)
William A. Isaacson (pro hac vice)
Amy J. Mauser (pro hac vice)
Martha L. Goodman (pro hac vice)
2001 K Street, NW
Washington, D.C.
Telephone: (202) 223-7300
Fax: (202) 223-7420
E-mail: kdunn@paulweiss.com
E-mail: wisaacson@paulweiss.com
E-mail: amauser@paulweiss.com
E-mail: mgoodman@paulweiss.com

Attorneys for AMAZON.COM, Inc.

AMAZON'S MOTION TO DISMISS (2:22-cv-00965-JHC) - 25