The Honorable John H. Chun

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CHRISTOPHER BROWN, SCOTT GRAEBER, LAURA LOES, LETICIA SHAW, and DAVID ATWOOD, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

AMAZON.COM, INC., a Delaware corporation,

Defendant.

No. 22-cv-00965-JHC

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**



# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ..................................................................................................1

II. FACTS ..................................................................................................................2

III. STANDARD OF REVIEW ..................................................................................3

IV. ARGUMENT ........................................................................................................3

    A.  Plaintiffs have standing to recover overcharge damages and for equitable relief. ...........................................................................................3

        1.  Plaintiffs' injuries occurred in the same market where Amazon has restrained trade. ...................................................4

        2.  Plaintiffs are efficient enforcers of antitrust laws. .......................6

    B.  Amazon's MMAs are subject to antitrust scrutiny because they are agreements to raise or stabilize consumer prices by imposing a floor price that unreasonably restrains online retail competition. ..................9

    C.  Plaintiffs plausibly allege that Amazon's MMAs increase consumer prices and reduce competition in the relevant online markets. ...............13

        1.  Quick Look is the appropriate standard because the MMA is anticompetitive and has no procompetitive benefits. ...........13

        2.  Plaintiffs plausibly allege anticompetitive effects. ....................15

            a.  Plaintiffs allege supracompetitive prices. ......................15

            b.  Plaintiffs allege reduced consumer choices. ..................17

        3.  The relevant market is properly alleged as the Two-Sided Online Retail Marketplace Market, or alternatively the Online Retail Sales Market and Product Submarkets ...............19

            a.  Plaintiffs need not allege a relevant market for "quick look" claims...............................................................19

            b.  Plaintiffs properly allege a primary relevant market comprising two-sided online retail marketplaces. ........19

            c.  The alleged relevant online markets and submarkets are neither under- nor over-inclusive.............................21

    D.  Plaintiffs' state statutes provide broader relief than their federal counterparts and permit claims even if plaintiffs' federal claims were found deficient. ......................................................................................22

V.  CONCLUSION....................................................................................................24



1

# TABLE OF AUTHORITIES

2

<u>**Page(s)**</u>

3

## CASES

4

*AAA Liquors, Inc. v. Joseph E. Seagram & Sons, Inc.,*
    705 F.2d 1203 (10th Cir. 1982) ...............................................................11, 15

5

6

*AFMS LLC v. UPS Co.,*
    105 F. Supp. 3d 1061 (C.D. Cal. 2015) ............................................................14

7

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.,*
    190 F.3d 1051 (9th Cir. 1999) ...........................................................................7

8

9

*In re Am. Express Anti-Steering Rules Antitrust Litig.,*
    19 F.4th 127 (2d Cir. 2021) ...............................................................................8

10

11

*In re Amazon.com, Inc. eBook Antitrust Litig.,*
    2022 WL 4581903 (S.D.N.Y. 2022)............................................................15, 16

12

*Andrx Pharms. v. Biovail Corp. Int'l,*
    256 F.3d 799 (D.C. Cir. 2001) ...........................................................................8

13

14

*Apple Inc. v. Pepper,*
    139 S. Ct. 1514 (2019)............................................................................4, 5, 8

15

16

*Arista Networks, Inc. v. Cisco Sys., Inc.,*
    2017 WL 6102804 (N.D. Cal. Oct. 10, 2017)...................................................15

17

*Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.,*
    241 F.3d 696 (9th Cir. 2001) .........................................................................5, 6

18

19

*Associated Gen. Contractors of Ca., Inc. v. Cal. State Council of Carpenters,*
    459 U.S. 519 (1983)......................................................................................5, 6, 7

20

*Atl. Richfield Co. v. USA Petroleum Co.,*
    495 U.S. 328 (1990)............................................................................................11

21

22

*Austin v. Blue Cross & Blue Shield of Ala.,*
    903 F.2d 1385 (11th Cir. 1990) .......................................................................13

23

24

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007).............................................................................................3

25

*Big Bear Lodging Ass'n v. Snow Summit, Inc.,*
    182 F.3d 1096 (9th Cir. 1999) .........................................................................20

26

27

*Bon-Ton Stores, Inc. v. May Dep't Stores Co.,*
    881 F. Supp. 860 (W.D.N.Y. 1994).................................................................22

28



*In re Brand Name Prescription Drugs Antitrust Litig.*,
    123 F.3d 599 (7th Cir. 1997) ................................................22

*Brantley v. NBC Universal, Inc.*,
    675 F.3d 1192 (9th Cir. 2012) ..............................................17

*Brillhart v. Mut. Med. Ins., Inc.*,
    768 F.2d 196 (7th Cir. 1985) ................................................12

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
    485 U.S. 717 (1988)..............................................9, 10, 11

*Butera v. Sun Oil Co.*,
    496 F.2d 434 (1st Cir. 1974)................................................12

*Cable Line, Inc. v. Comcast Cable Commc'ns, of Pa., Inc.*,
    2017 WL 4685359 (M.D. Pa. Oct. 18, 2017) ..............................21

*In re Cal. Gasoline Spot Mkt. Antitrust Litig.*,
    2022 WL 3215002 (N.D. Cal. Aug. 9, 2022) ..............................23

*California v. ARC Am. Corp.*,
    490 U.S. 93 (1989)..............................................................23

*Campfield v. State Farm Mut. Auto. Ins. Co.*,
    532 F.3d 1111 (10th Cir. 2008) ........................................20, 21

*Carter v. Variflex, Inc.*,
    101 F. Supp. 2d 1261 (C.D. Cal. 2000) ..................................19

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    2016 WL 5871243 (N.D. Cal. Oct. 7, 2016)..............................13

*City of Oakland v. Oakland Raiders*,
    20 F.4th 441 (9th Cir. 2021) ................................................6

*Dickson v. Microsoft Corp.*,
    309 F.3d 193 (4th Cir. 2002) ..............................................16

*Eastman Kodak Co. v. Henry Bath LLC*,
    936 F.3d 86 (2d Cir. 2019)..................................................6

*In re EpiPen Direct Purchaser Litig.*,
    2022 WL 1017770 (D. Minn. Apr. 5, 2022)..........................15, 16

*Feitelson v. Google Inc.*,
    80 F. Supp. 3d 1019 (N.D. Cal. 2015) ..............................5, 18

*Fortner Enters. v. U.S. Steel Corp.*,
    394 U.S. 495 (1969)............................................................16


1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

*Frame-Wilson v. Amazon.com, Inc.,*
  2022 WL 741878 (W.D. Wa. March 11, 2022) .......................................................... *passim*

*FTC v. Qualcomm Inc.,*
  969 F.3d 974 (9th Cir. 2020) ................................................................................5

*FTC v. Staples, Inc.,*
  970 F. Supp. 1066 (D.D.C. 1997) ..........................................................................22

*Golden Gate Pharm. Servs., Inc. v. Pfizer, Inc.,*
  433 F. App'x 598 (9th Cir. 2011) ..........................................................................22

*Cal. ex rel Harris v. Safeway, Inc.,*
  651 F.3d 1118 (9th Cir. 2011) ..............................................................................14

*Illinois Brick Co. v. Illinois,*
  431 U.S. 720 (1977) ...............................................................................................4

*Kartell v. Blue Shield of Mass., Inc.,*
  749 F.2d 922 (1st Cir. 1984) .................................................................................13

*Kong v. Trader Joe's Co.,*
  2022 WL 1125667 (9th Cir. Apr. 15, 2022) ...........................................................3

*Kunert v. Mission Fin. Servs. Corp.,*
  110 Cal. App. 4th 242 (2003) ...............................................................................23

*Leeder v. Nat'l Ass'n of Realtors,*
  2022 WL 1307100 (N.D. Ill. May 2, 2022) ............................................................7

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,*
  551 U.S. 877 (2007)..........................................................................................4, 6, 9

*Lewis Serv. Ctr., Inc. v. Mack Trucks, Inc.,*
  714 F.2d 842 (8th Cir. 1983) ................................................................................11

*LifeWatch Servs. Inc. v. Highmark Inc.,*
  902 F.3d 323 (3rd Cir. 2018) ...............................................................................20

*Lorenzo v. Qualcomm Inc.,*
  603 F. Supp. 2d 1291 (S.D. Cal. 2009)...................................................................5

*Lucas v. Bechtel Corp.,*
  800 F.2d 839 (9th Cir. 1986) .................................................................................8

*Monahan's Marine, Inc. v. Boston Whaler, Inc.,*
  866 F.2d 525 (1st Cir. 1989)................................................................................12

*Moreno v. UtiliQuest, LLC,*
  29 F.4th 567 (9th Cir. 2022) ..................................................................................3



*In re Musical Instruments & Equip. Antitrust Litig.*,
 798 F.3d 1186 (9th Cir. 2015) ...................................................................23

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
 933 F.3d 1136 (9th Cir. 2019) .....................................................................5

*Nat'l Soc'y of Pro. Eng'rs v. United States*,
 435 U.S. 679 (1978)...................................................................................11

*Nettles v. Grounds*,
 830 F.3d 922 (9th Cir. 2016) .....................................................................10

*N.M. Oncology v. Presbyterian Healthcare Servs.*,
 418 F. Supp. 3d 826 (D.N.M. 2019) ..........................................................13

*Ohio v. Am. Express Co.*,
 138 S. Ct. 2274 (2018)...............................................................................20

*Orchard Supply Hardware LLC v. Home Depot USA*,
 967 F. Supp. 2d 1347 (N.D. Cal. 2013) .....................................................17

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
 555 U.S. 438 (2009)...................................................................................12

*Pilch v. French Hosp.*,
 2000 WL 33223382 (C.D. Cal. Apr. 28, 2000) ...........................................19

*Pinney Dock & Transp. Co. v. Penn Cent. Corp.*,
 838 F.2d 1445 (6th Cir. 1988) .....................................................................7

*PLS.com, LLC v. Nat'l Ass'n of Realtors v. Nat'l Ass'n of Realtors*,
 32 F.4th 824 (9th Cir. 2022) ......................................................................15

*Pool Water Prods. v. Olin Corp.*,
 258 F.3d 1024 (9th Cir. 2001) .....................................................................6

*Pro Music Rights LLC v. Apple, Inc.*,
 2020 WL 7406062 (D. Conn. Dec. 16, 2020)..............................................21

*PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*,
 615 F.3d 412 (5th Cir. 2010) .....................................................................22

*Randy's Ring & Pinion Serv., Inc. v. Eaton Corp.*,
 2009 WL 10727790 (W.D. Wash. 2009)......................................................18

*Samsung Elecs. Co., Ltd. v. Panasonic Corp.*,
 747 F.3d 1199 (9th Cir. 2014) ...................................................................24

*Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*,
 22 F.4th 103 (2d Cir. 2021) .........................................................................8

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

*Seafarers Welfare Plan v. Philip Morris*,
    27 F. Supp. 2d 623 (D. Md. 1998) ........................................................................24

*Standard Oil Co. v. U.S.*,
    337 U.S. 293 (1949) ..............................................................................................17

*State v. Philip Morris Inc.*,
    1997 Md. Cir. Ct. LEXIS 6 (Md. Cir. Ct. May 20, 1997) ....................................24

*Summit Health v. Pinhas*,
    500 U.S. 322 (1991) ................................................................................................4

*Tanaka v. Univ. of S. Cal.*,
    252 F.3d 1059 (9th Cir. 2001) ..............................................................................20

*Todd. v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001)..................................................................................20

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
    676 F.2d 1291 (9th Cir. 1982) ..............................................................................16

*United States v. Charley*,
    1 F.4th 637 (9th Cir. 2021) ...................................................................................10

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ................................................................................17

*Universal Grading Serv. v. eBay, Inc.*,
    2012 WL 70644 (N.D. Cal. Jan. 9, 2012) ............................................................22

*Verizon Commc'ns., Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ................................................................................................8

*William O. Gilley Enters., Inc. v. Atl. Richfield Co.*,
    2006 WL 8437393 (S.D. Cal. July 17, 2006) .......................................................17

*William O. Gilley Enters., Inc. v. Atl. Richfield Co.*,
    561 F.3d 1004 (9th Cir. 2009) ..............................................................................17

### STATUTES

15 U.S.C. § 1 ................................................................................................................11

Cal Bus & Prof Code § 16750(a) ................................................................................23

Md. Code Ann., Com. Law § 11-202(a)(2) .................................................................24

Md. Code Ann. § 11-209(b)(2)(i) ...............................................................................23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



## I.    INTRODUCTION

Amazon's minimum margin guarantee agreements ("MMAs") coerce its suppliers to adopt minimum resale price policies. These policies do not promote interbrand competition. They are solely intended to prevent retail competition and maintain Amazon's online retail dominance. Under MMAs, suppliers guarantee that Amazon will receive a minimum return from each sale of the supplier's products; if Amazon lowers its price to match a competitor's price, the supplier must pay Amazon the difference between the guaranteed sum and the lowest market price. This financial risk forces the supplier to adopt minimum resale prices with other retailers at the price it guarantees to Amazon or to raise their acquisition costs to achieve the same result.

Plaintiffs are online consumers from California and Maryland, who purchased thousands of dollars of merchandise from Amazon each year. Because of Amazon's restraints of trade and price manipulation, they paid more for their purchases than they otherwise would have. Plaintiffs seek to represent a national class of online consumers to recover overcharges caused by Amazon's restraints of trade and monopolizing conduct in violation of federal antitrust laws, and to represent California and Maryland consumer classes to recover overcharges in violation of California and Maryland antitrust laws.

Amazon's suggestion that its MMAs are beyond the scrutiny of antitrust laws must be rejected. Indeed, in *Leegin*, the Supreme Court characterized the practice of pressuring suppliers to adopt minimum resale price floors to restrain competition as an anticompetitive misuse of vertical price restraints. *See infra* Section IV.B. Amazon's related argument that its MMAs are benign or procompetitive ignores the loss of price competition and higher consumer prices that the Supreme Court predicted, and that Plaintiffs here allege, based on independent reports of market participants and findings of the antitrust subcommittee of the House Judiciary. *See infra* Section IV.C.2.

Amazon's remaining arguments also fail. *First*, Plaintiffs have standing because they are direct purchasers who overpaid at prices inflated by Amazon's MMAs. *See infra* Section IV.A. *Second*, Plaintiffs plausibly allege the relevant markets affected by the MMAs, and indeed need not allege a relevant market under the quick-look approach because Amazon's MMAs are naked

price restraints with no procompetitive justifications. *See infra* Sections IV.C.1 and IV.C.3. *Third*, even if the Court were persuaded that Plaintiffs inadequately pled their federal antitrust claims under the rule of reason, Amazon's arguments in support of dismissal do not apply to Plaintiffs' *per se* state law claims. And Amazon has not raised any state-specific basis to support dismissal of their California and Maryland antitrust claims. *See infra* Section IV.D.

## II.    FACTS

Amazon is the world's largest online retailer. ¶ 34.[1] Amazon operates the Amazon Marketplace platform, where Amazon conducts first-party sales that constitute the principal source of its revenue. ¶ 15. The platform also hosts the transactions of 2.4 million third-party sellers, which make up most sales on the platform. ¶¶ 15, 17. Collectively, Amazon and its sellers offer over 350 million products to its hundreds of millions of customers. ¶¶ 16, 94. Amazon Marketplace has tremendous market presence: approximately 74% of all online shoppers begin specific product searches there, and about 90% of all online marketplace sales occur there. ¶ 14. The House subcommittee on antitrust investigated Amazon and found it has positioned itself as the gatekeeper to internet commerce and engaged in anticompetitive conduct to maintain its dominance, including the use of MMAs. ¶¶ 17, 19–20. Because of Amazon's control over internet sales, few manufacturers—even of very large brands—can avoid doing business with Amazon, and many are compelled to sign MMAs against their independent economic self-interest.

The MMAs work like this: Amazon's supplier guarantees that Amazon will make a specific minimum return (*i.e.*, that it will recoup its acquisition cost and receive a minimum profit) on every sale of the supplier's products, *e.g.*, $15. ¶¶ 3–4. If Amazon reduces its retail price to match a competing online distributor of the supplier's product, *e.g.,* to $12, Amazon recoups from the supplier the $3 difference between the guaranteed minimum and its retail price. *Id.* To avoid this penalty, suppliers are forced to adopt the MMA's guaranteed return as the

---

[1] All paragraph references ("¶ _") in this brief refer to Plaintiffs' Class Action Complaint (Corrected), ECF 4.

PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS - 2
Case No. 22-cv-00965-JHC
010888-16/2069570 V1

**HB** HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

supplier's minimum resale price and enforce this policy against Amazon's retail competition. ¶¶ 5, 7–10, 35. Minimum resale prices are designed to raise or stabilize retail prices.

Amazon's MMAs have achieved their desired result. ¶¶ 7–12. The California Attorney General conducted a two-year investigation of Amazon, which it made public shortly after Plaintiffs filed their lawsuit. The State of California's complaint, which relies on witness statements and documents obtained from Amazon, confirms Plaintiffs' allegations that Amazon's MMAs force its suppliers to adopt minimum resale policies, not for potential pro-competitive purposes, like requiring retailers to invest in additional services for customers, but for the anticompetitive purpose of fixing prices by eliminating price competition with Amazon. ECF 8, Ex. A at 5-7, 65–80 (paragraphs 6-12; 175-204). And this is nothing new for Amazon; the European Commission on Competition also found that Amazon violated competition laws by employing similar provisions that likewise required Amazon's suppliers to guarantee that no other retailer would sell their eBooks at a lower price than on Amazon Marketplace. ¶ 40.

### III.     STANDARD OF REVIEW

On a motion to dismiss, the Court must accept all facts in the complaint as true, view them in the light most favorable to the plaintiffs, and draw all reasonable inferences in their favor. *Moreno v. UtiliQuest, LLC*, 29 F.4th 567, 573 (9th Cir. 2022). A plaintiff need only allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A "well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of th[e] facts alleged is improbable, and that a recovery is very remote and unlikely." *Id*. at 556. "If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Kong v. Trader Joe's Co.*, 2022 WL 1125667, at *1 (9th Cir. Apr. 15, 2022) (quotation omitted).

### IV.     ARGUMENT

**A.     Plaintiffs have standing to recover overcharge damages and for equitable relief.**

Amazon argues that Plaintiffs lack antitrust standing because their injuries did not occur in the same market in which Amazon and its suppliers agreed to restrain trade, and because

**HB | HAGENS BERMAN**

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

1    Plaintiffs are not "efficient enforcers" of antitrust laws. Neither argument has merit. *First*,

2    Plaintiffs have standing as direct purchasers of goods purchased at prices fixed by the MMAs.

3    *Second*, there are no parties more directly injured than Plaintiffs, whose injuries are directly

4    caused by Amazon pressuring its suppliers to adopt minimum resale prices. This is precisely the

5    conduct and harm that the Supreme Court warned of in *Leegin Creative Leather Prods., Inc. v.*

6    *PSKS, Inc.* 551 U.S. 877, 893-94 (2007). Amazon's standing arguments must be rejected.

7        **1.    Plaintiffs' injuries occurred in the same market where Amazon has restrained trade.**

8        Amazon urges that Plaintiffs lack standing because their injuries occurred in the retail

9    market, whereas Amazon and its suppliers agreed to anticompetitive MMAs and enforced them

10   against competing retailers in a "market involving wholesale suppliers selling to retailers," in

11   which Plaintiffs do not participate. ECF 18 at 7–8. Amazon's argument conflates the locus of the

12   conspiratorial conduct with the market in which the restraint operates. If Amazon were correct,

13   standing would be limited to defendants' competitors and direct purchasers could not recover

14   overcharges. But that is not the law. For example, in *Illinois Brick Co. v. Illinois*, 431 U.S. 720

15   (1977), where manufacturers allegedly colluded to fix the wholesale prices of masonry blocks,

16   the Supreme Court did not limit standing to participants in the manufacturing market, where the

17   conspirators carried out their conspiracy. Instead, the Supreme Court held that the masonry

18   contractors had standing because they overpaid for the blocks they purchased from the colluding

19   manufacturers at the price-fixed rate, whereas any overcharges the end consumers paid at retail

20   were allegedly passed on by others in the chain of distribution. *Id.* at 735–36.

21       This straight-forward rule of direct purchaser standing applies equally in cases involving

22   vertical restraints, so that consumer plaintiffs have standing when the purpose or effect of the

23   challenged conduct is to restrain the retail market.[2] For example, the consumer plaintiffs in *Apple*

24   *Inc. v. Pepper*, who purchased iPhone apps developed by third parties and sold by Apple on the

25   iPhone App Store, alleged that Apple used its monopoly power to pressure the app developers

26

27   _____
         [2] In "a civil action under the Sherman Act, liability may be established by proof of *either* an unlawful purpose
28   or an anti-competitive effect." *Summit Health v. Pinhas*, 500 U.S. 322, 330 (1991) (emphasis in original).



into giving Apple 30% commission on app sales and setting their app prices in one-dollar

increments, resulting in supracompetitive retail prices. 139 S. Ct. 1514, 1519–20 (2019). The

Supreme Court held that consumer plaintiffs had standing because they paid supracompetitive

prices directly to Apple, whose conduct with the app developers directly caused the alleged retail

overcharges via an allegedly supracompetitive commission. *Id.* at 1521, 1525. Likewise, in *In re*

*Nat'l Football League's Sunday Ticket Antitrust Litig.*, the Ninth Circuit confirmed consumers'

standing, where they paid an allegedly inflated retail price for DirecTV as a direct result of

alleged anticompetitive agreements between DirecTV, the NFL, and its teams. 933 F.3d 1136,

1158–59 (9th Cir. 2019); *see also Associated Gen. Contractors of Ca., Inc. v. Cal. State Council*

*of Carpenters*, 459 U.S. 519, 539 (1983) ("*AGC*") (denying antitrust standing to party that was

"neither *a consumer* nor a competitor in the market in which trade was restrained") (emphasis

added).

Here, Plaintiffs purchased products directly from Amazon at prices fixed through the

MMAs, which were designed to restrain retail price competition. ¶¶ 1–12, 35–42, 44–55, 82–86,

117. This is a critical distinction between this case and the cases relied on by Amazon, in which

the plaintiffs did not allege agreements to restrain competition in the market in which they were

overcharged. ECF 18 at 7–8. For example, in *Feitelson v. Google Inc.*, the plaintiff Android

phone purchaser alleged anticompetitive conduct "in the market for general and handheld

Internet search" but not in the market for the sale of Android phones. 80 F. Supp. 3d 1019, 1024,

1027–28 (N.D. Cal. 2015). The same is true of the plaintiff cell phone purchaser in *Lorenzo v.*

*Qualcomm Inc.*, who alleged a restraint in "the market for CDMA-related patents and

technology," in which the plaintiff was not an end purchaser. 603 F. Supp. 2d 1291, 1301 (S.D.

Cal. 2009); *see also FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) (where the

alleged restraints occurred in markets for certain modem chips, it was error to analyze

anticompetitive impact "beyond these markets to the much larger market of cellular services

generally"). Similarly, in *Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*, the Ninth

Circuit held that the healthcare provider plaintiffs failed to allege an antitrust injury because "the

nicotine delivery market … is the market where competition allegedly has been restrained,"

while the plaintiffs' injuries occurred "in the health care market." 241 F.3d 696, 704–05 (9th Cir. 2001).[3]

Because Plaintiffs incurred overcharges in the same retail markets (*see infra* Section IV.C.3) that Amazon's MMAs restrained, Plaintiffs have standing to sue for those injuries.

### 2. Plaintiffs are efficient enforcers of antitrust laws.

In *AGC*, the Supreme Court provided a multi-factor approach to determining whether a plaintiff (direct purchaser or otherwise) meets federal antitrust standing requirements. 459 U.S. at 537–46. The Ninth Circuit identifies the *AGC* factors as follows: 1) whether injury is the type antitrust laws were intended to prevent; 2) directness of the injury; 3) whether harm is speculative; 4) risk of duplicative injury; and 5) complexity in apportioning damages. *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 455 (9th Cir. 2021).

Except for the first factor—antitrust injury—which is mandatory, Plaintiffs need not meet all five factors to satisfy federal standing requirements. *Id.* Critically, Amazon does not dispute for purposes of this motion that Plaintiffs satisfy the mandatory first factor as well as factors three through five. *See* ECF 18 at 8–10. Plaintiffs satisfy the first factor because "[a]ntitrust injury means injury from higher prices," which Plaintiffs allege. *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2001) (quotation omitted); *see also* ¶¶ 6, 128. And this injury flows from the conduct that violates federal antitrust law: Amazon charged Plaintiffs supracompetitive prices by engaging in the very conduct that the Supreme Court described as a Sherman Act violation in *Leegin*, 551 U.S. at 893–94, namely pressuring its suppliers to adopt minimum retail prices to enforce against retail competitors that would otherwise sell at a lower retail price, ¶¶ 1–23, 29–33, 35–55, 117, 120–33; *see infra* Section IV.B. The third and fifth *AGC* factors—the speculative nature of the harm and the complexity in apportioning damages— may be considered together and are satisfied because Plaintiffs allege overcharges traceable to the minimum resale prices established by Amazon's MMAs and there are no other direct

---

[3] The general rule that direct purchaser standing is reserved for those who purchased in the market that is the subject of the restraint is not absolute. *Eastman Kodak Co. v. Henry Bath LLC*, 936 F.3d 86, 96 (2d Cir. 2019) ("There is no rule in antitrust law that defendants who undertake to restrain markets by concerted anticompetitive actions can be liable to victims in only one market, much less that they can be liable only in the market that is the first locus of restraint, regardless of the identity of the market that motivated the restraint.").



purchasers to assert conflicting claims for the alleged overcharge. *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1054-55 (9th Cir. 1999). The fourth factor, risk of duplicative injury, raises the *Illinois Brick* problem—where plaintiffs at each level in the distribution chain would be able to recover—which is not present here. *Frame-Wilson v. Amazon.com, Inc.*, 2022 WL 741878, at *4 (W.D. Wa. March 11, 2022).

Plaintiffs do not dispute that *Illinois Brick* and *AGC* address different aspects of a direct purchaser's standing, *see* ECF 18 at 10 n.7, but *Illinois Brick* and *AGC* are fully aligned with respect to the one factor that Amazon challenges: directness of the injury. And, indeed, the Supreme Court relied on *Illinois Brick* to illustrate how courts should apply this factor. *AGC*, 459 U.S. at 543–44; *see also Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1462 (6th Cir. 1988) (The "leading case on directness of injury is *Illinois Brick*[.]"); *Leeder v. Nat'l Ass'n of Realtors*, 2022 WL 1307100, at *7 (N.D. Ill. May 2, 2022) ("Courts have found that the directness-of-injury factor weighs particularly heavily" in cases of "an antitrust challenge by the direct purchaser[.]" (quotation omitted); *Frame-Wilson*, 2022 WL 741878, at *3–4 (holding that consumer plaintiffs have standing to pursue price-fixing and monopoly claims and rejecting Amazon's arguments that consumers' overcharge injuries were too remote).

Against this weight of authority, Amazon argues that the relationship between its anticompetitive conduct and Plaintiffs' injuries is too remote because Plaintiffs were not injured "at the first step of the causal chain of [its] actions." *See* ECF 18 at 9. But to make that argument, Amazon superimposes five purported "steps" to the "alleged harm" onto a chart in Plaintiffs' Complaint without any acknowledgement that it has *altered the original*. Compare ECF 18 at 5, to ¶ 6. Moreover, these "steps" that Amazon inserts into Plaintiffs' allegations merely depict the sequence of events that would occur if suppliers *fail to enforce* the MMAs' minimum resale prices. ECF 18 at 5 and 8–10. Amazon ignores Plaintiffs' allegations that Amazon designed its MMAs to prevent discounts from occurring in the first place. *See, e.g.*, ¶ 5 ("By requiring suppliers to compensate Amazon whenever their products sell below the agreed floor price, the MMAs fix prices by penalizing suppliers unless they suppress competitive pricing from Amazon's rivals."); *id.* ¶ 9 ("By forcing its suppliers to pay for its lost margins, Amazon's

MMAs ensure that its suppliers put an end to 'rogue' discounting."); *id.* ¶ 20 ("Amazon's MMA is one example of the types of anticompetitive agreements that Amazon uses to prevent other online retailers from offering the same product Amazon sells at a lower price."); *id.* ¶ 39 ("MMA penalties coerce Amazon's suppliers to raise wholesale prices to Amazon's retail competitors or otherwise restrict them from offering lower retail prices than Amazon."). Causation is clear: if the MMAs work as Amazon intends, suppliers avoid paying a penalty to Amazon by preventing other retailers from offering lower prices. ¶¶ 29–33, 117. This is a "classic antitrust claim," and Plaintiffs, who directly overpaid the alleged monopolist and horizontal price-fixing conspirator, are plainly "entitled to sue" for their overcharge damages "under the antitrust laws." *Pepper*, 139 S. Ct. at 1519.

Critically, none of the cases Amazon relies on involve direct purchaser standing.[4] For instance, in *In re Am. Express Anti-Steering Rules Antitrust Litig.*, plaintiffs were third-party retailers who alleged they had to pay uncompetitive fees to non-parties *Visa and Mastercard—not to defendant Amex*—because of Amex's anti-steering rules. 19 F.4th 127, 134−35, 139−40 (2d Cir. 2021); *see also Lucas v. Bechtel Corp.*, 800 F.2d 839, 844 (9th Cir. 1986) (plaintiff union electricians, who were neither the defendant's customers nor its competitors, lacked standing to assert claim that defendant monopolized the design and construction of nuclear power plants); *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 116 (2d Cir. 2021) (independent third parties, from whom plaintiffs made the purchases at issue, broke the causal chain linking the plaintiffs' harm to defendants' misconduct); *Andrx Pharms. v. Biovail Corp. Int'l*, 256 F.3d 799, 817 (D.C. Cir. 2001) (addressing competitor's, not direct purchaser's standing). Here, by contrast, Amazon's unlawful conduct caused Plaintiffs to pay higher prices to Amazon. Plaintiffs have alleged that they suffered an injury directly related to Amazon's anticompetitive conduct.

In sum, while not required, all five *AGC* factors support finding that Plaintiffs have antitrust standing.

---

[4] The Court never addressed standing in *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 416 n.5 (2004).

HB HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

**B.**   **Amazon's MMAs are subject to antitrust scrutiny because they are agreements to raise or stabilize consumer prices by imposing a floor price that unreasonably restrains online retail competition.**

Under the MMAs, Amazon's suppliers financially guarantee that Amazon will be able to match its competitors' prices for their products and earn a minimum set profit on each sale. ¶ 3. The actual and intended effect of this financial guarantee is that suppliers adopt the MMA's guaranteed return as their minimum resale price and enforce this policy against Amazon's competitors; if the suppliers do not, they pay penalties to Amazon whenever other online retailers sell the same products at a lower price. ¶¶ 2−12, 20, 29−33, 39, 117. Far from condoning such conduct (*contra* ECF 18 at 13), the Supreme Court in *Leegin* directly warned against underestimating "the potential anticompetitive consequences" of allowing a dominant retailer to control its competition in that way. 551 U.S. at 894. In evaluating the competitive impact of minimum resale price policies, the Supreme Court had little concern if they originated from the supplier, who could impose a floor price on its distributors for procompetitive purposes, *e.g.*, "to stimulate services or to promote its brand." *Id.* at 893. But if a dominant retailer like Amazon is "the impetus for a vertical price restraint," that fact increases the "likelihood that the restraint facilitates" anticompetitive purposes. *Id.* at 898−99. If, as alleged here, "the manufacturer believes it needs access to the retailer's distribution network," it may "consider it has little choice but to accommodate the retailer's demands for vertical price restraints." *Id.* at 893−94. Acquiescing to this demand harms competition by giving the "inefficient retailer[] higher profits," while "[r]etailers with better distribution systems and lower cost structures [are] prevented from charging lower prices." *Id.*

The Supreme Court's analysis in *Leegin* echoes Justice Stevens' dissenting opinion in *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, where he warned that adopting vertical restraints to appease dealers harms interbrand competition. 485 U.S. 717, 746 n.12 (1988) (Stevens, J dissenting). Justice Stevens explained that while manufacturers are "'more likely to seek efficient distribution, which stimulates interbrand competition,'" dealers are "'more likely to seek excess profits, which dampen interbrand competition,'" so courts should focus less on "'manufacturer efforts to control dealer prices, customers, or territories'" and more on dealers'



efforts to implement these restraints "'to control *their* competitors through the manufacturer.'" *Id.* (emphasis in original) (quoting 7 P. Areeda, Antitrust Law § 1457, p. 167−68 (1986)).

The *Leegin* decision ended a century-old precedent of treating minimum resale price restraints as *per se* illegal without regard to their effects on competition. While Amazon dismissively refers to the detailed guidance the Supreme Court provides to courts conducting rule of reason analysis of minimum resale restraints as "dictum," (ECF 18 at 14), that makes it no less binding on this Court. *See United States v. Charley*, 1 F.4th 637, 649 n.8 (9th Cir. 2021) (holding that "well-reasoned dicta" is binding in the Ninth Circuit) (quotation, brackets omitted); *Nettles v. Grounds*, 830 F.3d 922, 930−31 (9th Cir. 2016) ("[W]e afford considered dicta from the Supreme Court a weight that is greater than ordinary judicial dicta as prophecy of what the court might hold.") (quotation, ellipses omitted).

*Leegin* also makes clear that Amazon is wrong to suggest that it should escape antitrust liability because its MMAs pressure suppliers to enforce a minimum resale price against its competitors without binding Amazon to the same restraints. ECF 18 at 14, 24. Such pressure tactics are very much the focus of the Court's guidelines, and Amazon designed its MMAs to cause precisely the anticompetitive harm that *Leegin* warned against: awarding excess profits to Amazon, while preventing more efficient distributors from selling at a lower price, causing artificially inflated consumer prices. That Amazon is not bound by the same price restraints as the distributors it competes with does not allay anticompetitive concerns; it heightens them. Amazon uses MMAs as both a shield, eliminating the risk that price competition will cause it to lose market share or profits, and as a sword, penalizing suppliers for allowing price competition among its own distributors to occur.[5] The purpose and effect of Amazon's MMAs is also very much at issue under the rule of reason analysis (*contra* ECF 18 at 14), which does not stop at the four corners of the agreement, but also examines "the history of the restraint, and the reasons

---

[5] Amazon argues that no "agreement was made to fix a price to another" (sic). ECF 18 at 14. If Amazon means to argue that its MMAs do not violate antitrust law because they do not set specific prices, that is inconsistent with Plaintiffs' allegations that the minimum return guaranteed to Amazon sets a floor price or minimum resale price. *See, e.g.*, ¶¶ 2, 5, 9, 121, 131, 141, 151.

PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS - 10
Case No. 22-cv-00965-JHC
010888-16/2069570 V1

**HB** HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

1  why it was imposed," and its effect on competition. *Nat'l Soc'y of Pro. Eng'rs v. United States*,

2  435 U.S. 679, 692 (1978).

3       Amazon's MMAs therefore do not reflect lawful and procompetitive price negotiations,

4  and none of the cases Amazon relies on say otherwise. ECF 18 at 11-13. First, the Court in *Atl.*

5  *Richfield Co. v. USA Petroleum Co.* assumed for purposes of summary judgment that the

6  defendant *was liable* for vertical price-fixing. 495 U.S. 328, 331−33 (1990). Thus, that decision

7  hardly supports Amazon's brash assertion that any negotiations that result in lower prices "will

8  not be condemned under the antitrust laws," ECF 18 at 11, a proposition that contradicts Section

9  1's prohibition against "contract[s] … in restraint of trade," 15 U.S.C. § 1.

10      Nor are MMAs analogous to the procompetitive sales assistance programs in *Lewis Serv.*

11  *Ctr., Inc. v. Mack Trucks, Inc.*, 714 F.2d 842, 843–44, 848 (8th Cir. 1983), and *AAA Liquors, Inc.*

12  *v. Joseph E. Seagram & Sons, Inc.*, 705 F.2d 1203, 1205–07 (10th Cir. 1982), which were

13  designed to *reduce* consumer prices to *facilitate* interbrand competition.

14      *First*, in *Mack Trucks*, the manufacturer "lower[ed] retail prices to customers and

15  increase[d] interbrand competition" by dropping its wholesale price and guaranteeing its dealers

16  certain minimum profits to allow those dealers to compete against competing brands. 714 F.2d at

17  843–44, 848. In stark contrast, Amazon's MMAs focus only on *Amazon's* guaranteed profits and

18  are designed to *eliminate* price reductions by other retailers.

19      *Second*, in *AAA Liquors*, small liquor retailers challenged an alcohol manufacturer's

20  financial support for a distributor's discount program for large volume retailers—which allowed

21  those retailers to lower prices to compete with other brands—to the detriment of small retailers

22  who did not receive such discounts. The court held that not only should this conduct be

23  permitted, but "the supplier" should be encouraged "to start a price war." 705 F.2d at 1207 (10th

24  Cir. 1982). That same reasoning does not apply to MMAs, which, by contrast, prevent price

25  competition. Rather than lowering consumer prices, Amazon's MMAs generate excess profits

26  for Amazon while eliminating price competition from its online retail competitors, which

27  "dampen[s] interbrand competition." *Bus. Elecs. Corp.*, 485 U.S. at 746 n.12.

28

**HB HAGENS BERMAN**

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

*Finally*, Amazon's reliance on snippets from several inapposite cases to argue that its MMAs are "*per se* legal" and that Amazon has essentially unfettered rights to negotiate any terms it wants with wholesalers is misplaced. ECF 18 at 13–15. These cases involved claims that Plaintiffs do not allege here. As an initial matter, Amazon relies on the unexceptional statement in *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.* that businesses may freely choose their trading partners and "the prices, terms, and conditions of that dealing," 555 U.S. 438, 448 (2009), but Amazon omits a critical caveat— that such dealings be in the absence of conduct that violates antitrust law (which Plaintiffs allege exists here), *id.* at 448–49. Moreover, *Pacific Bell* does not support Amazon's contention that its MMAs are "*per se* legal." ECF 18 at 13. Instead, it holds that a monopolist does not violate antitrust law by charging its wholesale customer a wholesale rate high enough to impede that customer's competition with the monopolist in the retail market price. *Id.* at 452. Plaintiffs do not allege such a claim; they allege that Amazon's MMAs drive its suppliers to cut off supplies to other distributors or increase their acquisition costs if the other distributors undercut Amazon's prices—conduct that *Pacific Bell* did not approve of and that *Leegin* specifically disapproved of. Amazon's other cases are also not on point. *See Brillhart v. Mut. Med. Ins., Inc.*, 768 F.2d 196, 198–99 (7th Cir. 1985) (claims rested on the sole premise, rejected by the court, that in setting the insurer's rates of reimbursement for participating doctors, the insurer, whose board of directors was controlled by doctors, engaged in illegal price-fixing with the competing doctors who participated in the insurance program); *Butera v. Sun Oil Co.*, 496 F.2d 434, 436–37 (1st Cir. 1974) (premise of claim, rejected by the court, was that the plaintiff's supplier engaged in resale price maintenance by frequently changing its wholesale price, which effectively required him to continuously adjust his own retail prices).

The other cases Amazon relies on to try to cast its anticompetitive MMAs as just "aggressive" and "ordinary negotiation[s] between Amazon and its suppliers," ECF 18 at 13–14, are equally inapposite. None involve a monopolist like Amazon forcing suppliers to eliminate price competition for its own benefit. In *Monahan's Marine, Inc. v. Boston Whaler, Inc.*, the plaintiff retailer sought to hold the defendant liable for restraining trade solely on the ground that other retailers received better wholesale prices than the plaintiff. 866 F.2d 525, 528 (1st Cir.

**HB HAGENS BERMAN**

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

1989). In *Kartell v. Blue Shield of Mass., Inc.*, the First Circuit held that a contractual provision that limited participating doctors to the insurer's rate of reimbursement without collecting any additional fees from the patients was not a restraint of trade because it did not impact bargains with other market participants. 749 F.2d 922, 923–24 (1st Cir. 1984). In *N.M. Oncology v. Presbyterian Healthcare Servs.*, the court dismissed the plaintiff clinic's monopoly claims when it failed to establish that the defendant healthcare system had engaged in exclusionary or anticompetitive conduct in the healthcare services market. 418 F. Supp. 3d 826, 847–48 (D.N.M. 2019). Finally, in *Austin v. Blue Cross & Blue Shield of Ala.*, the court held that in the absence of any allegations that the defendant insurer coerced the hospitals to charge uninsured patients and patients covered by other insurers a higher rate than it charged the defendant, it could not be liable for the hospital's alleged practice of shifting costs to patients not insured by the defendant. 903 F.2d 1385, 1389 (11th Cir. 1990).

**C.     Plaintiffs plausibly allege that Amazon's MMAs increase consumer prices and reduce competition in the relevant online markets.**

**1.     Quick Look is the appropriate standard because the MMA is anticompetitive and has no procompetitive benefits.**

Amazon next argues that allegations of a Section 1 claim under a "quick-look" standard must be dismissed because the Complaint purportedly alleges procompetitive justifications for the MMAs. ECF 18 at 15–17. As an initial matter, this is not a basis to dismiss Plaintiffs' claims; whether they should be considered within a quick-look or "rule of reason" framework is best left for the summary judgment stage. *Frame-Wilson*, 2022 WL 741878, at *7 n.1 ("applicability of a quick look analysis is more appropriate on a motion for summary judgment."); *id.* at 11 ("[P]rocompetitive justifications may be used to rebut Plaintiffs' claims once a *prima facie* case has been established, but the Court need not consider such rebuttals on a motion to dismiss."); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 5871243, at *4–5 (N.D. Cal. Oct. 7, 2016) (claim survives if allegations are sufficient under any framework).

Even if this Court is inclined to consider the issue now, Amazon's argument fails. A quick look is appropriate when "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive

**HB | HAGENS BERMAN**

effect on consterners and markets." *Cal. ex rel Harris v. Safeway, Inc.*, 651 F.3d 1118, 1134 (9th Cir. 2011) (citation omitted). If the anticompetitive harm to the market is clear even in the absence of a detailed market analysis, then a quick look is appropriate. *Id.* (citing *NCAA v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 110 (1984)). An allegation of harm to competition, absent procompetitive or net-neutral effects, is sufficient to trigger the quick look. *Id.*

That is the case here. Contrary to Amazon's assertions, ECF 18 at 16–17, the Complaint details how the MMA harms competition and belies any claims of procompetitive effects. By virtue of its dominant position as the largest online marketplace, Amazon coerces its suppliers into the MMA, with its unfavorable and anticompetitive contractual terms, and then uses the MMA to effectively insulate itself against price competition and shift that risk to suppliers. ¶¶ 2– 5, 14, 36, 39. Suppliers, unable to refuse Amazon's demands, raise consumer prices by imposing minimum resale prices against Amazon's online competitors. ¶¶ 6, 9–10, 39. To the extent that Amazon lowers prices for its own consumers, that reduction is temporary and functions to discipline suppliers, forcing them to insure Amazon for that price reduction. ¶¶ 5, 6, 9, 39, 46. The result is higher prices for consumers across a wide variety of goods, reduced choice in where to shop online, and stifled innovation—not lower prices, as Amazon contends. ¶¶ 2, 5, 6, 14, 39, 44-55, 102; ECF 18 at 16. One does not need an economics degree to perceive that coercive contract terms yielding higher prices are harmful; quick-look review is appropriate.

Amazon's cited cases, ECF 18 at 16–17, do not dictate a different result. *Safeway* rejected a quick-look review because, *inter alia*, the revenue sharing provision between competing grocers had uncertain effects on competition and were mitigated by the presence of other significant competitors, who were not parties to the provision. 651 F.3d at 1138. In stark contrast, Amazon's MMA is alleged to suppress price competition and increase prices to consumers, and given Amazon's dominance, the MMA's effects are not tempered by other competitors. Likewise, *AFMS LLC v. UPS Co.* rejected the quick-look approach because the defendants' policy of not negotiating with third-party consultants could plausibly enhance efficiency. 105 F. Supp. 3d 1061, 1082 (C.D. Cal. 2015). Again, this contrasts with Amazon's MMA, which raises prices for consumers and blocks more efficient competitors. And, as

HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

discussed above, in *AAA Liquors, Inc.* the supplier offered retailers lower wholesale prices to help them compete against other brands and faced no coercion in doing so, 705 F.2d at 1205–07, whereas here, Amazon's suppliers are forced to enforce minimum resale price policies against their other retail distributors (*i.e*., raise their acquisition costs or refuse to supply them if they sell below the minimum price) so that Amazon does not have to compete with them.[6]

While the restraints in this case may be vertical, they involve the paradigmatic conduct the *Leegin* court denounced as anticompetitive. The harms are obvious, and a quick look is more than sufficient to demonstrate their illegality.

        **2.**        **Plaintiffs plausibly allege anticompetitive effects.**

Amazon argues that Plaintiffs' claims should be dismissed because they do not allege that the MMAs "cause supracompetitive pricing or otherwise impair competition" (ECF 18 at 17), but this argument ignores Plaintiffs' plausible allegations and is contrary to the case law Amazon cites in support of its Motion.

        **a.**        **Plaintiffs allege supracompetitive prices.**

Amazon first complains that "Plaintiffs do not identify any product that Amazon or another retailer sold at a supracompetitive price." ECF 18 at 17. But the Complaint alleges supracompetitive prices, ¶¶ 6, 22, 128, and a complaint "need not identify specific products that fall into the Relevant Product Markets to survive a motion to dismiss." *Arista Networks, Inc. v. Cisco Sys., Inc.*, 2017 WL 6102804, at \*17 (N.D. Cal. Oct. 10, 2017) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2017)). Amazon next argues that Plaintiffs failed to "allege that *suppliers* subject to Margin Agreements have the market power to raise prices market-wide." ECF 18 at 17–18 (emphasis added). But, per caselaw cited by Amazon, Plaintiffs are only required to "show that the *defendant* has market power." *PLS.com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 838 (9th Cir. 2022) (emphasis added); *see also In re EpiPen Direct Purchaser Litig.*, 2022 WL 1017770, at \*9 (D. Minn. Apr. 5, 2022) (explaining that market share of non-parties is not

---

[6] Other decisions Amazon cites addressed the *per se* standard, which Plaintiffs do not seek here. *In re Amazon.com, Inc. eBook Antitrust Litig.*, 2022 WL 4581903, at \*21-22 (S.D.N.Y. 2022); *Frame-Wilson v. Amazon.com, Inc*., 2022 WL 741878, at \*7 ("Plaintiffs' allegations of a *per se* violation fail" for lack of horizontal agreement).

**HB HAGENS BERMAN**

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

evaluated). Plaintiffs have sufficiently alleged that Amazon dominates the online retail marketplace market. *See, e.g.*, ¶ 87 (Amazon's "market share of the Online Retail Marketplace Market … is estimated to be as high as 90% of all U.S. online marketplace sales"); ¶¶ 87–103 (Amazon dominates the online retail marketplace market without any serious threat from competitors); ¶¶ 104–06 (Amazon dominates markets or submarkets for specific product categories sold online). These allegations of Amazon's market power are also consistent with *Leegin's* warning of the harm caused by a dominant retailer pressuring suppliers to adopt minimum resale price policies to insulate the retailer against competition.

Amazon's argument that the Court may not rely on Plaintiffs' allegations of the aggregate effects of individual MMAs is likewise unavailing. ECF 18 at 18. Amazon relies on non-binding, out-of-circuit, and factually distinguishable cases involving *separate* conspiracies. In other words, they "alleged discrete conspiracies between [Defendant A] and [Defendant B]" on the one hand, "and [Defendant A] and [Defendant C]" on the other. *Dickson v. Microsoft Corp.*, 309 F.3d 193, 210 (4th Cir. 2002). Thus, the courts did not consider the cumulative effect of the anticompetitive behavior. *Id.*; *see also In re Amazon.com, Inc. eBook Antitrust Litig.*, 2022 WL 4581903, at *23 (holding that aggregation of book publisher-defendants' effect on the market was inappropriate where the complaint alleged that each publisher controlled only its own prices after entering into separate agreements with operator of online retail platform), report and recommendation adopted, 2022 WL 4586209 (S.D.N.Y. Sept. 29, 2022); *In re EpiPen Direct Purchaser Litig.*, 2022 WL 1017770, at *9–10 (combining effect of anticompetitive conduct inappropriate where separate conspiracies alleged).

Outside of these circumstances, however, many courts, including the Supreme Court and Ninth Circuit through binding decisions, have held that a court "may look to the overall effects of a defendant's conduct in the relevant market," not just "the implications of the one contract." *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1302 (9th Cir. 1982); *see also Fortner Enters. v. U.S. Steel Corp.*, 394 U.S. 495, 501–02 (1969) ("For purposes of determining whether the amount of commerce foreclosed is too insubstantial to warrant prohibition of the practice, … the relevant figure is the total volume of sales tied by the sales

HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

policy under challenge, not the portion of this total accounted for by the particular plaintiff who brings suit."); *Standard Oil Co. v. U.S.*, 337 U.S. 293, 313 (1949) (considering the aggregate effect of 5,939 separate vertical agreements between Standard Oil and independent gas stations to determine that a prohibited effect on competition had occurred, even though no individual vertical agreement was alleged to have had an anticompetitive effect); *United States v. Microsoft Corp.*, 253 F.3d 34, 70–71 (D.C. Cir. 2001) (aggregating the effects of the defendant's separate vertical agreements with 14 internet providers to conclude plaintiff had shown substantial "harm to competition"); *Orchard Supply Hardware LLC v. Home Depot USA*, 967 F. Supp. 2d 1347, 1360–63 (N.D. Cal. 2013) (following *Twin City* and holding that "aggregating the effect" of separate vertical agreements "is appropriate for the purpose of showing the Defendant Home Depot's conduct was anticompetitive"). Indeed, on appeal of *William O. Gilley Enters., Inc. v. Atl. Richfield Co.*, 2006 WL 8437393, at *3–4 (S.D. Cal. July 17, 2006), cited by Amazon, the Ninth Circuit "conclude[d] that the district court erred in *not* allowing Plaintiffs to aggregate the agreements to demonstrate their anticompetitive effects." 561 F.3d 1004, 1012 (9th Cir. 2009) (emphasis added), opinion withdrawn and superseded, 588 F.3d 659 (9th Cir. 2009).[7]

Here, Plaintiffs allege that Amazon's MMA agreements fix prices for Amazon's benefit in retail markets dominated by Amazon, not discrete conspiracies with suppliers. *See* ¶¶ 4–6. Accordingly, the Court may consider the aggregate effect of Amazon's MMAs in considering whether Plaintiffs have sufficiently alleged anticompetitive effects.

### b.   Plaintiffs allege reduced consumer choices.

As set forth above, Plaintiffs have adequately alleged anticompetitive effects in the form of artificially inflated consumer prices. Plaintiffs also adequately allege reduced consumer choices, as shown by the cases Amazon cites. *See* ECF 18 at 19–20. In *Brantley v. NBC Universal, Inc.*, the Ninth Circuit made clear that "reduced consumer choice and increased prices … establish an injury to competition … when they are the result of an anticompetitive practice." 675 F.3d 1192, 1202 n.11 (9th Cir. 2012). Dismissal was warranted there because the *Brantley*

---

[7] In its superseding opinion, the Ninth Circuit affirmed the district court's holding on the alternate ground of *res judicata*. *William O. Gilley Enters., Inc.*, 588 F.3d at 665–68.



plaintiffs failed to allege that the practices that caused their harm were anticompetitive. *Id.* at 1202. Similarly, the Court in *Randy's Ring & Pinion Serv., Inc. v. Eaton Corp.* dismissed the complaint because it could not determine "the extent to which the agreements between defendant and its distributors have any anticompetitive effect" based on plaintiff's sparse allegations regarding the parties' competing businesses. 2009 WL 10727790, at *5 (W.D. Wash. 2009). Finally, in *Feitelson v. Google Inc.*, plaintiffs failed to "allege the relationship between the [agreements at issue] and competition in the [relevant] market." 80 F. Supp. 3d at 1032. But Plaintiffs here allege in great detail how Amazon's abuse of its monopoly power and MMAs—the relevant anticompetitive conduct—operate to reduce competition and consumer choices in the relevant market. *See, e.g.*, ¶¶ 1–23 (summarizing Amazon's MMAs and their anticompetitive effects); ¶¶ 44–55 (describing how "systematic use of [Amazon's] MMAs" leaves consumers with less "extensive and innovative" options); ¶¶ 102–03 (explaining that Amazon's online retail marketplace failed in the Chinese market because there "consumers have many innovative options for online shopping").

In arguing that Plaintiffs have not supported their allegations of market-wide harm, ECF 18 at 19 (citing ¶¶ 45–46), Amazon ignores Plaintiffs' allegations, supported by industry reports, that the MMAs require suppliers to impose minimum resale prices throughout the relevant online markets. *See* ¶ 3 (Under the MMAs, suppliers "guarantee both that Amazon will be able to price the supplier's product competitively against other online competition at least 95% of the time *and* that Amazon will receive a minimum margin on each sale regardless of the actual price that Amazon sells the product at retail."); ¶ 9 ("Through these policies Amazon is making it clear that *they hold suppliers responsible for managing pricing across the internet*."); ¶ 10 (Amazon employees "literally spider the web and other major retailers to ensure they are basically the lowest." If Amazon matches a lower online price, "Amazon will then direct" the supplier "to other sites like Target and Walmart and tell you to tell them to raise their price[.]").

Thus, Plaintiffs adequately allege reduced consumer choices.[8]

---

[8] Amazon also reiterates arguments concerning market power allegations, which Plaintiffs have already addressed. *See supra* Section IV.C.2.a.

PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS - 18
Case No. 22-cv-00965-JHC
010888-16/2069570 V1

**HB | HAGENS BERMAN**

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

3.     **The relevant market is properly alleged as the Two-Sided Online Retail Marketplace Market, or alternatively the Online Retail Sales Market and Product Submarkets**

Amazon next claims Plaintiffs have failed to allege cognizable relevant markets for either Section 1 or Section 2 claims. ECF 18 at 20-23. These arguments too must fail.

a.     **Plaintiffs need not allege a relevant market for "quick look" claims.**

As noted *supra* Section IV.C.1, a quick look is sufficient to find the MMA unlawful. Under that framework, agreements like the MMAs, which cause anticompetitive harm, can be found illegal without a precise delineation of the relevant market. *See, e.g.*, *Carter v. Variflex, Inc.*, 101 F. Supp. 2d 1261, 1266 (C.D. Cal. 2000) ("the court may apply a 'quick-look' rule of reason without requiring proof of the relevant market or market power") (citing *NCAA v. Board of Regents*, 468 U.S. 85 (1984), and *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447 (1986)).[9]

b.     **Plaintiffs properly allege a primary relevant market comprising two-sided online retail marketplaces.**

Although not required, Plaintiffs do plausibly allege a primary two-sided Online Retail Marketplace Market, "comprised of online platforms that allow consumers to purchase retail products listed by multiple independent sellers without having to leave the platform." ¶ 57. This market is delineated by certain features like the matching of multiple buyers and sellers in one place, convenient online multi-product shopping, and payment intermediation, and excludes brick-and-mortar or single-seller retailers. ¶¶ 64–74.

Amazon contends that this market fails because it "is comprised of retailers and *consumers*—while Plaintiffs challenge a restraint involving *suppliers* and retailers," ECF 18 at 23 (emphases added), and relatedly that "the effects of the alleged anticompetitive conduct" should be analyzed "within the market in which the anticompetitive conduct is alleged to occur" whereas the Complaint "makes no attempt to allege market comprised of retailers and suppliers," ECF 18 at 20–21. As previously addressed, this argument conflates the location of the conspiratorial conduct with the market in which the restraint operates. *See supra* Section IV.A.1.

---

[9] *See also Pilch v. French Hosp.*, 2000 WL 33223382, at *6 (C.D. Cal. Apr. 28, 2000) (quick look is an exception to the rule that antitrust plaintiff must prove a relevant market) (citing *American Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 789 (9th Cir.1996)). Because a quick look is appropriate, Plaintiffs need not allege a relevant market.



Plaintiffs have properly alleged the two-sided market, in which the restraint occurs.

¶¶ 56–86. As noted by the Supreme Court in *Ohio v. Am. Express Co.*—and as Amazon itself

concedes, ECF 18 at 23—in a two-sided platform market both sides of the platform should be

considered. 138 S. Ct. 2274, 2277 (2018). This means that in assessing the anticompetitive harm

caused by Amazon, one should properly consider the effects that conduct has on sellers on one

side of the platform, and on consumers on the other side of the platform. The Complaint

adequately discusses how Amazon's MMA restrains competition on the sellers' side by imposing

minimum resale prices, ¶¶ 82–86, 44–55, and leads to reduced competition and higher prices on

the consumer side, as required by *American Express.* ¶¶ 9–10, 21–23, 82. That is sufficient at

this stage. Moreover, Plaintiffs alternatively allege that the Online Retail Market and the

applicable submarkets are the relevant markets in which to assess Amazon's conduct. ¶¶ 87–106;

*see also Frame-Wilson*, 2022 WL 741878, at *10 (holding that the plaintiffs had plausibly

alleged that the Online Retail Market or the applicable submarkets are the relevant markets for

purposes of assessing Amazon's monopoly power and anticompetitive agreements).

Relatedly, Amazon claims that the relevant market "must be 'comprised of' retailers

'who are seen by' suppliers 'as being reasonably good substitutes.'" ECF 18 at 21–22. In making

this argument, Amazon pulls a sleight of hand, construing Plaintiffs' Complaint as alleging a

monopsony, and as therefore inadequately focused on suppliers' view of Amazon as the "buyer."

*Id.* But Plaintiffs do not allege a buyer-side conspiracy, but rather an unreasonable vertical price

restraint that has the effect of raising prices on the *consumer* side. It is from this perspective that

Amazon's market power and ability to raise prices must be assessed. Amazon's cited authorities,

which predominantly involve markets facing either a buyer-side conspiracy or a single dominant

buyer, *see* ECF 18 at 20-21, are thus inapposite.[10] *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059,

1063 (9th Cir. 2001), also cited by Amazon, is likewise inapposite because it rejected market

[10] *See Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008) (single-buyer monopsony case); *LifeWatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 335-36 (3rd Cir. 2018) (horizonal buyer-side refusal to deal conspiracy, noting that "when a firm exercises monopsony power pursuant to a conspiracy, its conduct is subject to more rigorous scrutiny... .") (citation omitted); *Todd v. Exxon Corp.*, 275 F.3d 191, 201 (2d Cir. 2001) (horizontal buyer-side conspiracy); *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1105 (9th Cir. 1999) (horizontal buyer-side price-fixing conspiracy, where court found flaw in alleged geographic, not product market).

HB HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

allegations based on the geographic scope of the alleged market, an issue that Amazon does not raise. And the plaintiffs in *Cable Line, Inc. v. Comcast Cable Commc'ns, of Pa., Inc.* mistakenly conflated two single-sided markets, in contrast to the two-sided market Plaintiffs have adequately alleged here. 2017 WL 4685359, at *8 (M.D. Pa. Oct. 18, 2017).

### c.   The alleged relevant online markets and submarkets are neither under- nor over-inclusive.

With respect to the Online Retail Market and applicable submarkets, this Court already rejected Amazon's argument (ECF 18 at 21–23) that the alleged markets are underinclusive because they exclude physical stores. *See Frame-Wilson*, 2022 WL 741878, at *10. Plaintiffs likewise sufficiently allege important differences between physical and online retail—the two, for instance, have different prices, cost structures, networks, customers, hours, locations, and services—that makes them not reasonably interchangeable from the perspective of either the suppliers or customers. ¶¶ 13–14, 60–68. The same is true for the two-sided Online Retail Marketplace Market, which is similar to the Online Retail Market but excludes single-merchant online retailers. Plaintiffs provide detailed allegations addressing key attributes of this market, such as the variety and diversity of both suppliers and customers they offer and the additional assurances of payment and data security they provide, that single-seller stores lack; these different features make single-seller retailers inadequate alternatives for both suppliers and customers. ¶¶ 69–75. Plaintiffs' plausible allegations are therefore distinguishable from Amazon's cited cases (ECF 18 at 22).[11]

The Court should also reject Amazon's argument that the markets are overinclusive (ECF 18 at 22–23) for the same reasons it rejected that argument in *Frame-Wilson*. Alleging a relevant market that includes a wide array of products does not mean consumers must consider dog food and diapers to be interchangeable in use; rather, that the marketplace itself has features (independent of the products sold on the marketplace) that consumers desire and retailers compete on. ¶¶ 56–81. Indeed, it is well understood that the "'fact that a customer might buy a

---

[11] *See Campfield*, 532 F.3d at 1118 (single-sided market with single dominant buyer); *Pro Music Rights LLC* v. *Apple, Inc.*, 2020 WL 7406062, at *10 (D. Conn. Dec. 16, 2020) (plaintiff divided alleged monopsonists into "separate, narrow markets," but pled *no* facts that these markets existed and did not discuss interchangeability or cross-elasticity at all).



stick of gum at a supermarket or at a convenience store does not mean there is no definable groceries market.'" *Frame-Wilson*, 2022 WL 741878, at *10 (quoting *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1040 (D.C. Cir. 2008) (product market comprising "premium, natural, and organic supermarkets")); *see also Bon-Ton Stores, Inc. v. May Dep't Stores Co.*, 881 F. Supp. 860, 865, 875 (W.D.N.Y. 1994); *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1080 (D.D.C. 1997) (product market comprising office supply superstores); *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599 (7th Cir. 1997) (alleging industry-wide conspiracy to fix the prices of thousands of brand name prescription drugs that treated different conditions and were not interchangeable in use with each other). The fact that Amazon sells a wide array of products and harms consumers of all of them does not mean that eCommerce marketplaces cannot constitute a product market for analysis of anticompetitive effects; Plaintiffs' allegations are sufficient.[12]

Finally, as discussed, where the impact of Amazon's anticompetitive conduct is felt in the form of supracompetitive prices, it is in Amazon's capacity as a seller to consumers that is relevant. *Supra* Section IV.C.3.b. Thus, Amazon's contention that these markets are deficient because Plaintiffs allege Amazon's market share as a seller, not as a buyer in these subcategories, ECF 18 at 20–22, is incorrect.

### D. Plaintiffs' state statutes provide broader relief than their federal counterparts and permit claims even if plaintiffs' federal claims were found deficient.

For the same reasons that Plaintiffs satisfied the federal pleading requirements, they have also satisfied pleading requirements under California and Maryland antitrust laws. California prohibits price-fixing "'whether the price is fixed among competitors … or businesses at different economic levels.'" *Frame-Wilson*, 2022 WL 741878, at *13 (ellipsis in original) (quoting *Mailand v. Burckle*, 572 P.2d 1142, 1147 (Cal. 1978)). Maryland likewise prohibits agreements "'that establish[] a minimum price below which a retailer … may not sell a

---

[12] Amazon's cited cases are inapposite. *See PSKS, Inc. v. Leegin Creative Leather Prods., Inc.* 615 F.3d 412, 418 (5th Cir. 2010) (rejecting market definition that included only a single brand's products and failed to explain why brand-name products were not reasonably interchangeable with non-brand-name products); *Golden Gate Pharm. Servs., Inc. v. Pfizer, Inc.*, 433 F. App'x 598, 599 (9th Cir. 2011) (market consisted only of the defendants' products and omitted interchangeable substitutes); *Universal Grading Serv. v. eBay, Inc.*, 2012 WL 70644, at *7 (N.D. Cal. Jan. 9, 2012) (plaintiffs failed to explain how eBay's behavior in conducting auctions on its own site would affect consumers on other sites; contrast to this case, where Plaintiffs explain how the MMA raises consumer prices on other marketplaces).

HB HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

commodity or service.'" *Id.*, at \*12 (quoting Md. Code Ann., Com. Law § 11-204(b)). Amazon's MMAs fit a common price-fixing pattern recognized by the *Leegin* Court, in which a dominant retailer controls its competitors' retail prices by coercing its supplier to enforce a minimum resale price policy against them. *See supra* Section I.B. This agreement is a *per se* violation of California and Maryland antitrust laws, whether construed as a minimum resale price agreement or any other agreement to fix retail prices. *Frame-Wilson*, 2022 WL 741878, at \*13 (rejecting "Amazon's argument that Maryland and California *per se* violations are limited to minimum resale price agreements").[13]

Even if credited, Amazon's argument that it has procompetitive justifications for its MMAs and its objections to the quick-look approach, Plaintiffs' market definition, and allegations of anticompetitive effects, *see* ECF 18 at 11–23, provide no basis for dismissal. Procompetitive justifications are not a defense to *per se* claims, nor do Plaintiffs need to prove an adverse effect on the market to prevail. *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1191–92 (9th Cir. 2015). Because Congress did not intend "federal antitrust laws to … displace state antitrust remedies," federal standing requirements (ECF 18 at 7–8) also do not warrant dismissal of their state causes of action. *California v. ARC Am. Corp.*, 490 U.S. 93, 102 (1989). California and Maryland both reject *Illinois Brick* and permit recovery for antitrust injuries that result from a more attenuated and indirect causal chain than is permitted under federal law. Md. Code Ann. § 11-209(b)(2)(i); Cal Bus & Prof Code § 16750(a). Amazon cites no cases where courts applied the *AGC* test to assess standing under the Cartwright Act. *See* ECF 18 at 23–24. The California Supreme Court has never adopted the *AGC* test, and the prevailing view among California federal courts is that it does not apply. *In re Cal. Gasoline Spot Mkt. Antitrust Litig.*, 2022 WL 3215002, at \*3 (N.D. Cal. Aug. 9, 2022) (collecting cases); *see also*

---

[13] *See also Kunert v. Mission Fin. Servs. Corp.*, 110 Cal. App. 4th 242, 253 (2003) (cited by Amazon) ("A vertical price-fixing … agreement between supplier and distributor destroys horizontal competition as effectively as would a horizontal agreement among distributors or retailers and is *per se* unlawful under the Cartwright Act.") (citation omitted). *Kunert* is factually distinguishable because the plaintiffs did not support their price-fixing claim with allegations that the defendant lender controlled the rate at which the auto dealers sold their financing contracts, or that it refused to do business with dealers that sold at a lower rate, or that it imposed any limitation on competition among dealers on the sell rate they charge to buyers. *Id.* at 263–64.

*Samsung Elecs. Co., Ltd. v. Panasonic Corp.*, 747 F.3d 1199, 1205 n.4 (9th Cir. 2014) (California does not treat the Cartwright Act as "coextensive with the Sherman Act.").

The Maryland Supreme Court likewise has never adopted the *AGC* test. And while the court in *Seafarers Welfare Plan v. Philip Morris*, 27 F. Supp. 2d 623, 633 (D. Md. 1998), cited by Amazon, did apply the *AGC* test to assess a private plaintiff's standing, it did so decades before the 2017 statutory amendment that extended to private plaintiffs the right to pursue indirect damages. Because the Maryland statute allows private plaintiffs to assert indirect claims, Maryland's harmonization provision, Md. Code Ann., Com. Law § 11-202(a)(2), requiring Maryland courts to be guided by federal antitrust law in like circumstances, does not impose a requirement to apply the *AGC* test. This issue was addressed in *State v. Philip Morris Inc.*, which held that § 11-202(a)(2) did not support dismissal of the state's indirect damages claims under *Illinois Brick* and *AGC* because, unlike the Clayton Act, the Maryland statute expressly permitted the state to assert such claims. 1997 Md. Cir. Ct. LEXIS 6, at *49 (Md. Cir. Ct. May 20, 1997). Because the Maryland legislature extended a right of action for indirect damages to private plaintiffs, the same reasoning applies.

Therefore, even if Amazon were to persuade the Court that Plaintiffs' allegations were insufficient to support federal antitrust claims, none of the arguments Amazon raises defeats Plaintiffs' standing or right of action under the laws of California and Maryland.

## V.    CONCLUSION

For the foregoing reasons, the Court should deny Amazon's motion to dismiss in its entirety.

DATED this 14th day of November 2022.    Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By: */s/ Steve W. Berman*
Steve W. Berman, WSBA #12536
By: */s/ Barbara A. Mahoney*
Barbara A. Mahoney, WSBA #31845
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
barbaram@hbsslaw.com

KELLER POSTMAN LLC

Zina G. Bash (*pro hac vice*)
111 Congress Avenue, Suite 500
Austin, TX, 78701
Telephone: (512) 690-0990
zina.bash@kellerlenkner.com

Warren D. Postman (*pro hac vice*)
Mary E. Sikora (*pro hac vice*)
1100 Vermont Avenue, N.W., 12th Floor
Washington DC, 20005
Telephone: (202) 918-1123
mary.sikora@kellerpostman.com
wdp@kellerlenkner.com

Jessica B. Beringer (*pro hac vice*)
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Telephone: (312) 280-5788
jessica.beringer@kellerpostman.com

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By:     */s/ Alicia Cobb*
Alicia Cobb, WSBA # 48685
1109 First Avenue, Suite 210
Seattle, WA 98101
Telephone: (206) 905-7000
aliciacobb@quinnemanuel.com



Steig D. Olson (pro hac vice forthcoming)
David D. LeRay (pro hac vice forthcoming)
Nic V. Siebert (pro hac vice forthcoming)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
steigolson@quinnemanuel.com

Adam B. Wolfson (pro hac vice forthcoming)
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
Telephone: (213) 443-3000
adamwolfson@quinnemanuel.com

*Attorneys for Plaintiffs*



**CERTIFICATE OF SERVICE**

I hereby certify that on November 14, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to those attorneys of record registered on the CM/ECF system.

/s/ *Steve W. Berman*
Steve W. Berman

